UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
                                                    :
F. FREDERIC FOUAD,                                  :   Index No.: 1:18-cv-05674-PAC
                                                    :
                                    Plaintiff,      :   **VERIFIED COMPLAINT &**
                                                    :   **JURY DEMAND**
                        v.                          :
                                                    :
THE MILTON HERSHEY SCHOOL AND SCHOOL                 :
TRUST, ELLIOT GREENLEAF PC, PETER GURT,             :
RALPH CARFAGNO, ROBERT HEIST, VELMA                 :
REDMOND, DAVID SALTZMAN, JAMES C.                   :
KATZMAN, JAMES W. BROWN, M. DIANE KOKEN,            :
JAMES M. MEAD, MELISSA L. PEEPLES-                  :
FULLMORE, JAN LOEFFLER BERGEN, ANDREW S.            :
CLINE, and JARAD W. HANDELMAN,                      :
                                                    :
                                    Defendants.     :
                                                    :
------------------------------------------------------------------------x

      Plaintiff F. Frederic Fouad, by and through his undersigned attorneys, Meister Seelig &

Fein LLP, for his verified complaint against Defendants, hereby alleges as follows:

## INTRODUCTION

      1.    This action for *prima facie* tort, abuse of subpoena, abuse of process, outrageous

conduct causing emotional distress, breach of the covenant of good faith and fair dealing, breach

of fiduciary duty, and civil conspiracy to commit a tort centers on Defendant the Milton Hershey

School and Trust ("MHS" or the "MHS Trust") — a scandal-ridden $14 billion child welfare

charity that Defendants have converted into a vehicle of profiteering — and Defendants' tortious

campaign against Plaintiff for his efforts to end Defendants' profiteering and help needy children

who are systematically harmed by Defendants.

      2.    Defendant MHS is operated by a "nonprofit" Board of Managers (the "Board") the

members of which — unlike virtually all other nonprofit boards whose members commit to donate

to and raise money for the charities on the boards of which they serve — pay themselves minimum annual compensation of $110,000 for their "nonprofit" positions, with some Board members having garnered millions in total pay for their part-time "work."

3.      The self-selecting and self-enriching Board also keeps at bay child welfare professionals who would gladly serve without compensation, but who would also put at risk Defendants' lucrative status quo; *i.e.*, Defendants are operating MHS as a money-making scheme for themselves and their cronies, ignoring the interests of needy children, with devastating consequences for those children and their families, as further described below.

4.      For nearly two decades, Plaintiff has pursued MHS governance reforms in an effort to end Defendants' money-making scheme, force Defendants to help vastly larger numbers of needy children, stop Board self-enrichment, prevent Board abuses of needy children, bring child welfare expertise to the Board, and prevent further financial waste, poor policy, and other wrongdoing.

5.      Plaintiff's actions have included, for instance, sounding the alarm when the Board recklessly placed MHS children in dangerous living arrangements that subjected young children to predatory behavior by older children in shared residences, exposing the Board's misuse of child welfare money, and informing oversight officials about Board and MHS administrator misconduct, often before it occurs.

6.      In an effort to punish Plaintiff for this reform work and to silence him — and to thereby preserve a lucrative system that allows Defendants to profiteer at the expense of needy children — Defendant MHS, in concert with the other Defendants named herein and with others, has committed tortious acts, including those set forth below, against Plaintiff on multiple fronts and through various means for nearly the entire 19 years that Plaintiff has sought MHS reforms.

7.      In committing these tortious acts, Defendant MHS has acted through its officers, employees, and agents, including the other Defendants named here, in order to harass, intimidate, marginalize, and neutralize Plaintiff, who is Defendants' most persistent, effective, vocal, and high-profile critic and reform activist.

8.      The profiteering Board members are so intent on protecting their lucrative scheme that they hire unqualified administrators, such as the current president, who is also a Defendant here, solely because they are willing and able to execute the Board's tortious campaign against Plaintiff; *i.e.*, the Board has relied on MHS administrators to do its unlawful "dirty work" against Plaintiff even if it means placing unqualified people in charge of MHS children.

9.      Defendant MHS's attacks on Plaintiff escalated during the last 24 months as Defendants sought to "finish off" Plaintiff and as Defendants became particularly enraged by Plaintiff exposing certain Board and administrative misconduct in 2016, as described below.

10.     In escalating their attacks against Plaintiff, Defendants have unlawfully misused subpoenas and legal process for malicious and improper purposes — not to mention hundreds of thousands of dollars of charitable funds designated for needy children — in order to implement a plan hatched by the Board and administration as early as 2011 as part of continuous tortious conduct against Plaintiff, who is at the top of Defendants' "enemies list."

11.     Defendant MHS's tortious campaign against Plaintiff has included soliciting and logistically supporting a harassing and frivolous lawsuit targeting Plaintiff and other MHS alumni reform activists associated with Plaintiff, use of goons to menace Plaintiff, intimidating and bullying those close to Plaintiff, orchestrating actions to silence Plaintiff, organizing actions to marginalize Plaintiff, maliciously inciting petition drives to marginalize and silence Plaintiff, soliciting physical threats against Plaintiff, and other malicious actions.

12.     Among other things, Defendants have orchestrated internet "mob attacks" against Plaintiff, mass-mailed tens of thousands of letters throughout the country (including to New York) attacking Plaintiff, wrongfully barred Plaintiff from MHS social events in New York, used legal process to maliciously manufacture scandalous and false charges against Plaintiff (including in New York), and have otherwise burdened, intimidated, and oppressed Plaintiff financially, emotionally, and socially for nearly 19 years.

13.     The abuse of subpoena and certain related tortious acts pleaded below have been pursued by Defendants by, among other things, misusing lawsuits in which Defendant MHS is a party but Plaintiff is neither a party, counsel of record for a party, nor a proper witness of any kind; *i.e.,* the subpoenas in these cases have been issued and manipulated strictly for harassment and other tortious ends.

14.     Defendant MHS's campaign of incitement against Plaintiff improperly and unlawfully uses MHS's $14 billion endowment to reward participants financially — including each individual Defendant here — while punishing those who refuse to participate or who vocally oppose the misuse of such funds; *i.e.,* Defendant MHS has dangled lucrative jobs, contracts, high-pay "nonprofit" board seats, and other "rewards" as a means of procuring tortious attacks against Plaintiff by third parties in a veritable "bounty" system.

15.     All individual Defendants here — including Plaintiff's own former lawyers, who are also Defendants in this case after they "switched sides" while the matter was ongoing in a shocking breach of attorney ethics — owe their lucrative MHS positions or contracts to either overtly acting to harm Plaintiff or willingness to allow actions harming Plaintiff.

16.     In one example of the abuses directed at Plaintiff, Defendant MHS's incitement campaign caused the posting online of Plaintiff's unpublished phone numbers, address, and a photo

of Plaintiff's apartment building, with an arrow pointing at Plaintiff's unit, all to intimidate Plaintiff, and a stalker showing up at Plaintiff's New York office and home, causing Plaintiff reasonably to fear for his physical safety, exactly as Defendants intended.

17.   In another instance, Defendants preyed on a deeply troubled individual to goad him into assisting in their tortious campaign, by coaching the individual to manufacture vile and false charges against Plaintiff, which Defendants then disseminated despite knowledge that they were untrue, and indeed, even though Defendants were the source of the charges.

18.   In another instance, Defendants' attacks against Plaintiff led to the creation of a Facebook page devoted to attacking Plaintiff.

19.   In other instances, Defendants' incitement led to calls for Plaintiff's death.

20.   In an effort to completely marginalize Plaintiff, Defendants have also attacked those close to him, including humiliating such persons, harassing them, hurling expletives at them, threatening them with adverse employment consequences when they worked at MHS, and otherwise doing everything in Defendants' power to punish them, all as part of Defendants' tortious campaign to harm, marginalize, and isolate Plaintiff, by bullying and harassing third parties associated with him.

21.   In an effort to prevent journalists from telling the truth about Defendant MHS and the abuses that Defendants direct at Plaintiff, and to otherwise silence journalists, Defendants have also lashed out at reporters who cover MHS matters even-handedly, threatening and bullying such reporters into withholding the truth, so as to enable Defendants' tortious campaign against Plaintiff by keeping Defendants' abuses out of the public light.

22.   Defendants' efforts to silence Plaintiff also include punishing needy families and children who seek Plaintiff's *pro bono* legal assistance, insulting such needy families and children

publicly, attempting to prevent such needy families and children from obtaining Plaintiff's assistance, and using "scorched earth" litigation tactics against them in order to "teach them a lesson" for consulting with Plaintiff at all while also "teaching a lesson" to others who might similarly seek Plaintiff's *pro bono* legal assistance in standing up for their rights.

23.     As described below, a primary ringleader of the tortious campaign against Plaintiff is the current MHS school president whose sordid personal history, professional misconduct, and many scandalous acts illustrate why Plaintiff continues to expose MHS wrongdoing in a way that triggered Defendants' recent escalation in their campaign against Plaintiff, as Plaintiff exposed how the Board has shielded this individual from accountability.

24.     Defendants' nearly 19 years of harassment of Plaintiff is beyond what most people could endure, and all merely because Plaintiff has tried to change an MHS system that is harmful to needy children, places unqualified people in charge of needy children's lives, and squanders resources ostensibly devoted to needy children while enriching people like Defendants, who jealously and ruthlessly guard a system that benefits them.

25.     Most troubling of all, Defendants MHS's mistreatment of the children in its care — including homophobic abuses directed at gay children, sexual abuses of children, driving at least one child to her death, knowingly putting children in dangerous housing arrangements (where Defendants knew such children would be sexually assaulted), tolerating adult misconduct towards children (including the mocking of a sexually abused girl by the current school president), hiring and promoting grossly unfit administrators (including those facing criminal indictment or sent to prison on child pornography charges), ignoring flagrant misconduct and drunken carousing by such administrators, and more — has been so embarrassing to Defendants and has so jeopardized Defendants' lucrative scheme that Defendants have sought to deflect from such by attacking

Plaintiff, scapegoating Plaintiff, and blaming Plaintiff for Defendants' own problems, merely because Plaintiff exposes Defendants' wrongdoing, helps children whom Defendants have harmed, and seeks to change an MHS system that causes all of these problems in the first place; *i.e.,* Defendants have engaged in classic "shoot-the-messenger" tactics.

26.     Having been pushed beyond the brink by the bullying and tortious acts of Defendant MHS and its co-conspirators, Plaintiff now seeks redress through this lawsuit for nearly two decades of Defendants' unlawful abuses.

### VENUE

27.     Venue is proper in this district because Plaintiff resides in this district, continues to suffer injury in this district, and a substantial part of the tortious activities occurred in this district, or were directed to it by Defendants, one of whom resides in this District.

### PLAINTIFF

28.     Plaintiff F. Frederic Fouad is a natural person residing in New York, New York.

29.     Plaintiff is an attorney with an international law practice focused on Japanese matters and is an adjunct law professor teaching professional responsibility in Tokyo, Japan.

30.     Plaintiff received a B.A. *cum laude* from the University of Pennsylvania, a J.D. from New York University School of Law, and was a 2009-2010 Harvard Law School Visiting Scholar.

31.     Plaintiff is also an MHS alumnus, spent seven years of his childhood at MHS after early separation from his family, and has worked with and led other MHS alumni in the MHS reform effort.

32.     Plaintiff has also written extensively on MHS reform issues, child welfare, and charitable trust governance matters, including in *The Nation, The Philadelphia Inquirer,* and *The*

*Harrisburg Patriot-News,* and has also lectured extensively on such matters, including at Harvard Law School, Columbia University, New York University, and Temple University Japan.

33.    Plaintiff is the most outspoken, effective, and persistent activist for MHS governance and program reforms, ones that are recognized by virtually all knowledgeable observers as long overdue, as further explained below.

## DEFENDANTS

34.    Defendant MHS is a Pennsylvania law charitable trust located in Hershey, Pennsylvania and — on one level — serves as a residential school for needy children in grades K through 12, many of whom are from New York, where Defendant MHS also solicits students and conducts substantial activities at issue in this lawsuit. Defendant MHS has been the primary vehicle for — and forms the "hub" of — the tortious conspiracy and campaign to harm Plaintiff at issue here and that commenced in or around the year 1999 and has continued to this day. In executing this conspiracy, Defendant MHS acts through various individual co-tortfeasors who have joined or left the conspiracy over time, whether as employees, officers, directors, agents, or proxies, all lucratively benefitting from their roles in this scheme. Defendant MHS has thus distributed lucrative jobs, contracts, or minimum-work/high-pay "board" seats as a direct reward to individuals who aid Defendant MHS in its tortious campaign against Plaintiff, including all individual Defendants here.

35.    The MHS Trust owns or controls three core companies: the Hershey Company (the iconic candy company), the Hershey Trust Company (a state-chartered trust company and the MHS Trust's "trustee"), and Hershey Entertainment and Resorts (a company that owns and operates local hotels, the Hersheypark amusement park, and other tourist attractions).

36.     The Hershey Trust Company is the MHS Trust's "trustee." The MHS Board of Managers and the Hershey Trust Company Board of Directors are "mirror boards" comprised of the exact same individuals; *i.e.,* the distinction between the two boards is a fiction maintained by MHS Board members to hide their misconduct and profiteering. "MHS" as used herein thus refers to both entities — the MHS Trust and the Hershey Trust Company — as one unitary whole. Attached hereto as <u>Exhibit A</u> is a chart depicting the MHS Trust's organizational structure.

37.     Defendant Peter Gurt is the current MHS president, a resident of Pennsylvania, and has participated in, directed, approved, or ratified all of the tortious conduct described herein, commencing in 2003; *i.e.,* Defendant Gurt is one of the original architects of the tortious campaign against Plaintiff, is a primary ringleader of that campaign, and owes his current lucrative position entirely to having helped the Board fight off reforms sought by Plaintiff, attack Plaintiff, and harass, badger, and oppress Plaintiff in the tortious manner described herein. But for Defendant Gurt's anti-reform efforts and tortious conduct against Plaintiff on behalf of the Board, Defendant Gurt's egregious personal misconduct; grave policy mistakes; sordid and scandalous behavior towards MHS children, young graduates and MHS staff; and flagrant leadership mistakes would have prevented his ever being hired by MHS or in any case would have led to his termination long ago, as described below; *i.e.*, the Board has turned a blind eye to Defendant Gurt's unbroken record of misconduct and policy failure simply because Gurt has "delivered" in coordinating the tortious acts against Plaintiff at issue here.

38.     Defendant Ralph Carfagno is the MHS "Senior Director, Alumni Relations & Programs," a resident of Pennsylvania, and has participated in, directed, approved, or ratified all of the tortious conduct described herein, commencing in 2003, when he helped orchestrate an ugly set of attacks again Plaintiff; *i.e.,* Defendant Carfagno is also one of the original architects of the

tortious campaign against Plaintiff and owes his current position entirely to having helped the Board fight off reforms sought by Plaintiff, attack Plaintiff, and harass, badger, and oppress Plaintiff in the tortious manner described herein, working closely with Defendant Gurt.

39.     Defendant Andrew S. Cline is a lawyer, the MHS "Vice President for Legal Affairs and General Counsel," a resident of Pennsylvania, and has participated in, directed, approved, or ratified all of the tortious conduct described herein commencing in 2013 when he was hired by Defendant MHS in his current role. Defendant Cline approved Defendants' misrepresentations to courts, abuse of subpoena and process, and misuse of child welfare assets to fund a malicious and tortious vendetta against Plaintiff.

40.     Defendants Gurt, Carfagno, and Cline are referred to herein as the "Employee Defendants" and each has been acting both in an individual capacity as well as on behalf of Defendant MHS.

41.     Defendant Robert Heist is a lawyer, chairman of the Board, a resident of Illinois and Massachusetts, and has participated in, directed, approved, or ratified all of the tortious conduct described herein, commencing in 2003, before being named to the Board in 2011, the latter of which was strictly as a reward for his role in the tortious campaign against Plaintiff; *i.e.,* Defendant Heist was given his lucrative Board position for entirely improper reasons, has virtually no qualifications for that position, and is also one of the original architects and a primary ringleader of the tortious campaign against Plaintiff, owing his Board position entirely to having helped the Board attack, harass, badger, and oppress Plaintiff in the manner described herein and working especially closely with Defendants Gurt and Cline.

42.     Defendant David Saltzman is a member of the Board since 2014, a resident of New York, and has participated in, directed, approved, or ratified all of the tortious conduct described

herein, primarily while physically located in New York. Defendant Saltzman flatly refused to hear Plaintiff out or meet Plaintiff when Plaintiff repeatedly sought Defendant Saltzman's intervention to warn him of the misconduct and child-harming policies pursued by Defendant Gurt and others, as alleged below, and to stop the tortious campaign against Plaintiff pursued by Gurt and others, even though Saltzman was apprised that the Pennsylvania Office of Attorney General (the "OAG") had endorsed having such a conversation between Plaintiff and Defendant Saltzman.

43.     Defendant Velma Redmond is a resident of Pennsylvania, was a member of the Board at all relevant times commencing in 2003, and has participated in, directed, approved, or ratified all of the tortious conduct described herein, when she was named to the Board for entirely improper reasons; *i.e.,* Defendant Redmond is one of the original enablers of the tortious campaign against Plaintiff and was only able to enrich herself from her MHS "nonprofit" work — garnering more than $1 million in total pay — due to the success of that tortious campaign. Defendant Redmond was compelled to "retire" from the Board by the OAG in December 2017, after she participated in launching the most egregious of the recent attacks against Plaintiff.

44.     Defendant James M. Mead is a resident of Pennsylvania, was a member of the Board at all relevant times commencing in 2007, and has participated in, directed, approved, or ratified all of the tortious conduct described herein. Defendant Mead was also compelled by the OAG to "retire" from the Board in December 2017 — along with Defendant Redmond, and also garnering more than $1 million in total pay.

45.     Defendant James W. Brown is a resident of Pennsylvania, a member of the Board commencing in 2016, and has participated in, directed, approved, or ratified all of the tortious conduct described herein, or commencing earlier, when he may have already been helping to orchestrate certain of the tortious acts described herein and misled Plaintiff about that fact during

a 2015 encounter in New York when Defendant Brown concealed his then ongoing scheme to secure a lucrative Board seat for himself through his political connections.

46.     Defendant M. Diane Koken is a resident of Pennsylvania, a member of the Board commencing in 2016, and has participated in, directed, approved, or ratified all of the tortious conduct described herein.

47.     Defendant Melissa L. Peeples-Fullmore is a resident of Florida, a member of the Board, and has participated in, directed, approved, or ratified all of the tortious conduct described herein commencing in 2013 when she engaged in attacks against Plaintiff that contributed to her being appointed to the Board as a reward and which appointment followed in 2017 for improper reasons.

48.     Defendant James C. Katzman is a resident of Arizona, a member of the Board commencing in 2017, and has participated in, directed, approved, or ratified all of the tortious conduct described herein.

49.     Defendant Jan Loeffler Bergen is a resident of Pennsylvania, a member of the Board commencing in 2017, and has participated in, directed, approved, or ratified all of the tortious conduct described herein.

50.     Defendants Heist, Saltzman, Redmond, Mead, Brown, Koken, Peeples-Fullmore, Katzman, and Bergen are referred to herein as the "Board Defendants," are being sued in their dual Board capacities (i.e., as members of the MHS Board of Managers and the Hershey Trust Company Board of Directors), as well as in their individual capacities, for their participation, individually, in the tortious conduct described herein.

51.     The Board Defendants all owe their lucrative Board positions entirely to the grossly-flawed MHS governance regime and, as such, have all had a direct vested interest in

promoting the tortious campaign against Plaintiff described herein, whether by approving each individual tortious act or by failing to stop such despite a legal obligation to do so.

52.     Defendant Elliot Greenleaf, PC ("Elliot Greenleaf") is a professional corporation and law firm with its main office in Blue Bell, Pennsylvania. Plaintiff consulted with Elliott Greenleaf in or about 2007 and 2008 — midpoint in Defendant MHS's tortious campaign against Plaintiff — in connection with obtaining advice and counsel regarding that ongoing tortious campaign and asserting claims for tortious conduct that flowed directly from that campaign.

53.     Defendant Jarad W. Handelman is a lawyer, a resident of Pennsylvania, a shareholder in Defendant Elliot Greenleaf, and has participated in, directed, approved, or ratified the tortious conduct described herein, acting both individually and on behalf of Defendant Elliott Greenleaf, Defendant MHS, and the other individual Defendants in this case.

54.     Defendants Elliott Greenleaf and Handelman are referred to herein as the "Elliott Greenleaf Defendants."

55.     Each of the individual Defendants named herein has participated in the tortious campaign to harm Plaintiff during the last one or more years, including by approving the actions of others and refusing to stop those actions despite a legal obligation to do so.

56.     Each of the above-named Defendants' participation in the planning and execution of Defendants' tortious campaign to harm Plaintiff included in-person, telephonic, email, and other direct contacts with New York, including several who participated in at least one June 2015 Board meeting in New York City and with all Defendants participating in conference calls or email exchanges with co-tortfeasors located in New York.

**Defendants Are All Financially Motivated To Participate In The Tortious Campaign Against Plaintiff And Have Special Personal Malice Towards Plaintiff**

57.     The motives for Defendants' tortious acts at issue in this lawsuit are Defendants' desire to defend a money-making scheme that enriches Defendants but visits abuses on needy children and malice at Plaintiff for exposing this scheme and fighting to end it.

58.     The primary beneficiaries of this money-making scheme are the Board Defendants who, as explained below, place unqualified individuals, such as the Employee Defendants, in charge of MHS children, strictly because those Employee Defendants are willing and able to execute MHS's tortious campaign against Plaintiff, who is the major threat to Defendants' money-making scheme, and even though the Employee Defendants lack the qualifications and experience required to serve the MHS student population and thus visit grave harms on MHS students and their families.

59.     To illustrate how lucrative the MHS "nonprofit" Board racket has become, in 2016, just ten MHS "child welfare charity" Board members collected Board compensation aggregating $2,331,664. By contrast, the approximately 239 board members of Harvard, Yale, Stanford, Princeton, MIT, Cornell, and Penn, in the aggregate, received no compensation — to say nothing of how much money many of the latter board members personally contributed to those institutions, or raised for those institutions, in keeping with how virtually every properly-run educational nonprofit board operates.

60.     But MHS Board profiteering is a mere canary in a coalmine of systemic problems that burden the MHS charity and that produce the harms to children and asset misuse that Plaintiff has sought to end by means of his public and vocal reform activities, putting Plaintiff in Defendants' crosshairs as they attempt to keep their gravy train rolling.

61.     The reform efforts that Plaintiff leads has continued for nearly two decades and on four occasions — in 2002, 2003, 2013, and 2016 — came close to success. But each time, the Board — including Defendants here — were able to use their political clout to fight off reforms and preserve their lucrative status quo, to the detriment of needy children and families.

62.     Because Plaintiff has nonetheless persevered in pressing for governance reforms, Plaintiff remains a threat to the Board members' scheme of using their "nonprofit service" as a vehicle of self-enrichment.

63.     If the governance and program reforms that Plaintiff has advocated were in place, MHS's "nonprofit" Board would be comprised primarily of uncompensated and competent child welfare professionals and others with proven records of commitment to child welfare, impeccable personal histories, and professional resumes appropriate for a genuine child welfare charity board; *i.e.,* the Board Defendants would never have obtained their lucrative positions and would be removed from such for the wrongful actions, wasteful decisions, indefensible MHS leadership selections, child-harming policies, unlawful acts, and other wrongs that have occurred at MHS under its existing governance model and the Board Defendants' improper leadership.

64.     More concretely, the governance reforms pursued by Plaintiff would mean, for instance, that Defendants Brown, Heist, Redmond, Mead, Saltzman, and Koken would have each been denied between $121,000 and $403,000 in annual compensation for their "nonprofit" "part-time" "work" in 2016 alone, according to MHS's latest available IRS filings; *i.e.,* Defendant Brown's 2016 MHS pay was $191,000, Defendant Heist's was $196,000, Defendant Redmond's was $216,000, Defendant Mead's was $403,000, Defendant Saltzman's was $114,000, and Defendant Koken's was $121,000, all of which is virtually unheard of in the nonprofit world.

65.     If the MHS reforms sought by Plaintiff were instituted, the profiteering Board members would get no pay and be replaced by full-volunteers drawn to the MHS charity by child welfare goals, rather than a desire for self-enrichment.

66.     Put differently, assuming 10-year "term limits," each Board Defendant has at least $1.2 million in total "nonprofit board" compensation at risk if the reforms pursued by Plaintiff were put into effect.

67.     Similarly, if the reforms sought by Plaintiff were put into effect, Defendant MHS would hire only competent administrators, child welfare-qualified in-house attorneys, and other employees with proven records in child welfare, impeccable personal histories, and appropriate professional resumes; *i.e.,* the Employee Defendants — each of whom was hired for improper reasons — would not have their current positions and would immediately be removed for the wrongful actions, wasteful decisions, child-harming policies, unlawful acts, and other wrongs that have occurred at Defendant MHS under its existing governance model and during their grossly improper tenure.

68.     The reforms sought by Plaintiff would mean, for instance, that Defendant Gurt — whose sordid personal conduct has been a long-running MHS scandal and who has advocated some of the most retrograde and child-harming policies pursued by Defendant MHS — would not have the $602,821 in total annual compensation paid to him in calendar year 2016 alone.

69.     Among the reasons that Defendant Gurt is a primary ringleader in the tortious campaign against Plaintiff and has special malice towards Plaintiff is because Plaintiff has consistently and unflinchingly exposed Gurt's history of misconduct, mistreatment of children, bullying of employees, pathological lying, fostering of adult misconduct and drunkenness around him, numerous policy debacles, and — by virtue of his having any position at MHS — his

epitomizing of MHS governance flaws that allow such an individual to secure a vital MHS child welfare position at all, despite numerous red flags, incompetence, and decisions that contributed to the deaths of at least one child and one young graduate, as described below.

70.     Defendant Gurt's history of misconduct includes perjuring himself in a 1999 MHS court proceeding, being forced to leave MHS in the past for misconduct involving a female subordinate (after which he was later rehired despite this behavior), mocking a sexually abused girl in front of her classmates (for "laughs"), instituting knowingly-dangerous housing policies where children were sexually assaulted, subjecting children to other knowingly-harmful living arrangements, promoting incompetent cronies to key positions, surrounding himself with a circle of fellow alcohol- and drug-abusers whom he helped hire, promoting policies that violate state and federal law, manipulating MHS enrollment policies to help enroll the child of a friend who should not have been enrolled, repugnant behavior and bullying towards subordinates, inappropriate conduct towards young graduates including engaging in sex with a young graduate in exchange, apparently, for giving the young graduate a low-level MHS employment position shortly thereafter, and other behavior completely unacceptable for the head of the world's largest child welfare charity or for any educational institution.

71.     At one point, Defendant Gurt's repeated misconduct was so egregious that concerned houseparents sent an email to the Board detailing his misconduct and that included numerous examples of depraved "jokes" that Gurt told in front of students, off-color and racist "jokes" that Gurt told in front of employees (about African-American genitalia sizes), "jokes" about women's breast sizes, scatological "jokes," and other matters that illustrate how Defendant Gurt has behaved. Attached hereto as Exhibit B is a copy of that email.

72.    Similar to Defendant Gurt, and in league with him, Defendant Heist also has special malice towards Plaintiff because Plaintiff has exposed how Defendant Heist — working hand-in-glove with Defendant Gurt — also maneuvered his way into his current lucrative Board position as a reward for his role in the tortious campaign against Plaintiff, including orchestrating a harassing lawsuit against the Milton Hershey School Alumni Association ("MHSAA") in 2005 in order to disrupt MHSAA's then ongoing reform efforts and including attacking Plaintiff personally and repeatedly, all as part of the Board's strategy for shutting down alumni reform efforts, among other Heist misconduct.

73.    During the period 2013 through 2016, Defendant Heist facilitated the naming of Defendant Gurt as MHS president, after a sham "nationwide search" for a credible president.

74.    Defendant Heist also facilitated the effort to name Defendant Gurt to the Board itself in or about 2016.

75.    Because Plaintiff helped prevent the naming of Defendant Gurt to the Board at that time, Defendants Heist and Gurt became particularly enraged and have been ringleaders in the escalation of the malicious campaign against Plaintiff, together with Defendant Cline, while the other Board Defendants allow Heist, Gurt, and Cline to do the majority of their tortious "dirty work;" *i.e.*, the other Board Defendants are fully aware of Defendant Gurt's history of misconduct, including his penchant for ruthless bullying and sordid behavior towards employees, MHS children, and young graduates, but have nonetheless allowed him to help direct the tortious campaign against Plaintiff described herein, working closely with Defendants Heist and Cline.

76.    Defendant Cline also has special malice towards Plaintiff stemming from Defendant Cline having produced a "whitewash" of MHS Board misconduct in the fall of 2000

(the "K&L Report") while Cline was still in private practice and prior to Cline being hired by Defendant MHS in his current position as a reward, in part for producing that "whitewash."

77.     After Defendant MHS, Defendant Cline, and Defendant Cline's then law firm released their "whitewash" report to much fanfare in the fall of 2000, Plaintiff thoroughly rebutted it in a stinging and publicly-released response called "Bias, Flaw, & Avoidance: A Response to the K&L Report."

78.     That action by Plaintiff exposed Defendant Cline and his then-law partners for abetting and covering up MHS problems, thereby embarrassing Defendant Cline and piquing his malice towards Plaintiff in a way that contributes to Defendant Cline also being a primary ringleader of the tortious campaign against Plaintiff today.

79.     Board Defendants Redmond, Brown, and Koken also have special malice toward Plaintiff because Plaintiff exposed how each of these three "connected" Pennsylvanians secured lucrative Board seats strictly through political cronyism and despite having no meaningful child welfare qualifications; *i.e.,* all three were named to the Board due to their Pennsylvania political connections so that they could profiteer off the MHS charity in lieu of competent child welfare professionals desperately needed on the Board to address MHS's grave and ongoing problems.

80.     Defendant Saltzman also has special malice towards Plaintiff because Plaintiff exposed Defendant Saltzman's profiteering from Saltzman's MHS "nonprofit" Board service, after Saltzman left his prior position as head of a New York-based nonprofit in order to "make more money," as Defendant Saltzman himself openly admitted in 2016.

81.     Defendant Katzman has also been eager to silence Plaintiff since Katzman — as a former Goldman Sachs businessman who has fostered a public myth of himself as an "ethics whistleblower" — has, on the contrary, coveted the lucrative benefits of serving on the MHS

"nonprofit" Board but not wanted the attention brought to his "nonprofit" board profiteering by Plaintiff's reform efforts, including exposing how Defendant Katzman improperly used his Goldman Sachs/Hershey Company work to secure his current exorbitant MHS pay.

82.   The rest of the Board Defendants are similarly embarrassed because Plaintiff keeps exposing their use of the MHS child welfare charity for shameless profiteering coupled with their blatant policy blunders, and thus are all eager to see Plaintiff silenced, regardless of what it takes to cause that silence, so that they can continue to enrich themselves without the spotlight that Plaintiff keeps shining on their behavior.

83.   In sum, each Defendant named herein has been motivated by malice towards Plaintiff to join the tortious campaign against Plaintiff, Defendant MHS's most outspoken, effective, and persistent public critic and thus the primary risk to their money-making scheme.

84.   Even when Plaintiff has tried to alert individual Board members to mistreatment of MHS children, gross misconduct by Defendant Gurt (some of which is outlined below), and the tortious acts being committed against Plaintiff by Defendant Gurt and others, the Board members refused to listen, let MHS children be mistreated, and let the tortious campaign against Plaintiff continue, because that path is more lucrative to Defendants.

85.   On two occasions — in 2013 and 2016 — the Board chair at the time refused to listen to Plaintiff's warnings and within a month deaths at MHS followed: first, in 2013, a 14-year old girl committed suicide after MHS leadership decisions, including the decisions of Defendant Gurt, led to her expulsion from MHS; and later, in 2016, a young graduate was allowed to die of gross neglect in "transitional housing" after cronies of Defendants Gurt failed to discharge their duties properly.

86.     On another occasion, the Board refused to heed Plaintiff's warnings over several years about dangerous "multiage housing" arrangements and a spate of horrific and predictable sexual assaults followed, coming to light in 2012; i.e., a full ten years after Defendant MHS made promises to end "multiage housing" but nonetheless continued it under Defendants Gurt, Heist, Mead, Redmond, and other unqualified MHS decision-makers.

87.     But because in all cases the child victims were powerless and from impoverished families, not a single MHS Board member or employee was held responsible and only Plaintiff and his fellow alumni reform activists kept this matter in the public light.

88.     On another occasion, Plaintiff repeatedly warned Defendant MHS about the inherent danger of a 20-child per bedroom housing experiment known as "Springboard Academy" which served as an intake facility, but the Board again stubbornly barreled forward with the "experiment" and fiscal and program debacle followed, with $37 million wasted.

89.     Here as well, the Board and administration faced no accountability.

90.     Many similar warnings from Plaintiff about MHS leadership failures and misconduct have also been ignored by a Board and administration that has instead chosen to "shoot the messenger" and pursue the tortious campaign against Plaintiff as alleged below.

91.     Ultimately, the more that Plaintiff has persisted in exposing MHS Board and administration misconduct, policy flaws, poor personnel choices, self-enrichment, and other wrongs, the more eager Defendants have become to try to harm Plaintiff, bully him, and silence him, rather than fix MHS problems, because the latter might put their lucrative positions at risk.

# BACKGROUND

## Brief History of the MHS Trust

92.     Defendant MHS was established as an orphanage in 1909 by candy magnate Milton S. Hershey, who had no natural children of his own.

93.     In a singular act of kindness, the legendary chocolate maker bequeathed his entire fortune to save as many orphan children as possible in what was then the most advanced and well-run facility of its kind.

94.     But shortly after Mr. Hershey's death in 1945, his charitable vision was derailed.

95.     Ignoring their duties, the MHS Board began diverting the charity's resources from needy children to their own goals, with the indulgence of public officials.[1]

96.     This included making MHS personnel and asset-use decisions for non-child reasons; *i.e.*, for decades, the Board placed local development, related-entity business, and other non-child interests above the rights of poor children, leading to MHS fiscal and program debacle.

97.     The Board even went to the Orphans' Court in Harrisburg, Pennsylvania — which has supervisory responsibility over Defendant MHS — on two occasions to seek court approval to openly divert Trust assets away from needy children, in 1963 and then again in 1999, falsely claiming both times that MHS "could not serve additional children."

98.     The Board also learned early on to enlist certain key alumni to abet wrongdoing, providing the Board with "cover" and helping assure that alumni would remain docile.

---

[1]     *See, e.g., "The Chocolate Trust: Deception, Indenture and Secrets at the $12 Billion Milton Hershey School,"* by Bob Fernandez, Camino Books, June 1, 2015. *See, also,* Evelyn Brody, *"Whose Public? Parochialism and Paternalism in State Charity Law Enforcement,"* 79 Indiana Law Journal 937, 998-999 (2004) ("The Hershey case shows each of the three branches of Pennsylvania government acting illegitimately. The attorney general practically treated the Hershey assets as his campaign funds. [...] The Hershey case illustrates that the value of narrowly-confined [i.e., child welfare] assets does not disappear—it just gets appropriated by those with power at their disposal.").

99.     The reason for the latter is that in an environment where Board wrongdoing is rarely challenged by the general public or Pennsylvania oversight officials, MHS alumni are the only group that might prove an exception and thus constitute the one real threat to Board wrongdoing, if not carefully managed.

100.     For the same reason, Defendants have sought to drive a wedge between Plaintiff and his fellow alumni and otherwise have tried to prevent Plaintiff from even having contact with alumni, one of the central goals of the tortious conduct at issue here.

101.     In a kind of "placing the inmates in charge of the asylum," the Board has also historically distributed MHS administrative and staff positions to unqualified alumni, because that has also been found to placate alumni generally.

102.     Examples of the latter include Defendants Gurt and Carfagno, who — despite personal conduct that should have been disqualifying and their lack of credible qualifications — were given their positions strictly because they were willing to spearhead the tortious campaign against Plaintiff and otherwise lead the effort to undermine the alumni reform movement.

103.     Defendant Gurt, for example, has a history of sordid personal conduct that includes mocking the tragedy of an underage MHS girl who was the subject of a three-on-one sex video, and joking about the behavior in front of the girl's entire class. *See, e.g., "How child-porn case led to Hershey School," Philadelphia Inquirer,* November 2, 2011 ("On a matter of sex among students…a [federal lawsuit described] an incident in which four students were caught engaging in sex during a school-sponsored vacation to an amusement park in Ohio. [The then] vice president for residential life, Peter Gurt, is said to have joked about the situation during a school social event. [Gurt pointed to one of the perpetrators and referred to the] boy as having had 'the best ride in

Ohio' ... A 2005 graduate who witnessed Gurt's comment said… 'We laughed hysterically about it because some of the kids involved were in our class.'").

104.    In no other child welfare charity would such conduct have been tolerated.

105.    But at Defendant MHS, Gurt was thereafter given several raises and promotions, until attaining his current position as MHS president and nearly being named to the Board.

106.    Defendant Gurt has otherwise engaged in similar or worse personal conduct, including, making jokes about priests raping school boys and illustrating the "joke" with his own hip thrusts to demonstrate the rape "technique" on a mock "victim" — also before an audience that included MHS children.

107.    Defendant Gurt is otherwise notorious for foul-mouthed "jokes" and alcohol- and drug-fueled partying together with a group of administrators whom he has carefully cultivated and promoted on the basis of his ability to control them, all of which has resulted in MHS policy debacle, deplorable adult conduct, and snowballing problems.

108.    The administrators that Gurt handpicked — and who are approved by the lackadaisical Board — have been responsible for numerous bad MHS decisions and adult misconduct.

109.    Among the policy debacles for which Defendant Gurt bears major responsibility are: a child-crowding experiment that placed students in 20-child bedrooms; multiple violations of the Americans with Disabilities Act (the "ADA") leading to two Department of Justice ("DOJ") investigations; placing MHS children in dangerous "multiage housing" living arrangements; ugly and vindictive bullying of employees who cross him; and other incidents that in a properly-run child welfare facility would have disqualified Gurt from any role at all.

110.     At one point, in seeking to rationalize a retrograde housing scheme that would place MHS students in 40-child "H-Blocks" constructed like prison wings, Defendant Gurt boasted to alumni: *"We call this 'Back to the Future!;" i.e.,* Gurt openly bragged about reintroducing child-crowding policies that MHS itself had long since abandoned as dangerous.

111.     Plaintiff helped defeat the latter child-crowding scheme and exposed Defendant Gurt's shilling for it, thereby further enraging Gurt, who is held out by the Board as an ostensible MHS "child welfare expert" on the basis of this kind of sloganeering, all of which contributes to policies that systemically harm MHS children.

112.     The Board even sought to elevate Defendant Gurt to the Board itself in 2016, in an attempt to falsely claim that it had finally fulfilled its promises to add "child welfare expertise" to the Board, only to be thwarted in so elevating Gurt by Plaintiff's whistleblowing.

113.     Defendant Carfagno — as a reward for helping orchestrate attacks against Plaintiff starting in 2003 — was placed in charge of "advising" MHS students on such matters as college selection and enrollment, even though Carfagno (who at the time had just been laid off and was desperate for any job) had no qualifications for the position, not even a college, junior college, or trade school degree, beyond his MHS high school diploma (in vocational education).

114.     Nonetheless, in keeping with Defendant MHS's practice of rewarding alumni who participate in the tortious campaign against Plaintiff, Defendant Carfagno was placed in charge of "advising" students on college enrollment matters along with "supervising" a staff that included individuals with doctorates and other advanced degrees, a matter that was the subject of ridicule among MHS employees outraged by this dubious personnel decision.

115.     Defendant Carfagno was also given that position because his crony Defendant Gurt helped arrange the hire, in part because Carfagno is also in the circle of drug- and alcohol-abusers

with whom Gurt surrounds himself; *i.e.,* Carfagno is part of an MHS leadership clique notorious for "partying" and several of its members have been arrested on DUI charges.

116.    After Plaintiff helped expose the Carfagno hiring fiasco, Defendant Carfagno's role was quietly changed and the embarrassment this caused Carfagno contributes to his malice towards Plaintiff in pursuing the tortious campaign at issue here.

117.    A similar placing-the-inmates-in-charge-of-the-asylum dynamic has tainted MHS Board selection, as compromised MHS alumni — such as Defendants Heist and Peeples-Fullmore — are handed lucrative Board seats strictly because they are willing to participate in the tortious campaign against Plaintiff and otherwise show themselves willing to prop up the MHS status quo, despite having virtually no qualifications on matters concerning the residential care of at-risk children.

118.    In other words, at both the administrative and Board levels, the MHS system promotes the worst kind of people and marginalizes those who would put needy children first, pursue quality child welfare programs, seek genuine progress, and require healthy governance: MHS has been converted into a charity that hurts needy children but enriches opportunists.

**Flawed Governance Has Thwarted MHS Growth And Harms Poor Children**

119.    The Board's improper priorities, flawed governance, and systemic and grand-scale diversion and waste of child welfare assets over time is evidenced by the following figures: in 1970, MHS assets totaled $180 million and the charity served 1,600 children — but today, assets have grown to more than $14 billion while MHS still serves only 2,000 children; *i.e.,* over a 48-year span, MHS added some $14 billion to total assets but grew enrollment by a mere 400 children.

120.    This is the most egregious and disturbing asset deployment failure in child welfare charitable trust history.

121.    Indeed, there is simply no child welfare charity anywhere ever that has served so few children despite boasting such vast resources and that has exhibited such abysmal growth metrics over so many decades.

122.    Defendant Gurt has played a direct role in this failure; *i.e.*, when the Board went to the Orphans' Court in 1999, after decades of artificially suppressing the number of children served, and sought court permission to divert child welfare assets to serve even fewer children, Defendant Gurt — in his then role as the MHS director of enrollment — was called on to "testify" to the fiction that MHS "could not serve additional children" so that the Board could obtain court approval to use hundreds of millions of dollars for non-child purposes.

123.    Gurt later admitted that his testimony was perjurious. Attached hereto as <u>Exhibit C</u> is an email where Gurt makes this admission of lying under oath.

124.    But a simple arithmetic measure of Defendant MHS's failure to grow over time does not reflect the depth and breadth of MHS's failure.

125.    For instance, Defendant MHS also has a disturbing attrition rate of approximately 75% over time; *i.e.,* if 100 children are enrolled in MHS as kindergartners, 25 or fewer children will graduate while 75 will either be expelled or withdrawn, after MHS programs fail them.

126.    That disturbing attrition is despite MHS spending $118,000 per-child annually, which is the largest per-child budget for any comparable child welfare facility in the world and reflects bloated "nonprofit" Board pay, extravagant administrative salaries, and such Board indulgences as spa treatments, free golf, and luxury hotel stays that the "nonprofit" Board members lavish on themselves and their families.

127.    The Board and MHS leadership then blame the removed children for "not adapting" to MHS programs, ones that in many ways are archaic and discredited; *e.g.,* MHS alone

— under a Board bereft of child welfare professionals — entices poor families to surrender children as young as four-years old to live in MHS's group homes, a backwards and psychologically harmful policy abjured by virtually everyone in child welfare today.

128. But Defendant MHS is pursuing such family separation as a matter of 100-year old policy that the Board is too incompetent to change.

129. MHS's 75% attrition rate also produces severe trauma on its victims — needy children and families — and demonstrates that, net-net, Defendant MHS is likely harming far more children and poor families than it helps, when factoring in all of the gratuitous trauma being inflicted.

130. In other words, Defendant MHS is spending vastly more money per child than any other child welfare charity in history but likely damaging more children than it helps.

131. These are all matters that Plaintiff has worked tirelessly and publicly to expose and change, thus drawing Defendants' wrath.

132. MHS's disturbing attrition rates also reflect MHS's failure to evolve programs over time, such as breaking up loving families merely because of poverty while refusing to serve foster care children or wards of the court.

133. The MHS Board would recognize all of this and other glaring flaws, and remediate it, if the Board had competent child welfare professionals among its ranks.

134. But the insular Board keeps competent child welfare professionals at bay in favor of politically well-connected individuals who can be bought off to help perpetuate a self-enriching status quo — individuals like Defendant Brown, who "retired" in 2016 from a prominent position in Pennsylvania Democratic circles (as Senator Bob Casey's chief of staff) only to parachute into

his lucrative MHS "nonprofit" Board seat as a means of padding his retirement income from assets ostensibly devoted to needy children.

135.   As part of how this scheme works, Defendant Brown's political connections in turn help the Board fight off reforms and allow him and his co-Defendants to unleash on Plaintiff the tortious attacks at issue here, without concern that oversight officials will put a stop to misuse of child welfare assets for the unlawful and impermissible purposes described here.

136.   The Board is similarly methodical in "recruiting" only other new members who will help perpetuate the status quo; *i.e.,* each and every Board member is cut from the same cloth as Defendant Brown and was carefully vetted to be sure that they would uphold a status quo that is lucrative for them but bad for needy children and families, as the Board places maintaining its grip on wealth and power above the need to add the child welfare expertise required for proper decisions affecting the lives of countless poor children.

137.   By way of broad comparison, Boys Town is another classic orphanage founded at around the same time as MHS and that today has about $1 billion in its endowment.

138.   Boys Town thereafter evolved into a model provider of empirically-tested programs and services and today serves over a million children and family members across a broad range of programs in numerous locations throughout the country — and all under a board of uncompensated individuals, with proper backgrounds that include child welfare.

139.   Meanwhile, MHS has failed to use its billions to create even one satellite campus, evolve existing programs, or expand programs, while refusing to abandon knowingly-harmful programs or otherwise use its vast assets to serve needy children, as specified in the MHS Deed of Trust, in a rational or child-focused manner — and all under a "nonprofit" Board that pays itself millions but lacks any genuine child welfare expertise.

140.    If Defendant MHS had knowledgeable child welfare professionals managing its substantial assets as the world's single largest child welfare charity — instead of individuals drawn to MHS strictly by a desire for self-enrichment — MHS could have ended foster care as it is now known in Pennsylvania; i.e., rescued some 13,000 foster care children, or otherwise changed the face of child welfare across the state and beyond.

141.    Nor is there any lack of qualified full-volunteers ready, willing, and able to serve on the Board and help MHS turn around archaic programs, embrace empirically-tested changes that are better for poor children and families, hire qualified administrators, and guide MHS in deploying assets in other locations and satellite schools, as should have long since occurred.

142.    For instance, two dozen or more sterling-caliber candidates submitted resumes to MHS after a 2016 OAG shakeup that included Board promises to add child welfare expertise.

143.    These candidates also all offered to serve without compensation and included Richard P. Barth (the Dean of the School of Social Work at the University of Maryland), Elizabeth Bartholet (the Morris Wasserstein Public Interest Professor of Law at Harvard Law School and Faculty Director of Harvard Law School's renowned Child Advocacy Program), Robert C. Fellmeth (the Price Professor of Public Interest Law of the University of San Diego School of Law, Executive Director of the Center for Public Interest Law, and Executive Director of the Children's Advocacy Institute), Dr. Charles Nelson (the Director of Research at the Developmental Medicine Center of Boston Children's Hospital, a member of the faculty of Harvard Medical School, and one of the world's leading authorities on the affect of institutional care on child development), Richard Altman (former head of Jewish Foster Care Services of New York and one of the nation's leading authorities on out-of-home care), and other nationally- and internationally-

recognized figures who could and would have dramatically improved every aspect of MHS Board decision-making.

144.    But none of these candidates was afforded so much as a single interview, as the Board members instead again broke their promises to add child welfare experts and instead just continued protecting their lucrative status quo by naming more clones of themselves; *i.e.,* Board members who will gladly take the money and not make waves, including joining the Board's tortious campaign against Plaintiff, the most outspoken critic of this self-enriching and self-perpetuating racket.

145.    Thereafter, in December 2016, Plaintiff led alumni reform activists in again exposing this pattern, after Plaintiff learned that the Board intended to name Defendant Gurt and three other unqualified individuals to the Board instead of competent child welfare professionals.

146.    Plaintiff publicly exposing this Board intention to add Defendant Gurt and three other unqualified candidates contributed to the OAG putting its foot down and blocking the attempt to add Gurt and the other three to the Board.

147.    That action by Plaintiff, in turn, provoked the most recent, escalated, and malicious stage of Defendants' tortious campaign against Plaintiff, as Defendants became especially enraged at Plaintiff for disrupting their latest machinations.

148.    The most recent stage of the tortious campaign against Plaintiff includes, as one of its components, the diabolical use of subpoenas for pure harassment purposes and the use of sham "court filings" solely to engage in defamation (within the privilege afforded to statements made in court proceedings and which are thus immune from liability for defamation).

149.    As a result of the dysfunctional Board-selection/administrator-hiring vicious cycle described above, administrators hired by Defendant MHS in recent years have included an MHS

president caught fabricating his academic credentials (claiming a Johns Hopkins University "graduate degree in psychology" that he did not have), an interim president under federal investigation for political corruption (who eventually pleaded guilty to criminal charges), an administrator sent to prison on child pornography charges (who had been responsible for training MHS "houseparents"), and other administrators notorious for disturbing personal conduct and incompetent child welfare decisions, epitomized by serial offender Defendant Gurt.

150.     These MHS administrators — including presidents who have all been selected after sham "nationwide searches" that rejected genuinely-qualified candidates — in turn implement indefensible policy, put children in danger of sexual and other abuses, pursue reckless child-crowding "experiments," needlessly separate young children from loving families, and otherwise so warp MHS programs that vastly more children are removed from MHS than ever graduate, even as MHS spends $118,000 per child annually.

151.     Plaintiff has worked tirelessly, selflessly, vocally, publicly, and effectively for nearly two decades to remedy and reform these systemic problems, ones that threaten the safety of children in the care of MHS and that pervert the child-saving vision of Milton S. Hershey.

152.     But rather than heeding alarm bells, reassessing programs, and bringing child welfare professionals onto the Board in the manner that Plaintiff, reform activist alumni, the OAG, leading charitable trust commentators, and others have long implored, Defendants instead hide their problems with massive public relations spending, force needy children and families to suffer the consequences, and try to punish, silence, and harm reform activists like Plaintiff for exposing Defendants' failures and for persisting in seeking positive change.

153.    MHS is thus today a sick and dysfunctional patronage juggernaut that teems with Pennsylvania insiders and others who have glommed onto the charity to score high-pay jobs, lucrative board seats, hefty vendor contracts, rich legal fees, and other charitable lucre.[2]

154.    These are not merely esoteric or academic matters but instead grave problems that destroy children's lives, break up loving families, waste hundreds of millions of child welfare dollars, and foster many avoidable tragedies.

155.    Other concrete harms to MHS children that flow from MHS systemic flaws include: the most notorious pedophile in Central Pennsylvania history molesting untold numbers of MHS's youngest students;[3] the above-described conduct of Defendant Gurt; an employee going to prison for secretly video-recording naked students as they showered;[4] employees committing sexual crimes against children;[5] one young graduate dying in transitional housing after her houseparents (Defendant Gurt's drinking-circle cronies) failed to adequately monitor her; other children facing homophobic abuses including being forced to watch "gay conversion therapy" videos (at the hands of "housemother" Deanna Slamans, who is another Defendant Gurt crony and who was thereafter promoted by Gurt to the position of "Director of Emotional Development");[6]

---

[2]     *See, e.g., "High Cost of Hershey School-Related Boards," Philadelphia Inquirer,* July 25, 2010, ("Four prominent Pennsylvania Republicans are earning more than a combined $1 million a year as directors on three boards connected with [MHS]..."). https://tinyurl.com/y8gte3kp *See, also, See, also, "Harrisburg insiders tapped for Hershey chocolate's $240,000-a-year corporate board, The Philadelphia Inquirer, April 19, 2017* ("[Defendant James W.] Brown, 65, of Malvern, a lawyer, has political ties to the Casey political dynasty. He served as chief of staff for Pennsylvania Gov. Robert P. Casey in the 1990s. Most recently, he had the same role with Casey's son, Sen. Casey, in Washington, quitting that post in early 2016 to join the Hershey Trust board.") *https://tinyurl.com/ya6hvfx4*

[3]     See, *"Sex Abuse Case Shatters Hershey School,"* Philadelphia Inquirer, October 6, 2011: http://tinyurl.com/opjsp4r ("The Milton Hershey School...quietly paid $3 million earlier this year to compensate for the sexual abuse suffered by five former students...")

[4]     *See, "11 former Milton Hershey students suing school for invasion of privacy," CBS 21,* May 16, 2016: http://tinyurl.com/yc46yzt9

[5]     *See, "Milton Hershey School employee charged with sexual offenses against student"* Fox 43 News, July 13, 2015: http://go.fox43.com/1K47EQk

[6]     *See, "Evangelizing at Milton Hershey: Is this what the Chocolate King envisioned?"* Pennlive.com, January 25, 2018: http://s.pennlive.com/MofHUyi

discrimination in violation of the ADA against a 13-year old boy because he was HIV-positive;[7] and numerous other scandalous incidents that have produced multiple Pennsylvania OAG investigations, two United States DOJ investigations (including one ongoing), multiple Pennsylvania Human Relations Commission investigations, and an unending stream of lawsuits, scandals, and controversies involving Defendants and their squabbles over who gets to control MHS wealth and power.[8]

156.   Examples of MHS charitable asset misuse that flow from the same flawed governance structure and improper Board selection — and that help explain why a charity with $14 billion is serving only 2,000 children today in only one location and with no satellite campuses or program expansion of any kind — include the Board (with the participation of Defendants Redmond and Mead): squandering $21 million to purchase a failing luxury golf course that Board members treated as a "personal playground" (compounded by building a $5 million "Scottish style" clubhouse on the course for the Board's golfers);[9] spending $70 million unnecessarily renovating a luxury hotel that a whistleblower alleged to be purely so the Board members could "pamper themselves;"[10] frittering away $37 million on a reckless "experimental" intake facility that housed students in 20-child bedrooms and that had to be abandoned almost immediately and

---

[7]     *See, e.g., "Hershey settles HIV suit with 14-year-old boy denied admission,"* CBS News, September 13, 2012

[8]     *See, e.g., "Back-Stabbing and Threats of a 'Suicide Parachute' at Hershey," New York Times,* July 30, 2016 ("In the last 12 months the trust has spent more than $4 million on lawyers to investigate charges of misconduct that board members have lodged against one another. In one instance, Robert F. Cavanaugh, then the board's chairman, was accused of improperly securing a summer job for his son with…one of the trust's outside investment companies. In a sharp escalation, Mr. Cavanaugh…accused two board members of trading Hershey stock on privileged information, which is basically the corporate version of crying 'Murder!'").

[9]     *See, e.g., "Hershey school's purchase of golf course helped investors," Philadelphia Inquirer,* October 3, 2010.

[10]    *See, e.g., Ousted Hershey Trust president tells court of serious financial irregularities***,** *The Philadelphia Inquirer,* February 11, 2011 ("The just-dismissed top executive of the multibillion-dollar Hershey charity for poor children describes in a court filing widespread financial irregularities at the philanthropy, including the use of charitable assets for free rounds of golf, spa treatments, limousine rides, and excessive compensation for board members."). https://tinyurl.com/yd577kp6

with virtually no salvage value to MHS;[11] paying millions of dollars to "nonprofit" Board members; and the Board using charitable funds to punish people on their "enemies list" by imposing the expenses and burdens of litigation on those people strictly to pursue personal vendettas against them (including against Plaintiff, as alleged herein), as well as committing other acts of waste, misspending, and fiscal impropriety unparalleled in child welfare charitable trust history.

157.    Virtually no charitable trust stewards anywhere have ever engaged in the kind of licentious and indefensible spending decisions witnessed at Defendant MHS under the Board Defendants, to a degree that the OAG was compelled to issue directives limiting the number of meals and spa treatments that the Board Defendants can lavish on themselves and their families.

158.    To illustrate the Board's attitude about this spending, after the Board used $70 million to renovate Hotel Hershey — which a whistleblower asserted was a vanity project pursued to gratify then Board chair LeRoy Zimmerman — the Board members jokingly posed at Hotel Hershey under a sign that rechristened the hotel as "ZIMM'S PALACE," in honor of Zimmerman, who was particularly notorious for pampering himself at this luxury hotel and who is also a former Pennsylvania attorney general had himself appointed to the Board in 2003, together with Defendant Redmond, by exploiting their Republican political connections.

159.    Attached hereto as Exhibit D is copy of the "ZIMM'S PALACE" photo, which includes both Defendants Redmond and Mead posing with Zimmerman.

160.    The dysfunctional Board and its wrongly-constructed administration also reflect these ongoing governance problems. For instance, four Board members tendered resignations in the period 2015 through 2016 rather than being associated with further MHS scandal; several of

---

[11]    *See, e.g., A costly experiment ends, Philadelphia Inquirer,* April 18, 2010: goo.gl/ChmpKd

the most competent MHS administrators have departed rather than being associated with poor decisions; and the last three MHS in-house attorneys were fired by the Board after the attorneys lodged whistleblower claims; *i.e.,* the Board is growing more dysfunctional over time as the most toxic individuals — such as Defendant Heist — maneuver themselves into leadership roles while Board members with any scruples at all (such as former Board members John Fry or Rick Zilmer) resign in disgust.

161. By way of further illustration, Stephanie Bell-Rose was named to the Board in 2015 and immediately tendered her resignation rather than being associated with the Board's dysfunction.

**Plaintiff Has Spearheaded Efforts To Reform MHS Governance And Defendants Have Therefore Tortiously Targeted And Bullied Him Along With Anyone Associated With Him**

162. Because MHS reform work requires legal, child welfare, and advocacy skills as well as extraordinary personal, financial, and professional sacrifice, Plaintiff is among the only people who could or would sustain the David-versus-Goliath effort for as long as Plaintiff has done; *i.e.,* for nearly two decades.

163. Plaintiff has also undertaken this role working with other alumni, who are generally the only group focused on MHS governance matters.

164. Alumni reform activists initially worked through MHSAA, until Defendant MHS overpowered the organization, including through use of the above-noted harassing lawsuit.

165. Defendant MHS expended some $10 to $20 million or more to subdue MHSAA.

166. That spending included distributing jobs, contracts, and Board positions to alumni anti-reform "ringleaders" who in exchange organized a kind of "swarming" of MHSAA, disrupting MHSAA business, breaking up MHSAA meetings, intimidating MHSAA leaders, and eventually shutting down MHSAA as any kind of alumni reform activist vehicle.

167.    In this way, by 2006, MHSAA had become a quisling for the Board and it now rubber-stamps all Board misconduct.

168.    Defendants Heist, Gurt, and Carfagno spearheaded the campaign that accomplished the latter goal, which is partly how each obtained their current MHS position.

169.    Some alumni thereafter formed a nonprofit corporation called Protect The Hersheys' Children, Inc. ("PHC"), to keep the reform flame alive, in an act that further angered Defendants because they had assumed that with MHSAA brought to heel, the alumni reform movement was over.

170.    Plaintiff is currently the president of PHC and serves on its board of directors.

171.    In this way, Defendants' tortious campaign against Plaintiff began in earnest when Plaintiff served as an MHSAA board member, officer, and *pro bono* attorney and continued after Plaintiff left the MHSAA board but before joining the PHC board, and from the time that Plaintiff joined the PHC board until today.

172.    But in all cases, and throughout this time, Defendants' tortious campaign has primarily targeted Plaintiff while persons or groups assisting or associated with Plaintiff were "collateral damage."

**Plaintiff Sought Legal Counsel Regarding the Tortious Campaign Against Him, Consulting With Defendant Elliott Greenleaf In 2007-2008**

173.    Because Defendant MHS recognized Plaintiff's pivotal role in pursuing MHS reforms, it escalated the tortious attacks on him at various times. The latter included "blaming" Plaintiff for a lawsuit that MHSAA filed in 2003 which sought to reinstate a July 31, 2002 governance reform and child safety agreement (the "Reform & Child Safety Agreement") that the Board — including Defendant Redmond — had later rescinded. That rescission allowed the Board to enrich itself further and led directly to a spate of sexual assaults on vulnerable children who lost

the agreement's protections among other grave wrongs. At the time Plaintiff, was acting as one of MHSAA's *pro bono* lawyers in the case as well as serving on the MHSAA board.

174. By 2007, the harassment and malicious rumors fueled and disseminated by Defendant MHS about this and other matters — including by mass-mailings into the state of New York — had reached a point where Plaintiff decided to explore his legal options.

175. As a result, Plaintiff consulted with Defendant Elliott Greenleaf lawyers in the period 2007-2008, reposed confidences in Elliott Greenleaf, discussed related legal strategy with Elliott Greenleaf, explained how Defendant MHS was intent on targeting Plaintiff due to Plaintiff's central role in the MHS reform effort, and otherwise fully confided in Elliott Greenleaf about the tortious campaign directed at Plaintiff by Defendant MHS, including its tortious use of surrogates to achieve its goals.

176. While Plaintiff at the time determined not to pursue his legal remedies against MHS, he never waived his rights as a client of Elliott Greenleaf about a matter that remained ongoing, as Plaintiff continued to lead the MHS reform effort, including in his role as PHC's president, and as Defendant MHS continued its tortious campaign against him.

**As Plaintiff Persists In Seeking MHS Reforms, Defendants Escalate Attacks On Him, <u>Target Anyone Associated With Him, And Harass Impartial Journalists</u>**

177. Plaintiff's longstanding MHS reform efforts and his role with PHC have been noted by some of our nation's leading charitable trust scholars.

178. For instance, Pablo Eisenberg — the dean of nonprofit governance and a Georgetown University Law professor — stated: "Protect The Hersheys' Children — a dissident group of alumni headed by a tough lawyer, Ric Fouad — is the only organization that has continually fought to overhaul [MHS] policies and practices. Thanks to its persistence and courage

— and in spite of harsh criticism and attacks on its integrity by school officials — the Hershey pot has been kept boiling."[12]

179.    Because Plaintiff has been the most publicly outspoken advocate for MHS reforms, Defendants continued to focus their tortious campaign on him, intending to make an example of him and thereby keep other alumni reform activists in line.

180.    Defendants' tortious acts have thus had as their goal the complete isolation of Plaintiff and the bullying of anyone who associates with him or who seeks to lend a hand in MHS reform work.

181.    The Elliott Greenleaf Defendants' billings for implementing Defendant MHS's tortious campaign against Plaintiff in all its aspects must be $200,000 to $250,000 per month or more for the last two years and dwarfs in size any other revenues generated by this Bluebell, Pennsylvania law firm during the time that the firm has aided Defendant MHS in its tortious acts.

182.    Defendant Elliott Greenleaf's determination to garner these extraordinary legal fees from child welfare assets, despite the ethical duties they owed and still owe to Plaintiff as a result of his consultation with the firms' lawyers, has clouded the Elliott Greenleaf Defendants' judgment and led it to violate its ethical and fiduciary duties to Plaintiff (as further explained below), all to advance Defendant MHS's tortious vendetta against Plaintiff.

183.    Defendant MHS — acting through Defendants and others — has also targeted those personally close to Plaintiff and abused, bullied, and mistreated them for nearly 19 years, also as part of Defendants' tortious campaign against Plaintiff, seeking to completely isolate and marginalize Plaintiff by punishing those near him.

---

[12]    Pablo Eisenberg, *Chronicle of Philanthropy,* August 24, 2016, *"New Pa. Attorney General Must Put an End to Hershey Trust Scandals" https://www.philanthropy.com/article/Opinion-New-Pa-Attorney/237546/*

184.    Examples of those targeted by Defendant MHS in this manner include one MHS employee who is known to be close to Plaintiff and who was subjected to a whisper campaign starting in 2003 and continuing until today, being summoned by MHS administrators and expressly warned about her association with Plaintiff, and otherwise being harassed and humiliated, simply to abuse her as a means of maliciously punishing Plaintiff by harming those near him and who cannot defend themselves.

185.    Another woman — after posting a Facebook photo of a visit by her and her husband to Plaintiff's home in 2010 — was set upon by Defendant Gurt, his brother Robert Gurt, and former MHS administrator D. Michael Weller who all shouted expletives at the woman and humiliated her at a public gathering, again as part of Defendants' tortious campaign to punish Plaintiff by abusing those near him and who cannot defend themselves.

186.    Another woman was derided merely for becoming Facebook "friends" with Plaintiff.

187.    An alumnus contractor was told that his bids for MHS construction work were futile so long as he was associated in any way with Plaintiff.

188.    A young graduate who came to Plaintiff for career guidance confided that he had been warned to be sure that no one found out that he was even speaking with Plaintiff — a category of intimidation that is particularly malicious since many young MHS graduates receive college aid from Defendant MHS and thus risk losing that aid if they displease the MHS bullies.

189.    Other individuals and MHS employees report similar intimidation and harassment by or at the direction of Defendants, and all as part of the tortious campaign by Defendants to marginalize and punish Plaintiff in any manner possible.

190.    Defendants even wrote Plaintiff a letter in 2013 seeking to forbid him from having any contact at all with any MHS employee, an improper act that illustrates how desperate Defendants have been to isolate Plaintiff and prevent MHS employees from having any contact at all with Plaintiff, including employees seeking Plaintiff's *pro bono* legal advice, and all as part of Defendants' long-running tortious campaign against Plaintiff.

191.    Defendant Gurt has even directed his brother Robert Gurt to try to intimidate Plaintiff and those associated with Plaintiff, including by disrupting MHSAA meetings led by Plaintiff (in 2003-2005), menacing Plaintiff physically (2003), making abusive and profanity-laced phone calls to Plaintiff and others at various times to put such persons in fear for their physical safety, and otherwise engaging in ugly conduct towards Plaintiff and those associated with him.

192.    Defendant MHS has also solicited its employees to attack Plaintiff on internet message fora, including via Defendant Carfagno, whose unofficial job description includes fomenting such attacks and otherwise working to isolate Plaintiff from alumni.

193.    Defendants have in essence created a "bounty" system wherein it is generally known that attacks on Plaintiff will help produce MHS jobs, contracts, Board seats, or other benefits, while refusal to engage in such attacks will adversely affect one's prospects of attaining the same or even lead to abuse of those who might publicly stand with Plaintiff.

194.    In one revealing example, alumnus Tom McClay was enticed into funding the law suit against MHSAA commencing in 2005 — an expensive undertaking — and was slated to be given a lucrative Board seat in exchange, even though McClay has no meaningful qualifications for such a child welfare position.

195.    Thereafter, just when McClay was about to be given his "reward" for the harassing lawsuit that he funded, a background check revealed that McClay has a criminal record and that fact prevented his being given his "nonprofit" Board seat reward.

196.    Other would-be MHS vendors have suddenly shown up on public message fora and attacked Plaintiff in an ugly manner, knowing that Defendant MHS rewards such behavior.

197.    In this way, since 1999 and without interruption, Defendant MHS has used its assets, officers, employees, and agents — including its Alumni Relations Office under Defendant Carfagno — to fund and fuel an insidious and nonstop campaign of harassment, bullying, and intimidation directed at Plaintiff and anyone associated with Plaintiff, and all as part of Defendants' tortious campaign to harm and isolate Plaintiff.

198.    Defendant MHS — and Defendants Gurt, Carfagno, and Heist in particular — have also used MHSAA (since gaining control of MHSAA as described above) as a vehicle for attacking and marginalizing Plaintiff; *i.e.,* MHSAA has also become Defendants' cat's paw in the tortious campaign against Plaintiff.

199.    The latter includes having MHSAA write letters to news outlets blaming Plaintiff for Defendant MHS's own problems, and all as part of Defendant MHS's orchestrated campaign against Plaintiff.

200.    When objective journalists have reported MHS matters as concerns Plaintiff, Defendants have also tried to intimidate, bully, and otherwise silence them, also as part of Defendants' ruthless efforts to marginalize and isolate Plaintiff and chill public discussion of Defendant MHS's abuses of Plaintiff and others.

201.    Journalists targeted by Defendants in this manner include Megan Walde (in 2004-2005) and Ivey DeJesus (2014 to present) of *The Harrisburg Patriot-News*, Pablo Eisenberg (2015

to present) of *The Chronicle of Philanthropy*, and Bob Fernandez (2010 to present) of *The Philadelphia Inquirer.*

202.    When Plaintiff was slated to appear on a local PBS talk-show in 2010, Defendant MHS used its influence to bully the show into denying Plaintiff an on-air forum and instead consigning him to a pre-recorded "canned" interview that completely truncated his views.

203.    Meanwhile, Defendant MHS's representatives went live on-air during the show — including homophobic housemother Deanna Slamans — and disparaged Plaintiff.

204.    That PBS show also featured a prearranged call-in from the MHSAA president at the time, acting as an MHS proxy, who also disparaged Plaintiff.

205.    When Defendant Gurt's mocking of a sexually-abused girl was reported by *The Philadelphia Inquirer* in 2011, Gurt had his MHSAA lackeys write a letter to the newspaper attacking Plaintiff*; i.e.,* even that incident, by Defendants' logic, was "Plaintiff's fault."

206.    Defendant MHS has also caused Plaintiff's speaking engagements in Hershey to be canceled, also as part of the tortious campaign to harm, marginalize, and isolate Plaintiff.

207.    Thus, in countless ways, large and small, known and unknown, including those set forth above, and without interruption since 1999, Defendant MHS, together with the other Board and Employee Defendants, has harnessed and leveraged its vast wealth to fuel its tortious campaign against Plaintiff, in order to try to isolate, marginalize, silence, and grind Plaintiff down, as a $14 billion charity in essence put a "bounty" out on a reform activist critic and marshaled its resources to punish and silence him and to punish and bully anyone associated with him, going so far as to bully media in order to chill discussion of what that "charity" was doing.

**Defendants Engaged In Potentially Criminal Invasion Of Plaintiff's Privacy And Concocted A "Serial Litigation Strategy" Accusation To Target Plaintiff, Culminating In Abuse Of Subpoena Spearheaded By Plaintiff's Former Lawyers**

208.    While Defendant MHS's nearly 19-year vendetta against Plaintiff was ongoing, MHS hired away Plaintiff's first lawyers — *i.e.,* the Elliott Greenleaf Defendants — who in or around 2015 began to betray Plaintiff, misused Plaintiff's confidences, and actively advanced Defendant MHS's tortious campaign against Plaintiff, about which tortious campaign Plaintiff had consulted Elliott Greenleaf before the firm chose to "switch sides" in the middle of this ongoing matter, in breach of its ethical and fiduciary duties.

209.    The Elliott Greenleaf Defendants have also spearheaded the abuse of subpoena, abuse of process, and related harassment that are one part of Defendant MHS's 19-year harassment campaign, implementing a plot hatched by Defendant MHS in 2011 or earlier.

210.    Specifically, and as further described below, Defendants have misused court proceedings in order to: (1) manufacture and disseminate scandalous and false charges about Plaintiff, where the false charges are *non sequitur*, irrelevant to the underlying cases, and interposed solely to impugn Plaintiff's character, and for no legitimate or cognizable legal reason, but instead solely to smear Plaintiff with statements that are made under the color of the protections associated with assertions made in a lawsuit and thus having qualified immunity from liability for defamation; and (2) serve abusive discovery on Plaintiff where that discovery has no legitimate evidentiary purpose and instead is propounded strictly to punish and harass Plaintiff, including by its timing and location.

211.    To have a pretext for pursuing their abuse of subpoena and abuse of process against Plaintiff, along with their related smear campaign, Defendants concocted a bizarre and legally frivolous "serial litigation strategy" charge that they tried to "pin" on Plaintiff, without any legal

or evidentiary basis, in a Kafkaesque manner. Defendants then "assert" this "theory" in order to malign Plaintiff and embroil him in harassing discovery.

212.     According to Defendants' "theory," the "serial litigation strategy" is a 19-year "conspiracy" pursued by Plaintiff that seeks certain amorphous MHS-related "goals" which are supposedly to be achieved by the filing of a "series of lawsuits" against MHS by random third parties whom Plaintiff "recruits."

213.     Defendants further have falsely asserted that Plaintiff is pursuing this "serial litigation strategy" because he is "disgruntled," "seeking an MHS Board seat," "trying to change the mission of the School," wants to "take back the School" (whatever that means) or is otherwise "out to get" MHS's "dedicated employees, administrators, and directors," each of which falsehoods Defendants have repeated on numerous occasions in pleadings and otherwise.

214.     Neither Plaintiff nor anyone associated with Plaintiff has any idea what the "serial litigation strategy" is, what the phrase actually means, nor how it can even conceivably motivate or connect to any conduct by Plaintiff — or anyone associated with Plaintiff — in seeking MHS reforms.

215.     On the contrary, only Defendants — including Plaintiff's former lawyers — claim that such a "strategy" exists.

216.     Defendants have never produced any credible or admissible evidence showing that there is a "serial litigation strategy" at all.

217.     On the contrary, Defendants entire "basis" for alleging the existence of a "serial litigation strategy" is a presumably 19-year old document of unknown origin, of unknown actual date, of unknown purpose, and of unknown authorship, which Defendants suddenly introduced on July 21, 2017 in a proceeding in the Federal District Court for the Southern District of New York

(the "S.D.N.Y.") without ever saying from where, how, or when they had procured it (the "Serial Litigation Document").

218.     Defendants introduced this undated and unsigned Serial Litigation Document without any authentication or foundation — telling several federal court judges, with no supporting evidentiary foundation, that Plaintiff had authored the document — in order to try to compel deposition testimony from Plaintiff because Plaintiff, according to Defendants, "instigated" the underlying lawsuits; *i.e.,* Defendants introduced a document with no ties whatsoever to Plaintiff as a means of furthering Defendants' harassment campaign against Plaintiff via a barrage of abusive subpoenas served on him.

219.     The Serial Litigation Document is in any case unfathomable. No one has any idea what it is, although Defendants — particularly Defendant Jarad W. Handelman — have repeatedly and falsely claimed that they know what it is, without ever citing any basis for that "knowledge."

220.     Defendants also falsely represented to the S.D.N.Y. that the Serial Litigation Document was authentic and tied to Plaintiff, even though Defendants themselves knew both representations are false.

221.     Defendants thereafter made similar misrepresentations to other courts.

222.     The Serial Litigation Document uses the words "serial litigation" in a context that in any case would have no relevance of any kind today. Nothing about this purportedly 19-year-old document or the "serial litigation" phrase as used in it has any conceivable bearing on the legal proceedings in which Defendants have proffered it or the investigations to which Defendants have sought to tie it.

223.     Defendants nonetheless insist in court arguments and in public that the Serial Litigation Document forms the "blueprint" of a nefarious "conspiracy" hatched by Plaintiff against

Defendant MHS 19 years ago, a facially false, patently absurd, and completely manufactured claim without any evidentiary, legal, or logical support.

224.   Defendants have also produced three different versions of the Serial Litigation Document, each with differing numbers of pages and internal content, and none of which has been designated by Defendants as the "genuine" sham document. Defendants themselves don't seem to know which version of the "conspiracy theory" blueprint to use.

225.   Although no one knows with any certainty who drafted the Serial Litigation Document, why it was drafted, or what it means, Defendant Handelman has nonetheless insisted in court filings with absolute certitude that he and Defendants possess some definitive knowledge of the document as a "blueprint" supposedly followed by Plaintiff as "evidence" of Plaintiff's "serial litigation strategy" "conspiracy theory."

226.   That is, the only person who has ever "testified" about the Serial Litigation Document in any way, who has represented to courts that he "knows" what it is, and who has "elaborated" for various courts and the media about a vast and fantastic "conspiracy" based on the document is Defendant Handelman, who alone professes to understand what is to Plaintiff and virtually everyone else a mystifying and completely meaningless document (that just happens to contain the two words "serial lawsuits" which Defendants then ripped out of context to support their farfetched "conspiracy theory").

227.   Further, Defendant Handelman first introduced his false testimony about the Serial Litigation Document in the S.D.N.Y. and submitted an under-oath but false affidavit there in furtherance of Defendants' tortious campaign against Plaintiff.

228.   In order to tie the Serial Litigation Document to Plaintiff, and as the basis for Defendants' falsehoods, including Defendant Handelman's S.D.N.Y. perjury, Defendants have

also submitted to the courts a demonstrably unrelated November 14, 1999 fax cover sheet that contains Plaintiff's name and falsely represented to the courts that Plaintiff "faxed the Serial Litigation Document to himself;" *i.e.,* after ascribing a fantastic "conspiracy theory" meaning to the Serial Litigation Document, Defendants then used a demonstrably unrelated fax cover sheet as "evidence" that Plaintiff is responsible for it.

229.     For instance, Defendant Handelman submitted a July 21, 2017 Declaration to the S.D.N.Y. representing that the facsimile cover sheet ties Plaintiff to the Serial Litigation Document and, on that basis, accused Plaintiff of "instigating" lawsuits against Defendant MHS.

230.     Defendant Handelman's statement in that instance and all similar statements made by Defendants have been proven absolutely and unequivocally false.

231.     The latter is because the November 14, 1999 fax cover sheet date **precedes by at least three weeks** any conceivable creation date of the Serial Litigation Document; *i.e.,* the first paragraph of the Serial Litigation Document refers to an event that took place on December 7, 1999.

232.     Therefore, the one thing that is certain about the Serial Litigation Document is that it was **not** faxed in the manner and on the date represented to the courts by Defendants and thus cannot be tied to Plaintiff by the fax cover sheet in question, whatever the puzzling document may be.

233.     Defendants nonetheless — virtually exclusively through Defendant Handelman — repeatedly represented to multiple courts that Plaintiff had in fact "faxed the Serial Litigation Document to himself" and that the document was thus "tied" to Plaintiff by virtue of a fax cover sheet that contained Plaintiff's name.

234.    Even after having the truth publicly exposed in a definitive manner, Defendants —
and Defendant Handelman in particular — continued to misrepresent this falsehood to courts of
law, including the S.D.N.Y., and failed to correct the many instances in the record where this
falsehood had been misrepresented to courts (in New York, Georgia, and Pennsylvania as
Defendants' court-filed smear campaign against Plaintiff has spanned the Eastern Seaboard).

235.    Defendants — and Defendant Handelman in particular — also falsely represented
to the courts that Plaintiff "admitted" to this "serial litigation strategy," an outright falsehood as
Plaintiff has adamantly, repeatedly, and consistently denied this absurd and surrealistic charge
from the moment that Defendants first lodged it.

**Defendants Concealed And Withheld Evidence From Courts And Plaintiff**

236.    Defendants also simultaneously concealed from the courts another vital piece of
evidence that was also tied to the Serial Litigation Document and that admitted the **precise
opposite of what Defendants were representing**; *i.e.*, Defendants possessed another document
showing that Defendants themselves knew that the Serial Litigation Document was **not**
authenticated and admitting that Defendants did **not** know if Plaintiff had ever faxed it to himself,
notwithstanding their falsehoods to the courts and others.

237.    The latter document was an October 28, 2011 memo from then MHS president and
former Board member Anthony C. Colistra to then Board chairman LeRoy Zimmerman (the
"Colistra Memo") that plainly stated: *"We have not been able to authenticate that Fouad actually
sent this document to himself."* (Emphasis added.)

238.    Nonetheless, Defendants concealed the Colistra Memo from the courts, even while
making express representations that were contradicted by the withheld memo.

239.    Concealment of the Colistra Memo from the courts — including the S.D.N.Y. — was willful and malicious, with Defendant Handelman again as the leader of this charge.

240.    Concealment of the Colistra Memo from the courts — including the S.D.N.Y. — contributed to vast waste of judicial resources and of Plaintiff's own personal resources and was done solely to advance Defendants' tortious campaign against Plaintiff.

241.    The Colistra Memo also shows that Defendants' tortious plan to harm Plaintiff by using lawyers to harass and punish him on the basis of a contrived "serial litigation strategy" theory derived from within the MHS administration and Board; *i.e.,* from then MHS president Colistra and then MHS Board chair Zimmerman, with current MHS president Defendant Gurt and current Board chair Defendant Heist having taken the tortious-campaign baton from Colistra and Zimmerman.

242.    The Colistra Memo in its entirety says: "In our conversation the other evening, I told you that we have received a copy of a fax that Fouad sent to himself when he was staying at the Hotel Hershey in November of 1999. I believe it was sent from his office number in NY with instructions to have the fax delivered to his hotel room. ***We have not been able to authenticate that he actually sent this to himself.*** The records at the Hotel do not go back to 1999 but I think if you read his 'manifesto', it makes it very clear that this is the course of action that he has been on for the past 10 or more years. I have shared this with our attorneys and with attorney Cliff Haines." [Emphasis added.]

243.    In other words, as far back as seven years ago, the MHS Board and administration were laying the groundwork for the most recent phase of their tortious campaign against Plaintiff and discussing how to contrive flimsy "evidence" for their lawyers to use in pursuing the tortious conduct at issue here.

244.     Colistra and Zimmerman were both especially malicious towards Plaintiff because Plaintiff had repeatedly exposed the misconduct of these individuals, including, *e.g.,* the fact that Zimmerman had parlayed his "nonprofit" Board seat into over $500,000 in total annual compensation before stepping down from the Board at the end of 2012.

245.     The MHS Board and administration and their lawyer co-tortfeasors were in essence simply waiting for some lawsuit to be filed against Defendant MHS that could then be blamed on Plaintiff and utilized as a vehicle to commit the tortious acts against Plaintiff described herein.

246.     The Colistra Memo also shows that Colistra and Zimmerman were using Defendant MHS's ownership of Hotel Hershey in a shocking and outrageous invasion of Plaintiff's privacy; *i.e.,* as a means to access Plaintiff's private faxed correspondence, which is where Colistra and Zimmerman most likely obtained the fax cover sheet that Defendants (or someone acting for Defendants) then appended to the Serial Litigation Document in order to "pin" Defendants' farfetched "theory" on Plaintiff.

247.     These actions by Defendant MHS (acting through Colistra and Zimmerman) were in any case improper, tortious, may have been criminal, and demonstrate that Defendant MHS's fixation on Plaintiff traces back to 1999 when Defendants apparently directed Hotel Hershey employees to rummage through Plaintiff's private correspondence, seeking to manufacture any kind of charges at all against Plaintiff.

248.     Defendants know that all these charges are false but continue to dispense them through their court filings and public statements regardless of how *non sequitur* and irrelevant they are.

249.     All that remained was for Defendants to identify lawsuits against MHS that Defendants could then "attribute" to Plaintiff (along with "attributing" all their other problems to Plaintiff, including bad press) as part of Plaintiff's purported "serial litigation strategy."

250.     The first "serial litigation strategy" lawsuit alleged by Defendants was the above-noted action brought by MHSAA in 2003, seeking to reinstate the Reform & Child Safety Agreement.

251.     After Defendants fueled rumors and attacks on Plaintiff's character and ethics related to this, Plaintiff sought legal counsel from Elliott Greenleaf about taking legal action; *i.e.*, the Elliott Greenleaf Defendants have been fully aware of the "serial litigation strategy" manufactured charge and conferred closely with Plaintiff in regard to it when Plaintiff sought their legal counsel about his rights in connection with this very same MHS calumny, in 2006-2007.

252.     After the Elliott Greenleaf Defendants "changed sides," they joined with Defendant MHS in adding three more lawsuits to the false allegation about the Reform & Child Safety litigation and using the "defense" of those three lawsuits to ramp up the tortious abuse and attacks on Plaintiff, as further described below.

253.     The subsequent lawsuits in which Defendants introduced their baseless "theory" in order to misuse court proceedings are: (1) a case involving the suicide of 14-year old Abbie Bartels, who took her own life after Defendant MHS wrongly expelled her merely because she suffered a bout of adolescent depression (*Julie Ellen Wartluft, et al., v. Milton Hershey School, et al.,* 1:16-cv-2145-CCC (M.D. Pa.) (the "Abbie Bartels Lawsuit"); (2) a case involving Adam Dobson, who was also wrongly expelled at the end of his junior year after he too suffered a bout of adolescent depression following homophobic abuses directed at him by his houseparents (*Adam Dobson v. Milton Hershey School, et al., 1:16-cv-1958-CCC (M.D. Pa.)*) (the "Adam Dobson

Lawsuit"); and (3) a case involving Jaiden Buchan, who was also wrongly expelled after Defendant Gurt orchestrated a plan to frame her for arson in order to punish her for innocently revealing sordid conduct related to Gurt and after Gurt had manipulated MHS enrollment rules to have Jaiden improperly enrolled (*Buchan v. Milton Hershey School*, *et al.,* 1:16-cv-02557-CCC (M.D. Pa), since refiled in Dauphin County Court of Common Pleas) (the "Jaiden Buchan Lawsuit") (collectively, the "Three Lawsuits").

254.    Having concocted and baselessly ascribed their "serial litigation strategy" to Plaintiff, Defendants — including Plaintiff's former lawyers — have used the phrase to purportedly rationalize their tortious acts against Plaintiff in the context of the Three Lawsuits.

255.    This "serial litigation strategy" phrase has also been used by Defendants to claim that Plaintiff is also to blame for all of Defendant MHS's legal troubles over the last 19 years, lawsuits filed against MHS (including, primarily, the Three Lawsuits and the MHSAA Reform & Child Safety Agreement litigation), the Pennsylvania OAG's multiple investigations of Defendant MHS (in 2001-2002, 2011-2013, and 2015-2016), the United States DOJ's two investigations of Defendant MHS (including an ongoing one), the Pennsylvania Human Relations Commission's multiple investigations of Defendant MHS, and other legal actions not known to the public but that were somehow also "instigated by Plaintiff" — according to Defendants — as part of Plaintiff's "serial litigation strategy."

256.    In order to "buttress" their baseless "theory" and attack other individuals besides Plaintiff, Defendants have also claimed that Plaintiff is pursuing the "serial litigation strategy" as part of a "conspiracy" with other parties, whether attorneys, journalists, public officials, child victims of MHS wrongdoing, or anyone else whom Defendants deem an "enemy."

257.    In other words, according to Defendant MHS, MHS does not have legal problems with oversight officials or with children harmed by MHS policy — along with related bad press — because the Board and administration have engaged in serial bungling, mistreatment of children, reckless housing experimentation, repeated violations of federal and state law, misuse of child welfare assets, hiring of unqualified administrators, purchase of a luxury golf course with child welfare money, startling self-enrichment, or any other wrongdoing, but instead because "Plaintiff is behind all of MHS's troubles" and because "Plaintiff is orchestrating all the legal actions against MHS" in league with Plaintiff's "co-conspirators," and all as part of Plaintiff's nefarious and 19-year "serial litigation strategy."

258.    The allegation is flatly absurd, preposterous, and without a shred of logical, legal, or evidentiary support — akin to a lifelong smoker claiming that her lung cancer was caused by doctors who kept advising her that her smoking was the cause of her illness.

259.    The allegation also ignores the very real and substantial injuries that occurred when MHS has been sued or investigated — for example, after the abuse or death of a child or after children were sexually assaulted — along with how Defendant MHS contributed to the injuries suffered.

260.    To illustrate how Defendants have misused their "allegations" against Plaintiff, when the DOJ was reported to be investigating Defendant MHS for violations of the ADA, it was not — said Defendant MHS — because the DOJ undertook its own analysis after earlier MHS violations of the ADA, but because Plaintiff — pursuant to the "serial litigation strategy" — "caused the DOJ to pursue the investigation;" *e.g., The Philadelphia Inquirer* reported on May 18, 2016: "The Hershey School on Wednesday blamed a 'zealous antagonist' — an apparent reference to Ric Fouad, an alum who has been highly critical of the school — for soliciting the Justice

Department to pursue claims against it. 'I'm stunned that anyone thinks that I can pressure the Justice Department to investigate anything, let alone a $12 billion charity,' said Fouad, a lawyer in private practice in New York City."

261.    There are numerous similar examples where Defendants use Plaintiff as a "whipping boy" and simply "source" all MHS problems to him, including related news articles, and all supposedly as part of Plaintiff's "serial litigation strategy" in a ceaseless barrage of ugly and public attacks on Plaintiff: the more wrongdoing that Defendant MHS commits, the more it lashes out at Plaintiff and blames him for its troubles.

262.    Defendants also incessantly "assert" this baseless claim in the Three Lawsuits, but not as an actual "defense." Instead, Defendants assert it merely to have any flimsy excuse at all to keep making disparaging statements about Plaintiff in their legal filings, in order to deflect from their own misconduct, and to "justify" issuing and serving subpoenas on Plaintiff that are in fact purely to harass him and that have no genuine evidentiary purpose.

263.    In this way, Defendants have "weaponized" the Three Lawsuits and turned their "defenses" in the cases into a means by which to advance their longstanding vendetta against Plaintiff in order to further harm Plaintiff and blame him for all their own misconduct.

264.    Defendants have never explained — and cannot explain — in a rational and legally-cognizable manner what this "serial litigation strategy" even means or how it could even conceivably support any actual defense in the underlying actions where Defendants have interposed it.

265.    But Defendants use the phrase "serial litigation strategy" each time they want to blame Plaintiff for any legal matter or otherwise fabricate an excuse for harassing Plaintiff or impugning Plaintiff's motives in seeking MHS reforms.

266.    Defendants apparently maintain that Plaintiff "solicits" aggrieved parties to file lawsuits against Defendant MHS and that, but for Plaintiff's "manipulation" of such parties, the lawsuits would never be filed.

267.    For instance, the bereaved family of Abbie Bartels — who entrusted their daughter to Defendant MHS only to watch helplessly while administrators committed awful abuses against her and drove her to suicide — did not sue MHS, according to MHS, because they believe that MHS is responsible for Abbie's death, but because Plaintiff "solicited" the lawsuit, a false allegation that in any case is irrelevant to the proofs or defenses in the case.

268.    Defendants know the allegation is false but take advantage of the fact that Plaintiff has no standing in the Three Lawsuits to challenge assertions made by Defendants against Plaintiff personally, since Plaintiff is neither a party nor counsel of record in the cases; *i.e.,* Defendants have been able to unilaterally pollute the record in the Three Lawsuits with ceaseless smears about Plaintiff.

269.    The plaintiffs in the Three Lawsuits have little motivation to expend the vast resources necessary to challenge the flood of irrelevant assertions made by Defendants about Plaintiff, however odious; *i.e.,* these plaintiffs recognize that such smears have no bearing on the outcome in the cases but nonetheless are occasionally drawn into the hornet's nest tangentially, though never to the degree necessary to dispositively refute these smears.

270.    Pursuing Defendant MHS's vendetta against Plaintiff by making frivolous charges against him in court filings and otherwise is so lucrative for the Elliott Greenleaf Defendants — a small, Blue Bell, Pennsylvania law firm that has scored the legal billing jackpot with its MHS harassment "work" — that they do not even consider how irrational, wasteful, or unethical their conduct is.

271.    On the contrary, so long as Defendant MHS keeps paying Elliott Greenleaf's astronomical legal bills, the Elliott Greenleaf Defendants profiteer by adding their gratuitous harassment of Plaintiff to any legitimate legal defenses pursued by Defendant MHS in the Three Lawsuits: the more irrational and wasteful that MHS's "sideshow" harassment of Plaintiff is, the more that the Elliott Greenleaf Defendants get paid.

272.    The Elliott Greenleaf Defendants thus actively encourage Defendant MHS to persist in abusing legal process and make absurd charges because it garners them more money.

273.    The Elliott Greenleaf Defendants — together with the other Defendants — thus miss no chance to inject *non sequitur* and totally irrelevant attacks on Plaintiff into Defendant MHS's filings in the Three Cases, since only those attacks help rationalize the Elliott Greenleaf Defendants' massive billings, all paid for from MHS child welfare funds.

274.    By exploiting these insidious dynamics, Defendants have in essence turned the pleadings in the Three Lawsuits into a "free fire zone" where they can attack Plaintiff with impunity and with the Elliott Greenleaf Defendants indulging the other Defendants by carrying out their malicious campaign against Plaintiff, unfettered by any economic constraints.

275.    These public and incessant attacks on Plaintiff are also part of an effort by Defendants to keep changing the subject from their own repeated misconduct and instead make the Three Lawsuits about Plaintiff's imaginary "conspiracy" to foment MHS problems.

276.    Defendants know these charges are false but continue to dispense them through court filings and public statements, regardless of how *non sequitur* and irrelevant they are, and solely for the purpose of harassing, burdening, and maligning Plaintiff.

**Defendants knowingly Suborned Perjury From A Deeply Troubled And Completely Unreliable "Star Witness"**

277.    Having concocted a baseless "theory" about a "serial litigation strategy" that is contradicted by their own withheld Colistra Memo, Defendants also tried to prop up their charge with malicious falsehoods packaged as "testimony."

278.    That "testimony" came from a single, grudge-holding, deeply troubled, and demonstrably unreliable youth — Nevada Hatfield — whom Defendant MHS had itself declared to be untrustworthy and barred from its campus.

279.    Hatfield is a former MHS student who approached Plaintiff in 2010, while still a student, proposing to serve as some kind of "secret spy" for Plaintiff, including by deceiving then MHS president Colistra into providing video-taped statements that Hatfield suggested would be useful to Plaintiff's MHS reform efforts.

280.    Specifically, in an October 10, 2010 email introducing himself, Hatfield wrote:

> I currently am a student from The Milton Hershey School [...]
>
> Im a very strong minded student and speaks out alot on the school issues.
>
> My reason for this email is to inform more important topics of MHS that is hidden in the media and the public eye...
>
> Resources and Information I can provide can help you a lot.
>
> I have interviewed Dr. Colistra two times in the past month and can continue with more interviews, he has gained my trust, I have also videotaped the sessions...
>
> What Im asking is not be known of and just be the middle guy in this, I dont want to have mhs find out about this but is willing to help the phc,,,,,
>
> [Spelling and grammar are as in the original.]

281.    Hatfield later claimed that he was trying to deceive Plaintiff in this email, and not Colistra, and that he had hoped thereby to in essence make some kind of name for himself; *i.e.,* Hatfield's story has changed depending on the circumstances.

282.    Regardless of who the actual target of Hatfield's deception was, Plaintiff responded by telling Hatfield that Plaintiff never involves MHS students in MHS reform work and politely but firmly admonishing Hatfield never to deceive anyone nor break any MHS rules.

283.    Specifically, in a November 3, 2010 email to Hatfield, Plaintiff wrote:

[A]dults should not involve you students in our disputes, because our responsibility is to allow you space to learn without facing adult responsibilities. […] So while I urge you to keep exploring these issues, I cannot involve you actively in our work… Equally important, please do not break any MHS rules! And please don't use your interviews with Dr. Colistra for purposes other than the openly-stated ones —again, I ask this for your own good, because I don't want you to have any related problems later…"

284.    Thereafter, Hatfield was removed from MHS, in early 2011, as a result of his own conduct, a circumstance that he blamed on Defendant MHS while MHS blamed him.

285.    From what Plaintiff was able to piece together later, it appears that Hatfield was a student from a troubled background who had lost his father to cancer and whose mother eventually served a prison term, leaving Hatfield with problems that led him to act out — and that MHS used a flimsy excuse to rid itself of a troubled student rather than working with him.

286.    Regardless of who was to blame, shortly after Hatfield's removal, Hatfield again approached Plaintiff, in early 2011, this time seeking assistance from Plaintiff, an individual who is always solicitous towards children facing difficulties.

287.    Plaintiff thus agreed to help Hatfield on a limited basis.

288.    This included trying to find appellate counsel for Hatfield's mother (who went to prison for a car accident that killed her four grandchildren while she was trying to evade police), contacting an athletic coach on Hatfield's behalf after Hatfield quit a team at one of several schools he attended post-MHS (Hatfield bounced from school-to-school after leaving MHS but failed to get beyond the ninth grade), and making an unsuccessful appeal via a prominent Pennsylvania

attorney to then Board member John Fry to have Hatfield reinstated at MHS (which proved unsuccessful after Defendant MHS sent word that Hatfield could not be trusted).

289.     Plaintiff had also — again at Hatfield's pleading — made preliminary efforts to help Hatfield find Pennsylvania counsel or a Pennsylvania youth law clinic that might take on his case as part of an action addressing a pattern of MHS wrongdoing.

290.     But those efforts did not succeed, as Plaintiff informed Hatfield.

291.     Plaintiff's help, however, did not include assisting with any individual case that Hatfiled might have wanted to bring against MHS, as Plaintiff made very clear from the outset.

292.     In short, Plaintiff bent over backwards over several years to assist a former MHS student who reached out to Plaintiff via phone and email, having never met Hatfield in person.

293.     Hatfield in the meantime retained Pennsylvania counsel to represent him in his own individual case against MHS, as he sought to convert his MHS removal into a monetary settlement.

294.     Hatfield asked Plaintiff for help with his individual lawsuit against MHS but Plaintiff again made clear that Hatfield had to rely strictly on his Pennsylvania counsel and that Plaintiff would not assist him in his individual case.

295.     Hatfield also sent Plaintiff unsolicited materials, as email attachments, which Plaintiff never viewed nor opened.  Plaintiff was suspicious of these email attachments and did not trust opening files that he had never requested.

296.     Plaintiff later learned that the attachments were architectural drawings of the MHS "Springboard Academy" experimental intake facility and a student roster, which made Hatfield sending them more puzzling since neither item had any conceivable use to Plaintiff.

297.    Plaintiff also later learned that Hatfield had obtained these files improperly, despite Plaintiff having strongly admonished Hatfield never to break any MHS rules.

298.    Thereafter, Hatfield's anger toward Plaintiff increased as Hatfield's attempt to extract a monetary settlement from Defendant MHS foundered and as Plaintiff politely but firmly continued to decline to help Hatfield with his individual lawsuit against MHS.

299.    Specifically, Hatfield asked Plaintiff to help him finish drafting a complaint against MHS after Hatfield had a falling out with the latest of several lawyers whom Hatfield had retained; *i.e.,* Hatfield exhibited a pattern of obtaining help from solicitous adults who felt sorry for him and with Hatfield turning on them later, whether Colistra, Plaintiff, Hatfield's Pennsylvania lawyers, or others.

300.    When Hatfield again asked for help in drafting his then *pro se* complaint, Plaintiff informed Hatfield — consistent with all of Plaintiff's earlier statements — that Plaintiff could not provide the legal assistance that Hatfield sought and again encouraged Hatfield to just get on with his life.

301.    Specifically, in an email dated June 16, 2014, Plaintiff wrote:

> I received your voicemails, and am sorry to hear that you're now without counsel. But I'm afraid that I can't help you with your complaint —for one thing, I simply don't have the time at present to do the work that would be required to provide you with meaningful assistance. Additionally, I'm not licensed in PA; and I invariably work with PA counsel when I have matters there. My recommendation is that you find PA counsel who can assist you, if at all possible.

> In any case, I hope all's well —and whatever you're doing with your legal matter, please be sure to be mindful of your studies, because that's the most important thing of all. (I know that you're on summer break now, or about to be on break, but I mean this as a general matter. You're a gifted student and athlete, and these are areas where you control your destiny far more than in a legal proceeding, if I may say.)

302.    Plaintiff's declining to lend Hatfield the legal assistance that Hatfield sought piqued Hatfield's anger and Hatfield later admitted that he thereafter deceived Plaintiff further

merely to try to obtain material to use against Plaintiff, an attempt that also proved fruitless because there is no such material.

303.    Hatfield had by then also been highly influenced by Defendants' orchestrated attacks on Plaintiff and frequented a Facebook page and other message fora devoted to attacking Plaintiff. Hatfield was also well aware of the "bounty" that existed for those who help Defendant MHS in its campaign to harm Plaintiff*; i.e.,* Hatfield understood that it was possible to "monetize" attacks on Plaintiff and eventually determined to pursue that path, after he failed to extract money from Defendant MHS.

304.    Exploiting Hatfield's resentment and desire for material gain, Defendants orchestrated a sham "deposition" to allow Hatfield to "testify" against Plaintiff; *i.e.,* to describe his purported contacts with Plaintiff and to falsely assert that he had been "enlisted" by Plaintiff to introduce Plaintiff to individuals who might want to sue Defendant MHS, as part of Plaintiff's "nefarious" "serial litigation strategy."

305.    As coached by Defendants or their agents, Hatfield claimed that the individuals he purportedly "introduced" for this "serial litigation strategy" were the plaintiffs in the Abbie Bartels and Adam Dobson Lawsuits, which claim was a demonstrable falsehood.

306.    Nonetheless, this "testimony" was orchestrated by Defendants and was to be elicited by them ostensibly to "defend" the Abbie Bartels Lawsuit, notwithstanding the irrelevance of the false testimony to the case.

307.    The Hatfield deposition was also convened by Defendants to provide Hatfield and themselves with the "privileged immunity" from defamation that attaches to depositions and thus to allow Hatfield to say whatever he wished about Plaintiff no matter how false; *i.e.,* Defendants'

plan was carefully thought-out, deliberate, and took pains to make each step in the process facially "lawful" even though the ultimate goal was malicious harm to Plaintiff.

308.    Defendant Handelman openly admitted that he knew that Hatfield's testimony was suspect and admitted that Hatfield was trying to make himself relevant to the Abbie Bartels Lawsuit.

309.    Hatfield himself had boasted that Defendant Handelman told him that without Hatfield's "testimony," Defendants "had nothing on" Plaintiff.

310.    Hatfield had otherwise made clear that he was seeking self-gain in "testifying," using such phrases as *"What's in it for me?"*

311.    Hatfield had even tried to enter into discussions with Plaintiff about providing Plaintiff with a "non-disclosure agreement" in exchange for getting something from Plaintiff, an extortionate overture that Plaintiff flatly ignored.

312.    Hatfield's "testimony" was also intended by Defendants to smear Plaintiff by portraying Plaintiff as having been "happy" when Plaintiff learned — supposedly from Hatfield — of the death of Abbie Bartels. According to Defendants, Abbie's death would supposedly fuel the "serial litigation strategy" and Hatfield was thus "enlisted" by Plaintiff to "introduce" Plaintiff to the grieving Bartels family, because of Hatfield's "connections" in Perry County, Pennsylvania (where both Hatfield and the Bartels family resided).

313.    In other words, the entire Hatfield deposition was an expensively-orchestrated setup arranged by Defendants to allow Hatfield a forum for smearing and lying about Plaintiff but with no legitimate connection to the Abbie Bartels Lawsuit.

314.    Thereafter, at his June 2, 2017 deposition, Hatfield testified on cue in this manner and characterized Plaintiff as a cynical exploiter of tragedy whose purported first words upon learning of Abbie's death — supposedly from Hatfield — were ones of glee.

315.    As Hatfield put it: "He's like 'Navada, this is great!'  He said 'This is what I've been waiting for!' pretty much and he's like 'Keep up the good work, thanks for the tip!' And then he hung up." [Punctuation omitted by court reporter reinserted for clarity.]

316.    Hatfield then "testified" to a "follow-up conversation" with Plaintiff where Plaintiff allegedly sought to rely on Hatfield to build a rapport with the Bartels family, so that Plaintiff could "talk to them possibly" and hence foment another "serial lawsuit" against MHS.

317.    However, Hatfield's testimony — which was premised on and anchored in Hatfield's all-important claim that he had broken the news of Abbie's suicide to Plaintiff — was refuted during the deposition by **<u>contemporaneous written evidence</u>** that neither Hatfield nor his perjury-suborning accomplices had imagined would materialize*; i.e.,* Hatfield and Defendants had just assumed that it would be Hatfield's word against Plaintiff's, which was all that Defendants needed to damage Plaintiff's reputation.

318.    After Hatfield was exposed for testifying falsely — but desperate to remain "relevant" — Hatfield careened to another baseless allegation and made a suggestion that Plaintiff may have intended an "improper advance" by something that Plaintiff purportedly said over the phone.

319.    This was another absurd falsehood reflective of Hatfield's malicious desire to harm Plaintiff after Hatfield's "serial litigation strategy" falsehoods were exposed.

320.    Hatfield's "testimony" otherwise lacks any corroboration and is contravened by the written record and plain logic.

321.     Thereafter, Defendant MHS: (1) took no steps to verify or investigate Hatfield's claim about a possible "advance" that was in any case at best complete conjecture on Hatfield's part; (2) did not speak with Plaintiff about it; (3) did nothing to examine the claim independently; (4) failed to demonstrate any good faith in evaluating it; and (5) knew the claim to be false, as demonstrated by Defendants' own actions.

322.     Instead of acting properly, Defendants seized on the "opportunity" that Hatfield's perjury and imagination provided to maliciously harm Plaintiff by using the perjury as ostensible "grounds" for outrageously characterizing Plaintiff as a pedophile, banning Plaintiff from all MHS events — including in New York — and using the perjury as a platform for further smearing Plaintiff, as described below; i.e., Defendants took Hatfield's comment that "maybe he is gay" and recklessly and maliciously converted it into "Plaintiff is a dangerous pedophile."

323.     Defendants also used their orchestrated-perjury to advance their long-sought goal of ridding themselves of Plaintiff by driving a wedge between Plaintiff and other alumni; i.e., by making it very difficult for Plaintiff to interact with alumni at all and further casting Plaintiff in an ugly light.

324.     Defendant MHS thus sent Plaintiff a July 19, 2017 letter — based on Hatfield's falsehoods as maliciously twisted and exaggerated by Defendants — ostensibly "informing Plaintiff that he had been banned" from MHS but that was in actuality a set of vile smears that utilized Hatfield's defamation-privileged perjurious testimony to cast Plaintiff as a dangerous pedophile (the "Banning Letter").

325.     Defendants knew that the charges and insinuations leveled against Plaintiff in the Banning Letter were all false and malicious.

326.    Defendants nonetheless generated the Banning Letter with the intent to disseminate it, again taking advantage of the defamation-privileged nature of filings in legal proceedings.

327.    Attached hereto as <u>Exhibit E</u> is a copy of the Banning Letter.

328.    Pursuant to their tortious plan to inflict as much damage on Plaintiff as possible, Defendants immediately sent a copy of the Banning Letter to the local police in Hershey, Pennsylvania, thus putting Plaintiff in jeopardy of arrest in the event that he shows up in any areas owned by MHS (an entity that owns some 10,000 acres in Hershey, including quasi-public spaces such as Hersheypark, Hotel Hershey, and other locations).

329.    Even though the Banning Letter was completely irrelevant to the Abbie Bartels and Adam Dobson Lawsuits, Defendants thereafter nonetheless shoehorned the Banning Letter into Defendant MHS's pleadings in these cases; *i.e.,* Defendants introduced the Banning Letter into the related court filings not for any genuine legal purpose, but instead just to avail themselves of the ability to commit "privileged defamation" against Plaintiff by including this scandalous material in publicly-available court filings, and all pursuant to Defendants' malicious plan.

330.    Once Defendants had the Banning Letter in Defendant MHS's court filings, Defendants thereafter disseminated it as widely as possible, including trying to pitch the Banning Letter story to the media.

331.    Defendants pursued the latter pitching of the story both directly via MHS public relations director Lisa Scullin and indirectly via MHS lackeys working with Scullin, underscoring Defendants' bad faith, malice, and improper motives.

332.    In conjunction with Hatfield proving himself "cooperative," Defendant MHS rescinded its previous ban of him from the MHS campus and thereby provided him with a tangible

reward for aiding Defendants in their tortious campaign against Plaintiff above and beyond the grudge Hatfield held towards Plaintiff.

333.     Defendants thereafter continued to disseminate Hatfield's falsehoods and the Banning Letter via Defendant MHS's sham court filings, further misusing the underlying court proceedings for collateral and improper objectives.

334.     Defendants' Hatfield-related conduct, falsehoods about the Serial Litigation Document (and a fax cover sheet that cannot possibly be connected to it), and withholding the Colistra Memo all show a consistent pattern by Defendants. Even after they learned that an allegation they have made about Plaintiff in court filings or publicly is false, Defendants willfully and stubbornly "doubled-down" on and kept repeating such allegations.

335.     Among the most malicious of Defendants in propagating these falsehoods about Plaintiff is Defendant Handelman, who first introduced the "Serial Litigation Document" in New York in a perjured declaration and thereafter never backed off of the falsehood, even after it was definitively exposed as false.

336.     Defendant Handelman otherwise helped coordinate the use of the perjured testimony and court-filed smears against Plaintiff, working with others to this malicious end, and even taking a position adverse to Plaintiff regarding the very matter about which Plaintiff had consulted with Defendant Elliott Greenfield, while also making use of confidences that Plaintiff had reposed in Elliott Greenleaf.

337.     For example, after the complaint was filed in the Jaidan Buchan Litigation — and as part of the coordinated campaign by Defendants to attack Plaintiff — Defendant Handelman was quoted in *The Philadelphia Inquirer* on January 19, 2017 as follows: "The school's attorney, Jarad W. Handelman...said that [MHS] 'will vigorously defend against these baseless claims, and

will pursue appropriate legal remedies' to protect the school and advance the interests of its students. Handelman, a former general counsel for Gov. Tom Corbett, said the Buchan allegations and other recent suits involving Hershey students were part of a 'personal crusade' by school critic Ric Fouad, an alum and New York-based lawyer..."

338.    Defendant Handelman would later expand on that smear, saying: "The factually and legally baseless allegations in the [Jaidan] Buchan complaint are the latest irresponsible attacks orchestrated by a discredited critic of [MHS] and those acting in concert with him. ... The multiple pending legal actions against [MHS] are manifestations of Mr. Fouad's personal crusade against the leadership of [MHS]...all in furtherance of his calculated plan to disparage the reputations of [MHS], and its dedicated officers and employees. Former students and their families are being shamefully manipulated as pawns in the pursuit of this personal vendetta."

339.    Thereafter, Defendant Carfagno, once again playing his long-running support role in the tortious campaign against Plaintiff, followed Defendant Handelman's attacks on Plaintiff by soliciting alumni to join in the attacks and several alumni did so, including on *The Philadelphia Inquirer* message forum.

340.    The alumni so attacking Plaintiff included Defendant Gurt's cronies from across the country in an illustration of how Defendants amplify their smears of Plaintiff.

341.    Defendants persisted in making these false assertions even after clear evidence emerged showing that Defendants' smears of Plaintiff about the Jaidan Buchan Lawsuit were baseless; *i.e.,* a witness came forward with compelling evidence showing that Defendant MHS allowed Jaidan Buchan to be tried for arson of a student home even though MHS knew she was innocent — but Defendants thereafter still refused to withdraw their assertions about Plaintiff in

the matter, including court-filed ones, because Defendants simply don't care what the evidence shows: their sole goal is to attack and discredit Plaintiff.

342.    In sum, Defendants have been treating the Three Lawsuits as a vehicle to batter, attack, smear, and harass Plaintiff, totally divorced from any genuine defenses in the cases, and despite the lack of any factual basis for doing so.

343.    Defendants' consistent and overriding goal has been to punish Plaintiff, use the related court proceedings to drag Plaintiff's name through mud, manufacture vile and despicable "charges" against Plaintiff, ignore actual and irrefutable facts as they emerge, and keep abusing Plaintiff until he is forced to desist from his efforts to gain MHS reforms or help victims of poor MHS policy: it is difficult to imagine many people enduring the punishing and tortious campaign that Defendants have directed at Plaintiff for nearly two decades and over the last 24 months in particular, including the despicable and manufactured charge that Plaintiff is some kind of "pedophile" lurking around MHS group homes.

344.    Further, every Defendant — and the Board Defendants in particular — have been on clear notice of how Defendant MHS has notoriously misused child welfare funds in the past for similarly improper vendettas; *i.e.,* to fund malicious actions carried out by lawyers on behalf of Board members in tit-for-tat "investigations" launched by Board factions against one another.

345.    This MHS asset misuse came to light in 2016 when a whistleblower revealed that the Board had squandered $4.1 million on lawyers retained to pursue Board vendettas.[13]

---

[13]    *See, e.g.,* "Back-Stabbing and Threats of a 'Suicide Parachute' at Hershey," *New York Times,* July 30, 2016 ("In the last 12 months the trust has spent more than $4 million on lawyers to investigate charges of misconduct that board members have lodged against one another. In one instance, Robert F. Cavanaugh, then the board's chairman, was accused of improperly securing a summer job for his son with…one of the trust's outside investment companies. In a sharp escalation, Mr. Cavanaugh…accused two board members of trading Hershey stock on privileged information, which is basically the corporate version of crying 'Murder!'").

346.     The negative publicity and OAG investigation of the related waste put all Board members on heightened notice about their obligations to prevent similar misuse of MHS legal resources and all Board Defendants thus know, or should know, that lawyers have again been turned loose in a vindictive campaign against an "enemy;" *i.e.,* against Plaintiff.

347.     Each Board Defendant thus bears full responsibility for allowing these tortious acts against Plaintiff to continue.

348.     Further, the nuisance lawsuit filed against MHSAA (encouraged, incited, and supported by Defendant MHS) was orchestrated by Defendant Heist and included naming two MHSAA officers as individual defendants, solely to ratchet up the abuses heaped on them; i.e., the lawsuit against MHSAA was vicious as Defendant Heist sought to ingratiate himself with a Board that eventually rewarded him for this conduct.

349.     Defendant Heist otherwise has a history of malicious abuse of process and abuse of subpoena, including in his own divorce proceedings, where a court admonished him for having "little credibility" and being "disingenuous."

350.     During that same proceeding, Defendant Heist repeatedly invoked his Fifth Amendment right not to incriminate himself and orchestrated a sham "deposition" that was not intended to elicit genuine evidence in the case but instead to create the false impression that his now ex-wife was having an affair with her best friend's husband.

351.     That is, according to Kendelle Cornette — Defendant Heist's ex-wife — Defendant Heist issued a subpoena to Cornette's best friend's husband in order to maliciously sow discord between Cornette and her best friend, by "staging" a deposition merely to "plant" in the friend's mind the false impression that Cornette and the friend's husband were having an affair.

352.    In other words, Defendants have a history of misusing MHS child welfare resources on lawyers to punish "enemies" through vindictive and malicious legal campaigns while certain Defendants have a history of abuse of subpoena and abuse of process.

**Tortiously Using Subpoenas As Instruments Of Harassment**

353.    Defendants' tortious campaign to damage Plaintiff includes: abuse of subpoenas that they served on Plaintiff in New York, which subpoenas purported to command his attendance at depositions in New York; misrepresentations to courts — commencing with and including New York courts — to pursue those subpoenas; ignoring, circumventing, and violating S.D.N.Y. orders related to such subpoenas; maliciously refusing to accommodate reasonable rescheduling requests from Plaintiff (as a third-party witness) after intentionally scheduling subpoenas on dates and in places known to be impossible for Plaintiff to attend; using subpoena scheduling purely for harassment by, for instance, stonewalling Plaintiff and refusing even to answer requests for definitive information about whether a deposition would be rescheduled to accommodate overseas business travel, forcing Plaintiff to cut short overseas business travel in order to seek court relief; and numerous other acts of intentional misconduct as concerns subpoenas issued in the Abbie Bartels and Adam Dobson Lawsuits that were returnable in New York.

354.    In committing these abuses, Defendants have used Defendant MHS's $14 billion as an unlimited "litigation harassment war chest" in order to bully and intimidate Plaintiff, threatening him with sanctions without cause, refusing to be reasonable as concerns ordinary and required efforts to resolve discovery disagreements through good faith discussion and cooperation, and otherwise going out of their way to use sham "discovery" requests and improper subpoenas merely to harass Plaintiff, and all as part of Defendants' tortious campaign against Plaintiff.

355.    Defendants' initial volley in its abuse-of-subpoena strategy came on June 8, 2017, when Defendant MHS served Plaintiff individually in New York with a subpoena returnable in the S.D.N.Y. and that commanded Plaintiff to testify in New York, New York on June 20, 2017 — a mere 12 days later — in the Abbie Bartels Lawsuit (the "Abbie Bartels Lawsuit/Fouad Subpoena"); *i.e.*, this subpoena was issued on very short notice and with no consideration for Plaintiff's schedule or the fact that Plaintiff — who obviously has no competent, evidentiary knowledge of the facts surrounding Abbie's expulsion or suicide — has no relevant testimony to offer in the matter.

356.    Plaintiff thereupon wrote to Defendants on June 15, 2017 informing Defendants that Plaintiff had no non-privileged information in the matter and asked Defendants to identify areas where they believed Plaintiff could testify.

357.    While waiting for an answer, Plaintiff learned that he had to make an emergency trip to Tokyo for an urgent client matter, departing the week of the scheduled deposition.

358.    Plaintiff thus wrote to Defendants again on June 16, 2017 repeating his request that Defendants identify the proposed areas of examination, informing Defendants of his urgent need to travel to Tokyo, and asking Defendants to reschedule the deposition for after Plaintiff's return to accommodate Plaintiff's work travel.

359.    Attached hereto as <u>Exhibit F</u> are copies of these two (June 15 and 16, 2017) letters addressed to Defendant Handelman.

360.    Granting Plaintiff's reasonable request to reschedule the deposition due to Plaintiff's overseas business travel was a matter of course for a third-party witness in a proceeding where there was no discovery deadline urgency of any kind; *i.e.,* Defendants had no legal grounds

whatsoever, nor any other proper grounds, for denying Plaintiff's request to reschedule a unilaterally-noticed deposition that was served on short notice.

361.    Despite this, Defendants' response — via Defendant Handelman — was a June 16, 2017 missive in which Handelman wrote, "The caption of the subpoena provides ample identification of the matters on which you will be questioned."

362.    Defendant Handelman also refused Plaintiff's reasonable request for a postponement of the deposition, dismissing Plaintiff's urgent travel as "alleged;" *i.e.,* "the alleged travel plans pose no impediment to Tuesday's deposition and I have no intention of 'tabling' the deposition as you propose…"

363.    A copy of Defendant Handelman's June 16, 2017 letter is attached hereto as Exhibit G.

364.    It was manifestly clear that Defendant Handelman — an experienced lawyer who is certainly familiar with deposition rules requiring reasonable accommodations for third-party witnesses — was acting maliciously and unreasonably, solely to harass Plaintiff, because the goal of the subpoena was not legitimate discovery.

365.    Plaintiff thereafter sent Defendants a second June 16, 2017 letter, a copy of which is attached hereto as Exhibit H, that noted, "Since there appears to be no warrant in fact or law for your trying to compel me to testify — although you seem to claim some kind of unbridled right just to subpoena anyone you want in a matter — and since your tone and past statements disclose what I believe is an attempt on your part to use the [Abbie Bartels Lawsuit] for improper harassment purposes, I believe that you and your clients need to be held accountable for this conduct."

366. Plaintiff added, "This is compounded here by the fact that you won't even agree to a simple continuance on the basis of my travel plans — which you sneeringly refer to as 'alleged,' as though I would ever make something like this up. Frankly, I have never seen any other case where counsel refused a courteous request from a third-party witness for a continuance of a deposition with a subpoena served on such short notice anyway — another reason why I can only conclude that you are pursuing this conduct merely to help [MHS] punish me. Naturally, I respect that you take a different view — and we can let the court decide the matter once it hears both sides."

367. Plaintiff closed his letter with another request that Defendants act reasonably and as the rules required, stating, "[In] light of the above and my intention to file for relief on Monday [i.e., the day before the scheduled deposition], I would politely suggest that you at least reconsider my request for a delay in the scheduled deposition date..."

368. This time, Defendants simply stonewalled and failed to respond at all, until Sunday night June 18, 2017, when Defendant Handelman sent another letter suggesting that Plaintiff "familiarize [himself] with the federal rules and precedents regarding the limitations on relevancy objections in discovery..."

369. In other words, Defendant Handelman was making clear that Defendants were openly intending to abuse the discovery rules — which grant broad leeway on the question of relevance and discoverable evidence — to impose a gratuitous deposition on Plaintiff, even though Defendants knew Plaintiff had no discoverable testimony in the matter.

370. Defendant Handelman also again refused to identify the subject matter of the proposed deposition and instead cited six spurious "grounds" for why he claimed Defendants were

"entitled" to depose Plaintiff, setting forth these "grounds" in a conclusory manner that again evinced bad faith.

371.    Defendant Handelman also again refused to accommodate Plaintiff's matter-of-course request to reschedule in light of Plaintiff's overseas business travel, harassingly telling Plaintiff, without legitimate grounds, "By this correspondence, I place you on notice of my intention to seek an award of costs and expenses against you, as well as any sanction deemed appropriate by the court, in the event you fail to comply with the subpoena..."

372.    A copy of Defendant Handelman's June 18, 2017 letter is attached hereto as Exhibit I.

373.    Plaintiff responded via a June 19, 2017 letter to Defendants that carefully addressed each of the assertions contained in Defendant Handelman's June 18, 2017 letter and concluded with another request for a reasonable postponement, so that the matter could be resolved in an orderly manner if court action were in fact needed.

374.    As Plaintiff stated: "It would be a gross waste of...resources for you to force me to appear for a deposition tomorrow — on pain of my being held in contempt of court — merely to invoke my right under F.R.C.P. 30(d)(3) to postpone the deposition while I seek appropriate review. For all of these reasons, please advise immediately as to whether you will agree to my request to postpone the noticed deposition, so that all involved can plan accordingly... You will do all concerned a great service by acceding to this completely reasonable request..."

375.    A copy of Plaintiff's June 19, 2017 letter is attached hereto as Exhibit J.

376.    Plaintiff sent that letter via email to Defendants at 1:08 PM on Monday June 19, 2017, emphasizing the need for some answer, with his travel to Tokyo imminent and not wanting

to disobey a subpoena, even one improperly served and enforced, so that Plaintiff would at least know if he had to seek court relief by the following day, the day of the scheduled deposition.

377.    But Defendants chose to remain silent, forcing Plaintiff to guess at their intentions.

378.    Left with no alternative, and despite having simultaneously to prepare for overseas business travel, Plaintiff was forced to prepare an emergency motion seeking relief by Order to Show Cause the following morning in the S.D.N.Y.

379.    But Defendants' abuse-of-subpoena harassment was only beginning. As Plaintiff was completing his papers to seek relief on the Abbie Bartels Lawsuit/Fouad Subpoena noticed for that morning — and after being up virtually all night working on those papers — Defendants served Plaintiff with two more harassing subpoenas at his New York apartment that very morning.

380.    The first of these was served in New York on Plaintiff individually in the Adam Dobson Lawsuit and was also returnable in New York City on July 12, 2017 (the "Adam Dobson Lawsuit/Fouad Subpoena").

381.    The second was served on Plaintiff, purportedly in his capacity as PHC's president, and required a PHC corporate designee to appear and testify in the Abbie Bartels Lawsuit, returnable in Blue Bell, Pennsylvania on July 13, 2017 (the "Abbie Bartels Lawsuit/PHC Subpoena").

382.    Defendants later made clear that they had intended all along to compel Plaintiff — **and only Plaintiff** — to testify on behalf of PHC; *i.e.,* from the moment that Defendants served these second and third subpoenas, Defendants intended to compel Plaintiff to appear for the respective depositions knowing it was physically impossible for Plaintiff to do so, including because the subpoenas were timed to interfere with the Tokyo business travel about which Plaintiff had advised Handelman and because timing the two depositions back-to-back in different states

made Plaintiff's attendance impossible.  Plaintiff could not conclude one all-day deposition in New York City and then show up for a 9:30 A.M. deposition the next day in Blue Bell, Pennsylvania because of the sheer travel logistics, as Defendants knew.

383.     But for the time being Plaintiff had to contend with the first deposition and thus, on the morning of June 20, 2017, while Defendants were waiting for Plaintiff to arrive at the improperly-noticed deposition, Plaintiff informed Defendants that he was en route to the courthouse to file an Order To Show Cause in the S.D.N.Y., just as Plaintiff had repeatedly informed Defendants he would do, seeking relief in the matter.

384.     Defendants then willfully refused to be heard in the matter, declaring their intention to effectively ignore the S.D.N.Y. proceeding.

385.     By mid-afternoon the same day, the Honorable Deborah A. Batts (1) ordered the Abbie Bartels Lawsuit/Fouad Subpoena stayed *sine die,* (2) admonished Defendants for their handling of the matter, and (3) directed that Defendants "specify the subject matter of the deposition, especially in light of the attorney-client relationship the Deponent has to the Plaintiffs" prior to Defendants rescheduling the deposition, which they have not done to this day.

386.     Judge Batts specifically noted, "The subpoena gives no indication about the scope or subject matter of the deposition. Indeed, where the subpoena sets forth the subject matter, the Defendant wrote 'N/A.' Defendant has refused Deponent's request for clarification of the subject matter."

387.     A copy of Judge Batts's June 20, 2017 order is attached hereto as <u>Exhibit K</u>.

388.     Plaintiff thereafter repeatedly wrote to Defendants asking for reasonable postponement of the July 12th and 13th depositions, in light of Plaintiff's Tokyo business travel

and the fact that Plaintiff would require time to ask a court to review the matter in the event that Defendants and Plaintiff could not agree on how to resolve any related disagreements.

389.    Plaintiff also asked Defendants to confirm the applicability of Judge Batts's order to the Adam Dobson Lawsuit/Fouad Subpoena, since the latter was a mirror subpoena raising the very same issues that Judge Batts had addressed in her order on the Abbie Bartels Lawsuit/Fouad Subpoena.

390.    But once again, Defendants simply ignored Plaintiff's repeated requests for a postponement and gave Plaintiff no answer whatsoever.

391.    Defendants also disregarded Judge Batts's order, circumvented that order, and refused to afford the order even the most perfunctory respect required under the circumstances: Defendants to this day have never so much as acknowledged that they are bound by Judge Batts's order, despite having been directly asked to do so.

392.    When Plaintiff served Judge Batts's order on Defendants on June 20, 2017, Plaintiff made clear that Defendants were not permitted to keep making Plaintiff go to court just to obtain reasonable scheduling change requests, expressly adding: "I trust that I won't need to keep returning to court to get you to accommodate my professional obligations."

393.    But Defendant MHS responded by issuing a fourth individual subpoena to Plaintiff, on June 21, 2017, in the Abbie Bartels matter, seeking documents from Plaintiff and again ignoring Judge Batts's order.

394.    Defendant MHS never served that fourth subpoena: Defendants appear to have sought to evade Judge Batts's order by seeking the same material via alternative means.

395.    Compounding and further evidencing Defendants' bad faith, the deposition that Defendant MHS noticed for July 12, 2017 in the Adam Dobson matter was scheduled by

Defendants for nearly a full year before the end of discovery in that action and would have been the very first deposition conducted in the case for anyone, party or non-party.

396.     In other words, there was no compelling reason at all for seeking to depose Plaintiff in the Adam Dobson Lawsuit on July 12, 2017 — just as there was no reason for seeking to depose Plaintiff the following day (July 13, 2017) in another state in his PHC corporate capacity in the Abbie Bartels Lawsuit: these depositions were noticed in bad faith, with Defendants fully aware of Plaintiff's Tokyo business travel and the impossibility of appearing in both locations on back-to-back days in any case.

397.     Defendants thereafter simply ignored every letter that Plaintiff wrote asking for a rescheduling of the depositions to accommodate Plaintiff's Tokyo business travel; *i.e.,* Defendants not only refused to grant Plaintiff's completely reasonable request for brief postponements, they refused even to respond to Plaintiff's correspondence at all.

398.     Defendants' refusal to respond at all, coupled as it was with Defendants' prior express threat to seek an order holding Plaintiff in contempt if he failed to appear in response to the subpoena, was intended by Defendants to intentionally harass Plaintiff, by forcing him to return from Tokyo in order to seek court relief even though Defendants were obligated under New York law to simply grant Plaintiff's reasonable request to reschedule.

399.     Because of Defendants' stonewalling, intentionally-harassing timing of their second and third subpoenas, and refusal to answer questions about rescheduling, Plaintiff was forced to cut short his Tokyo business travel and fly back to New York, just to seek additional protective orders in the S.D.N.Y. by virtue of motions that Plaintiff should never have had to file.

400.     This worked extraordinary hardship on Plaintiff's law practice, as a solo practitioner who makes his livelihood from clients based in Japan.

401.    One of the motions for a protective order filed by Plaintiff — in regard to the Adam Dobson Lawsuit/Fouad Subpoena — was briefed and set for hearing before the Honorable Richard A. Sullivan on August 2, 2017.

402.    But at 5 PM on the night before the hearing, Defendants again gamed the rules by filing their own motion in the Middle District of Pennsylvania (the "M.D.Pa.") seeking an order that PHC produce Plaintiff — *and only Plaintiff* — as PHC's corporate witness in the Abbie Bartels Lawsuit.

403.    In other words, Defendants were trying to use a subpoena served on PHC in the Abbie Bartels Lawsuit as an end-run around both Judge Batts's existing order in that proceeding as well as any order that Judge Sullivan might issue in the Adam Dobson Lawsuit, in connections with the subpoenas that Defendants had previously made returnable in New York, thereby forcing Plaintiff to testify outside S.D.N.Y. protective orders concerning him.

404.    To this end, after putting Plaintiff through all of the briefing in the Adam Dobson S.D.N.Y. proceeding, and after forcing Judge Sullivan to be prepared to hear the matter, Defendants showed up at the hearing only to abruptly announce that the matter was "moot" because — said Defendants — they believed that they could get an order from the M.D.Pa. requiring Plaintiff to testify as PHC's corporate representative.

405.    This also constituted a full admission by Defendants that the multiple subpoenas were unwarranted, that all along they wanted only to depose Plaintiff, and that they viewed a PHC subpoena in the Abbie Bartels case as sufficient to gain whatever testimony they wanted from Plaintiff individually in the Adam Dobson matter.

406.    Not once prior to the August 2, 2017 hearing did Defendants admit such facts nor try in any way to arrange the multiple subpoenas in a manner that would have obviated the need

for Plaintiff to travel from state to state to comply with Defendants' intentionally-harassing deposition scheduling.

407.    Defendants' conduct also confirmed that Defendants' were seeking to circumvent Judge Batts's order, by using the PHC "corporate representative" subpoena to obtain the individual deposition that Judge Batts had stayed, but without meeting Judge Batts's conditions.

408.    Similarly, the entire series of depositions was constructed on a spurious "theory" fabricated by Defendants using the bogus Serial Litigation Document that Defendants — through Defendant Handelman — had expressly misrepresented to Judge Sullivan.

409.    Those misrepresentations included withholding from Judge Sullivan the "Colistra Memo" that contravened what Defendant Handelman had represented to Judge Sullivan in a sworn declaration.

410.    At the August 2, 2017 hearing, when Judge Sullivan pressed Defendant Handelman as to whether the Adam Dobson Lawsuit/Fouad Subpoena was genuinely mooted, Handelman represented to the court that it was in fact mooted.

411.    Judge Sullivan thereupon issued an August 2, 2017 order on that basis noting that Defendants represented that they had "no intention of deposing Fouad in his personal capacity."

412.    A copy of Judge Sullivan's August 2, 2017 order is attached hereto as Exhibit L.

413.    Defendants thereafter, knowing that they, in fact, intended to do exactly that — *i.e.,* depose Plaintiff in his individual capacity — asked Judge Sullivan to modify that order so as to delete Defendants' above-noted representation.

414.    Judge Sullivan, however, refused that request and issued another order on August 3, 2017 admonishing Defendants and repeating his original language; *i.e.,* "In the event that Defendants *do* serve a subpoena requesting to depose Fouad in his individual capacity, the Court

will determine whether certain statements made at the August 2, 2017 conference were made in bad faith…") (Emphasis in the original.)

415.    A copy of Judge Sullivan's August 3, 2017 order is attached hereto as <u>Exhibit M</u>.

416.    The thrust of what Defendants thereafter did was in fact to depose Plaintiff individually, bogusly claiming that they were deposing Plaintiff in his "PHC representative capacity;" *i.e.,* when Defendant Handelman questioned Plaintiff, Handelman did not restrict himself to PHC topics but instead converted the deposition into an individual deposition of Plaintiff, in disregard of the S.D.N.Y. orders.

417.    Further, when Defendant Handelman questioned Plaintiff, Defendant Handelman improperly used confidences obtained from Defendant Elliott Greenleaf's representation of Plaintiff in the course of the questioning, in disregard of the ethical and fiduciary duties that the Elliott Greenleaf Defendants owe to Plaintiff.

418.    Defendant Handelman also made unethical and false representations to Plaintiff during that deposition about the Serial Litigation Document, claiming that Plaintiff had faxed the Serial Litigation Document to himself when Handelman had no knowledge of whether that was so and thus making that false representation solely to try to trick Plaintiff into inadvertently "authenticating" a document that could not be authenticated.

419.    In questioning Plaintiff, Defendant Handelman also withheld from Plaintiff the Colistra Memo; *i.e.,* documentary evidence exposing Defendant Handelman's falsehood about the Serial Litigation Document.

420.    This was also done to try to trick Plaintiff into an admission that in any case would have been irrelevant to the proofs or defenses in the Three Lawsuits and as such was an improper subject of inquiry.

421.    When Plaintiff expressly asked Defendant Handelman where he had obtained the Serial Lawsuit Document, Defendant Handelman simply refused to answer and again withheld the fact that he also had in his possession the Colistra Memo refuting Defendant Handelman's false representations.

422.    It was only on April 30, 2018 that Defendants finally revealed the existence of the Colistra Memo, and even then, it appears that Defendants revealed it inadvertently; *i.e.,* in Defendants' haste to meet a midnight filing deadline, the Colistra Memo was included when one version of the Serial Lawsuit Document was submitted to the court — whereas in every previous submission, Defendants had carefully stripped away the Colistra Memo and kept its very existence secret, as they blatantly misrepresented facts about the Serial Litigation Document that were contradicted by the intentionally-withheld Colistra Memo.

**<u>Using Pleadings As A Vehicle Of Smear</u>**

423.    Defendants have also used Defendant MHS's purported "pleadings" in the Three Lawsuits as vehicles for blatantly smearing Plaintiff and accusing him of despicable conduct, including creating the impression that he is a pedophile, "preys on children," is unethical, and is otherwise a deranged individual motivated by malice to pursue a "crusade" against Defendant MHS and its employees, officers, directors, and agents.

424.    The sheer number of attacks on Plaintiff's character in Defendant MHS's pleadings makes quantification difficult as there have been a hundred or more of instances of it.

425.    Further, even after it was demonstrated that there is no evidence to authenticate the Serial Litigation Document, and that other of Defendants' charges were false, Defendants nonetheless persisted in repeating them, willfully misrepresenting matters to the court.

426.   Examples of Defendants' nonstop attacks on Plaintiff in Defendant MHS's pleadings include a response to a motion seeking interlocutory appeal where MHS tried to tie the appellate questions to Plaintiff's "nefarious crusade." *See, Julie Ellen Wartluft, et al., v. Milton Hershey School, et al.,* 1:16-cv-2145-CCC (M.D. Pa.), *"Defendants' Response In Opposition To Plaintiffs' Motion To Certify For Appeal Pursuant To 28 U.S.C. § 1292(b),"* fn. 1 ("Fouad's 'shadow policy' theory, also known as his 'two-hospitalization' theory, is averred in Plaintiffs' Amended Complaint and is inextricably linked to the negligence claims that Plaintiffs identify as the 'heart' of their state law claims. Thus, Plaintiffs' instant request for amendment of the August 10, 2017 Order is unsurprising. If the negligence claims are lost, so too is any opportunity for the promotion of Fouad's 'shadow policy' theory, a theory he has promoted to the DOJ and other authorities in an effort to advance his long-standing crusade against Defendants and calculated to instigate investigations of Defendants.").

427.   The allegation that the plaintiffs in the Abbie Bartels Lawsuit sought to appeal an interim order because Plaintiff needed such for his "crusade" is false and baseless. Further, Plaintiff had never even heard the phrases "shadow policy" or "two-hospitalization rule" until reading them in the complaints in the Abbie Bartels and Adam Dobson Lawsuits; i.e., Defendants simply fabricated this charge, without a shred of evidence, and with Defendant Handelman again as the sole "witness" to make the false charge, one that in any case was utterly irrelevant to the underlying lawsuits.

428.   Nonetheless, Defendants have adamantly misrepresented this particular falsehood to multiple courts — including in New York — citing it as a "factual averment," in order to buttress their "arguments" about Plaintiff.

429.     Defendants did so even after Plaintiff expressly informed Defendant Handelman — when Defendant Handelman deposed Plaintiff — that Plaintiff had no idea who coined the phrases in question.

430.     These fabrications also come not from any Defendant MHS witness, but from MHS's counsel, Defendant Handelman, since no MHS witness nor anyone else can testify to what are complete falsehoods. Defendant Handelman has simply misrepresented this false allegation as "fact" to the courts on numerous occasions.

431.     Further, Defendant Handelman continues to: (1) repeat these fabrications, (2) "testify" about documents about which his MHS clients cannot testify; and (3) "authenticate" documents that no one can authenticate, in each case knowingly and intentionally perjuring himself.

432.     Defendants' fixation on who coined the phrases "two-hospitalization rule" and "shadow policy" is particularly malicious. There is no legal relevance to who came up with this language, never mind that it was not Plaintiff. But Defendants are so intent on trying to "prove" that the Three Lawsuits are part of Plaintiff's "serial litigation strategy" that they insist on alleging that Plaintiff "coined" the phrases and is therefore "responsible" for the lawsuits — a claim that is as preposterous as it is irrelevant — as a pretext to justify and cover for the fact that they are using the Three Cases, and their intrusive and tortious campaign of abusing the discovery process in those cases, for an improper purpose of harassment and intimidation.

433.     Indeed, even after Defendants had to have learned the allegation was false, they refused to correct misstatements in the record about it and have forced Plaintiff to keep addressing it, as part of Defendants' campaign to drag Plaintiff's name through mud by any means at all.

434.     In another instance of Defendants' misuse of court proceedings for smear, Defendants alleged that Plaintiff's "conspiracy" included the attorneys that PHC was forced to retain to comply with MHS's abusive discovery requests. *See, e.g., Julie Ellen Wartluft, et al., v. Milton Hershey School, et al.,* 1:16-cv-2145-CCC (M.D. Pa.)*,* "Defendants' Reply Brief To Opposition Of Royer Cooper Cohen Braundfeld, LLC, And Alexander J. Nassar, Esq. To Motion To Compel Compliance With 30(b)(6) Subpoena And For Sanction," fn. 6 ("Defendants respectfully request a hearing at which Fouad, [PHC's counsel] Attorney Nassar, and others, are compelled to testify under oath concerning their obstruction of the 30(b)(6) examination and misrepresentations to the Court, including Attorney Nassar's involvement in the case and knowledge of Fouad's involvement in the case, PHC, and Fouad's 'serial lawsuits' strategy.").

435.     Here as well, it was preposterous and baseless to allege that PHC's attorneys were involved in some kind of "conspiracy" with Plaintiff, merely because they were retained to defend the PHC 30(b)(6) deposition that Defendants demanded — as though PHC was required to testify *pro se*.

436.     In other words, anyone who so much as associates with Plaintiff — even as counsel representing a PHC witness in a deposition that Defendants improperly demanded — has been on the receiving end of Defendants' "conspiracy theory" charges and subjected to Defendants' "scorched earth" litigation tactics and "sanctions" demands.

437.     Defendant MHS simply has so much child welfare money at its disposal that it does not care about relevance, propriety, or factual basis for lodging smears against Plaintiff and instead just pays the Elliott Greenleaf Defendants millions to tarnish Plaintiff's name and embroil Plaintiff in legal proceedings completely unconnected to him.

438.    No rational defendant that had to account for litigation spending would use resources in this manner, least of all child welfare charitable resources.

439.    In another example of Defendants' malicious charges against Plaintiff in the Three Lawsuits, in order to "object" to discovery requests, Defendants argued — in a classic case of projection — that their responses would be "used for the improper purpose of furthering the agenda of [PHC and Plaintiff] … or otherwise to further Mr. Fouad's personal vendetta and crusade against MHS;" *i.e.,* the "discovery objection" is premised on a third-party's (Plaintiff's) purported intention to misuse discovery for an imaginary "vendetta and crusade."

440.    As another example, in answering the complaint in the Abbie Bartels Lawsuit, Defendants falsely accused Plaintiff of "manufacturing" the lawsuit itself. *See, Julie Ellen Wartluft, et al., v. Milton Hershey School, et al.,* 1:16-cv-2145-CCC (M.D. Pa.), *Defendants' Amended Answer And First Amended Answer To Plaintiffs' Amended Complaint* ("F. Frederic 'Ric' Fouad has for twenty (20) years, in concert with others, admittedly implemented a strategy of 'serial lawsuits' attacking the MHS and its leadership to 'take back control of the MHS.').

441.    Further, Defendants do not point to even one case actually "incited" by Plaintiff, because there are none. This allegation is woven from whole cloth and Defendant MHS is sued (or investigated by oversight officials or featured in unfavorabvle news stories) because Defendant MHS violates the law, squanders resources, engages in Board profiteering, buys insolvent golf courses, harms needy children, and commits other wrongs, not because of anything that Plaintiff or any other lawyer does.

442.    Because Plaintiff consulted with Defendant Elliott Greenleaf when the defamatory claim about Plaintiff "instigating" lawsuits against MHS was originally manufactured in the period 2007-2008, the Elliott Greenleaf Defendants know that the court-filed defamatory statements that

they themselves are now making are untrue and they are also well aware of Plaintiff's vulnerability and sensitivity to precisely this tack by Defendants. Indeed, Elliott Greenleaf itself advised Plaintiff about his legal remedies related to such statements.

443.    But rather than coming clean about that fact or counseling their new client, Defendant MHS, to conduct itself properly and defend the Three Lawsuits on the merits — a defense that would not involve expensive and irrelevant attacks on Plaintiff — the Elliott Greenleaf Defendants instead "switched sides" and started to propound the same smears about which Plaintiff had originally sought their counsel, improperly helping Defendant MHS carry out its tortious campaign against Plaintiff.

444.    That tortious campaign against Plaintiff has brought each Defendant in this case vast sums of money and the chance to amass more money, which is why the MHS Board and administration and their agent lawyers have done all in their power to harm Plaintiff for nearly 20 years, hoping that Plaintiff will eventually crumble under the weight of a $14 billion bully's sustained barrage.

445.    In sum, Defendants' nearly 20 years of abusing Plaintiff, harassing Plaintiff's friends, intimidating journalists who report even-handedly about Plaintiff, ceaselessly smearing Plaintiff in court pleadings, using subpoenas to abuse and harass Plaintiff, shamefully exploiting a troubled individual's malicious grudge to fabricate despicable and false charges about Plaintiff, banning Plaintiff from all MHS alumni functions on the basis of contrived and perjurious statements, disseminating court-filed smears about Plaintiff to media and others, putting a "bounty" out on Plaintiff to solicit attacks on him, and Defendants' other deplorable conduct has crossed all legal lines and must be called to account in a court of law.

**FIRST COUNT**
(Prima Facie Tort, Against All Defendants)

446.   Plaintiff repeats and realleges all of the allegations contained in all previous paragraphs of the Complaint as if those allegations were set forth fully herein.

447.   Defendants, acting in concert, orchestrated a carefully-executed plan to intentionally harm Plaintiff by, among other things, smearing Plaintiff in court filings, mass-mailing and mass-emailing attacks about Plaintiff (including into New York), isolating Plaintiff and turning him into a pariah, banning Plaintiff from all MHS alumni events (including in New York), punishing, abusing, and harassing Plaintiff's friends, bullying MHS employees into attacking Plaintiff, soliciting attacks on Plaintiff by holding out the prospect of MHS jobs, contracts, Board seats, and other lucrative items as a means of recruiting lackeys to attack Plaintiff, bullying and intimidating MHS alumni and others into fearing even being associated with Plaintiff, organizing internet "mob actions" — including physical intimidation — against Plaintiff, encouraging MHS alumni to create a Facebook page attacking Plaintiff, furthering a whisper campaign against Plaintiff, punishing Plaintiff's clients, punishing Plaintiff's co-counsel, punishing journalists and media outlets who would otherwise report even-handedly about Plaintiff, damaging Plaintiff financially, willfully disrupting Plaintiff's work including his Tokyo business travel, willfully scheduling depositions in a manner that Defendants knew would be impossible for Plaintiff to attend, smearing Plaintiff hundreds of times in court filings where such smears had no legitimate connection whatsoever to the underlying cases, deviously exploiting an emotionally troubled individual to knowingly suborn perjurious testimony from that individual as part of an outrageous and carefully-orchestrated plan to cast Plaintiff in the most despicable light imaginable — i.e., as a "pedophile" who "preys" on children and "uses student rosters and housing plans" to "troll" for child victims — disseminating that blatantly perjurious testimony knowing it to be false

and solely to harm Plaintiff, reporting such falsehoods to the police, disseminating such falsehoods to the media, and otherwise trying to turn Plaintiff into a pariah, a goal that Defendants have pursued for nearly 19 years and at least since 2003 in one continuous series of tortious acts.

448.     Plaintiff suffered special damages as a result thereof, including expenditure of legal fees and costs, court costs, travel expenses, business disruption, loss of membership fees paid to MHSAA, extraordinary humiliation and emotional damages, and other damages.

449.     In all instances, Defendants acted without excuse or justification but instead solely out of malice and disinterested malevolence.

450.     Defendants' series of acts were facially legal though, in actuality, were intended as a whole to achieve the unlawful goal of tortiously harming Plaintiff under the color of legal right.

451.     The Defendants conspired with each other to carry out and effectuate the tortious conduct alleged above.

### SECOND COUNT
<u>(Abuse of Subpoena/Abuse of Process, Against All Defendants)</u>

452.     Plaintiff repeats and realleges all of the allegations contained in all previous paragraphs of the Complaint as if those allegations were set forth fully herein.

453.     Defendants issued multiple subpoenas in a regular manner including the Abbie Bartels Lawsuit/Fouad Subpoena, the Adam Dobson Lawsuit/Fouad Subpoena, the Abbie Bartels Lawsuit/PHC Subpoena, and other subpoenas; i.e., these subpoenas complied with all formal technicalities.

454.     However, in each instance, these subpoenas were issued for purposes wholly-unrelated to their actual lawful purposes but instead were intended solely to harm Plaintiff.

455.     Thus, each of these subpoenas was used in a perverted manner to gain a collateral objective, specifically, to harm Plaintiff and to engage in a discovery "fishing expedition" unrelated to the actual underlying litigation.

456.     For instance, knowing that he would not tell the truth, Defendants orchestrated Hatfield's deposition solely to provide Hatfield with a forum in which to testify and thus receive a qualified privilege for defamation that Defendants intended to use to harm Plaintiff, and did so use to harm Plaintiff, by publicly disseminating — in court filings and to the media — Hatfield's perjurious testimony knowing it was false and harmful to Plaintiff and not in any way to advance Defendant MHS's actual defenses in the underlying case nor any other proper objective.

457.     The subpoenas issued to Plaintiff and PHC were similarly intended for the improper purpose of harassing, punishing, and financially burdening Plaintiff, both directly and through PHC.

458.     Defendants' actionable conduct here included willfully scheduling depositions at times and in locations that Defendants knew Plaintiff could not attend, refusing matter-of-course and reasonable requests from Plaintiff to reschedule such depositions, refusing even to answer Plaintiff's questions about whether Defendants would reschedule such depositions, refusing to engage in any of the cooperative efforts required of parties with a dispute about deposition testimony, refusing to engage in any dialogue, conversation, or any other good faith effort to address disputes about deposition testimony and the related scheduling issues solely to intentionally and willfully bully, harass, and burden Plaintiff.

459.     In so doing, Defendants also willfully violated S.D.N.Y. court orders related to such subpoenas, evaded the import of S.D.N.Y. court orders about those subpoenas, and used Defendant MHS's $14 billion as a means by which to so overwhelm Plaintiff with legal process

that Plaintiff could not possibly keep filing all of the relief requests that Defendants' willful abuse of subpoena necessitated, and all solely to achieve the unlawful, improper, and tortious collateral objectives of harassing, intimidating, and damaging Plaintiff as part of Defendants' carefully-orchestrated campaign through the use and abuse of such process.

460.    As just some examples, Defendants refused to vary from the dates that they set unilaterally and on short notice for the return of their subpoenas, and which refusal was without cause or justification and solely to harm Plaintiff by causing him maximum burden and inconvenience.

461.    Defendants also denied Plaintiff's reasonable requests for scheduling changes to accommodate his overseas business travel — refusing even to discuss reasonable alternative dates — and which requests were also to allow Plaintiff time to have a court hear Plaintiff's motions for protective orders.

462.    Defendants refused, without cause or justification and solely to cause harm to Plaintiff, to respond to Plaintiff's reasonable requests for answers to his questions about deposition schedule changes.

463.    Defendants thereby caused Plaintiff economic harm, including the expenses of filing motions for protective orders and the costs associated with his time spent on drafting such motions on expedited schedules when he could have been working on other client matters and when Plaintiff was entitled to accommodation without seeking court relief, the expenses of traveling out of state to submit to a deposition, expenses of retaining counsel related to the subpoenas and discovery, lost business due to the massive disruption of Plaintiff's work as a result of having to respond to Defendants' abusive discovery and obtain court relief where none should have been required, and other economic damages.

464.     Defendants further filed, without cause or justification, hundreds of malicious and false statements about Plaintiff in various legal proceeding, solely to smear, harass, marginalize, and emotionally sicken Plaintiff.

465.     Plaintiff suffered economic damage in having to respond to malicious and false statements, including preparing numerous affidavits and explanations of matters that were completely irrelevant to the legal proceedings where Defendants introduced them.

466.     Defendants' conduct in this regard was malicious.

467.     The Defendants conspired with each other to carry out and effectuate the tortious conduct alleged above.

## THIRD COUNT
### (Breach Of The Covenant Of Good Faith And Fair Dealing, Against Defendant MHS)

468.     Plaintiff repeats and realleges all of the allegations contained in all previous paragraphs of the Complaint as if those allegations were set forth fully herein.

469.     Plaintiff is a life-time member of MHSAA, which operates intertwined with defendant MHS, as both provide services to all MHS alumni and MHSAA members, including Plaintiff.

470.     Plaintiff is also an MHS alumnus in good standing.

471.     Defendant MHS thus has contractual obligations to Plaintiff to treat him as any other alumnus in good standing, include Plaintiff in normal MHS alumni functions, and otherwise fulfill Defendant MHS's contractual obligations to Plaintiff.

472.     In an effort to punish Plaintiff for his MHS reform efforts, Defendant MHS willfully breached its contractual obligations to Plaintiff by, among other things, barring Plaintiff from New York alumni events, including an event held on April 30, 2018 and from all other alumni events.

473.    Defendant MHS did this in a manner that breached the covenant of good faith and fair dealing, in a malicious and tortious manner.

474.    Defendants Gurt, Carfagno, Cline, and Heist participated directly in executing this breach of the covenant of good faith and fair dealing.

475.    Plaintiff is damaged by the diminishment in value of his MHSAA lifetime membership fees and by the loss of the collegial relations with fellow alumni that Defendant MHS's tortious actions caused.

476.    The Defendants conspired with each other to carry out and effectuate the tortious conduct alleged above

## FOURTH COUNT
(Outrageous Conduct Causing Emotional Distress, Against All Defendants)

477.    Plaintiff repeats and realleges all of the allegations contained in all previous paragraphs of the Complaint as if those allegations were set forth fully herein.

478.    For nearly 20 years, Defendants have pursued a malicious, meanspirited, ugly, abusive, bullying, and outrageous campaign of harassment and intimidation against Plaintiff, targeting him, targeting those close to him, targeting attorneys working with him, targeting indigent clients whom he has helped on a *pro bono* basis, targeting journalists reporting on him or on matters concerning him, targeting MHS employees and others who might be sympathetic to him, targeting MHS alumni — young and old — who might befriend him or seek guidance from him, and targeting anyone else within the reach of Defendant MHS's $14 billion of bullying power.

479.    This malicious, meanspirited, ugly, abusive, bullying, and outrageous campaign of harassment and intimidation includes mass-mailing tens of thousands of letters attacking Plaintiff to MHS alumni throughout the country (including in New York), viciously abusing and harassing MHS employees known to be close to Plaintiff, using goons such as Defendant Gurt's brother

Robert Gurt to break up meetings conducted by Plaintiff and otherwise to menace and harass Plaintiff and those close to Plaintiff including by means of expletive-laced phone calls, distributing MHS jobs/contracts/Board seats to lackeys who in exchange participated in attacks on Plaintiff or those close to Plaintiff, bullying alumni who would otherwise have worked with Plaintiff in seeking MHS reforms, intimidating young alumni into fearing any association with Plaintiff, insidiously preventing Plaintiff from fulfilling speaking engagements by bullying sponsors of such events into cancelling them, bullying media outlets and journalists into fear of even reporting even-handedly on matters concerning Plaintiff, orchestrating letter campaigns attacking Plaintiff, orchestrating internet "mob" actions attacking Plaintiff, using court filings to engage in "privileged defamation," malicious harassment, ugly, false, and unfounded calumny, flagrant and outrageous misuse of subpoenas solely to harass and badger Plaintiff, making false statements to courts to fuel the use of subpoenas for harassment, suborning perjury from an emotionally unbalanced and unreliable individual as part of an outrageous and carefully-orchestrated plan to cast Plaintiff in a despicable light — i.e., as a "pedophile" who "preys" on children and "uses student rosters and housing plans" to "troll" for victims — banning Plaintiff from all alumni events including in New York, and otherwise doing everything in Defendants' power to inflict as much harm on Plaintiff as possible for the last 19 years, without interruption.

480.     These malicious acts are compounded by Defendants' falsehoods and bogus claims that Plaintiff is "motivated" by anything other than his unalloyed goal of seeking MHS governance and program reforms while each Defendant here has been motivated by greed.

481.     Each Defendant has participated in the concerted campaign of harassment and intimidation set forth herein, whether overtly or by ratifying and approving the acts of others, commencing in 2000 or earlier for Defendant MHS, in 2003 for Defendants Redmond, Heist, Gurt,

and Carfagno, in 2007 for Defendant Mead, in 2014 for Defendants Saltzman and Cline, in 2016 for Defendants Brown and Koken, in 2017 for Defendants Bergen and Katzman, and in 2013 or earlier for Defendant Peeples-Fullmore.

482.    For example, Defendants Heist, Gurt, and Carfagno orchestrated vicious attacks on Plaintiff and those close to him in 2003 and have continued to orchestrate similar and related vicious attacks until this very day.

483.    Defendants Redmond and Mead approved of the harassment of Plaintiff funded with MHS child welfare assets from the day that both joined the Board; i.e., since 2003 for Defendant Redmond and 2007 for Defendant Mead, and all strictly to protect their lucrative "nonprofit" Board positions.

484.    Defendant Brown, Koken, Saltzman, Katzman, Peeples-Fullmore, and Bergen similarly approved of all these acts against Plaintiff and those close to him for the same mercenary reasons; i.e., they have wanted to profiteer from their "nonprofit" Board service and have both wanted to silence Plaintiff, their most outspoken and effective critic, and thus approved of use of MHS child welfare funds to pursue the tortious campaign against Plaintiff.

485.    Defendants' conduct was extreme and outrageous, willful, wanton and malicious, outside the boundaries of decency and shocking to the conscience. Through it, Defendants inflicted severe mental pain and anguish upon the Plaintiff through a deliberate and malicious campaign of harassment and intimidation, including by viciously targeting those near Plaintiff.

486.    Defendants all conspired with each other to cause injury to the Plaintiff, who has suffered long-lasting emotional damage as a result.

## FIFTH COUNT
### (Civil Conspiracy To Commit A Tort, Against All Defendants)

487.    Plaintiff repeats and realleges all of the allegations contained in all previous paragraphs of the Complaint as if those allegations were set forth fully herein.

488.    The Defendants provided substantial assistance to each other in carrying out the scheme alleged above, coordinated these acts with each other, divvied up the responsibility for committing these acts amongst each other, collectively accessed MHS child welfare resources to fund and fuel these acts, and otherwise collaborated with each other as concerns the entire course of conduct at issue herein.

489.    Plaintiff suffered damages as a result.

## SIXTH COUNT
### (Breach of Fiduciary Duty, Against Defendants Jarad W. Handelman and Elliott Greenleaf)

490.    Plaintiff repeats and realleges all of the allegations contained in all previous paragraphs of the Complaint as if those allegations were set forth fully herein.

491.    Plaintiff consulted with, for the purpose of obtaining legal advice and counsel, and obtained legal advice and counsel from, Defendant Elliott Greenleaf in the period 2007-2008, specifically regarding Defendant MHS's campaign of harassment, intimidation, and bullying against Plaintiff, as well as Plaintiff's efforts to secure MHS systemic reforms so as to protect the children in Defendant MHS's care.

492.    Plaintiff conveyed confidences to Defendant Elliott Greenleaf in regard to such consultation and obtaining of legal advice.

493.    As a result, Defendant Elliott Greenleaf assumed a fiduciary duty to Plaintiff, including the duty to protect Plaintiff's confidences communicated to Elliott Greenleaf and the

duty not to act adversely to Plaintiff concerning the matter on which Plaintiff sought and obtained legal advice.

494.     Defendant Elliott Greenleaf, in its own capacity and acting together with Defendant Jarad W. Handelman, a shareholder and partner in the firm, breached its fiduciary duties to Plaintiff by mining Plaintiff's correspondence with Elliott Greenleaf, using confidences obtained thereby to harm Plaintiff's interests in the very same matter about which Plaintiff consulted with Elliott Greenleaf, taking positions on behalf of Defendant MHS that were directly adverse to Plaintiff's interests in that matter, including making use of confidences reposed in Defendant Elliott Greenleaf by Plaintiff.

495.     Plaintiff was damaged by this tortious conduct in an amount to be determined at trial, including the legal expenses of responding to Defendants' harassing discovery, Plaintiff's lost business as a result of the same, and the loss of friendship and standing in the MHS alumni community as a result of Defendants' orchestrated and malicious campaign to harm Plaintiff.

496.     In addition to those damages, Defendant Elliott Greenleaf is required to disgorge all fees earned in matters for which it acted against Plaintiff's interests regarding matters about which Plaintiff consulted with Elliott Greenleaf and in connection with which Plaintiff sought Defendant Elliott Greenleaf's legal counsel as well as in connection with all matters in which Elliott Greenleaf used Plaintiff's confidential communications to aid Defendant MHS.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment:

  A. on the First count, against the Defendants, jointly and severally, in an amount to be determined at trial, including special and punitive damages, plus pre- and post-judgment interest, attorneys' fees and the costs of this action;

B.  on the Second Count, against the Defendants, jointly and severally, damages in an amount to be determined at trial, including punitive damages, plus pre- and post-judgment interest, attorneys' fees and the costs of this action;

C.  on the Third Count, against Defendant MHS, damages in an amount to be determined at trial, including punitive damages, plus pre- and post-judgment interest, and for an order enjoining the effect of the Banning Letter, and attorneys' fees and the costs of this action;

D.  on the Fourth Count, against the Defendants, jointly and severally, for damages in an amount be determined at trial, including punitive damages, plus pre- and post-judgment interest, attorneys' fees and the costs of this action;

E.  on the Fifth Count, against the Defendants, jointly and severally, for damages in an amount be determined at trial, including punitive damages, plus pre and post judgment interest, attorneys' fees and the costs of this action; and,

F.  on the Sixth Count, against the Elliott Greenleaf Defendants, jointly and severally, for damages in an amount be determined at trial, including punitive damages, plus pre and post judgment interest, attorneys' fees and the costs of this action; and;

granting Plaintiff such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a jury on all issues so triable.


Dated:      New York, New York
            September 17, 2018

**MEISTER SEELIG & FEIN LLP**

 /s/ Jeffrey Schreiber
By:    Jeffrey Schreiber
125 Park Avenue, 7th Floor
New York, New York 10017
Tel: (212) 655-3500

*Attorneys for Plaintiff F. Frederic Fouad*
