**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **F. FREDERIC FOUAD,** | : | **Civil No. 1:19-CV-253** |
| | : | |
| **Plaintiff** | : | **(Judge Wilson)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **THE MILTON HERSHEY SCHOOL** | : | |
| **AND TRUST, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION AND ORDER

## I.   Introduction

This case, which comes before us for consideration of 15 discovery motions, (Docs. 260, 261, 262, 263, 269, 270, 369, 371, 376, 390, 399, 400, 402, 406, 408), presents itself as yet another battle in a prolonged bout of internecine legal warfare between the plaintiff, F. Frederic Fouad, and the defendants. The parties have conducted this litigation in a bitter and acrimonious fashion, taking every opportunity to engage in a mutually caustic dialogue resulting in dysfunction and strife which is antithetical to the goals of our legal system—"the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. The instant discovery motions are no exception.

Indeed, it appears that in the three months that these parties have engaged in discovery regarding Fouad's motion for termination sanctions, they have accomplished very little in terms of reaching the merits of the issues they have placed before this court. Rather, they have littered the docket with prolific and acerbic rhetoric, a practice which does not advance either party's position before this court. They have also been largely unable to come to a consensus on the scope of the limited and tailored discovery which we had ordered them to undertake in March of this year. Based on our review of these parties' extensive submissions, we believe that each party has approached these discovery questions from an almost theological perspective, with each party adhering to certain positions as articles of faith, rather than viewing them as factual matters which must be subject to discovery and proof. For example, the plaintiff appears to believe that the focus of discovery should be on what the defendants allegedly did with the 1999 Memo after it appeared in their possession. Thus, for Fouad it is an article of faith that this disputed memo was both privileged and stolen.

In contrast, the defendants focus upon the 1999 Memo's creation, Fouad's relationship to it, and the events at the 1999 conference at the Hotel Hershey at which Fouad alleges that the theft of this document occurred. However, they do so in a categorical fashion, asserting as an article of faith that the memo was neither privileged nor stolen. Adopting this perspective, the defendants would like us to

decide this sanctions motion on the pleadings alone and refrain from ordering any additional discovery.

In our view, as is frequently the case, the path toward resolution of this sanctions motion lies somewhere in between the parties' two extreme suggestions. As Fouad's counsel noted during our oral argument on these discovery motions, this court has broad discretion in sequencing discovery. In the instant case, we will exercise that discretion and order the parties to return to return to first principles. Since our initial discovery scheduling order appears to have been too broad in scope, the purpose of this memorandum opinion is to refocus and refine the scope of discovery which we believe will lead to prompt resolution of the key, largely overlooked issue before us within the plaintiff's motion for termination sanctions: whether the 1999 Memo was in any sense privileged and whether it was ever stolen—key issues since Fouad seeks sanctions for *stolen* document use. To this end, we will order the bifurcation of the discovery process in this case as follows: the parties should first endeavor to determine whether the 1999 Memo was ever stolen and whether this document is subject to any valid privilege held by Fouad.[1] Only after these determinations have been made, and both answered in the affirmative, should the parties delve into what use has been made of this document. We will set

---

[1] We specify that the privilege should be held by Fouad in this instance because in his motion for termination sanctions, Fouad states that the document "included Plaintiff's attorney work-product[.]" (Doc. 241).

a separate discovery schedule for the second half of discovery, relating to the use of the memo, should the parties need to progress to this stage. We note that thus far, the parties have largely expected us to decide this motion for sanctions on the basis of each side's conjecture and speculation, rather than facts garnered through discovery efforts in support thereof. Thus, we expect that the parties will engage in a full and good faith exchange to establish a factual record that will enable us to determine these important preliminary issues relating to this motion.

We also note that by properly refocusing the parties' discovery efforts upon these essential threshold questions, the more focused scope of discovery may render many of the pending discovery disputes moot. In addition, we are aware that much of the discovery served thus far has been tailored to a much larger universe of information than this order prescribes. To avoid prejudicing either side, the parties should begin the discovery process again with this new limited scope in mind as set forth below.

We now turn to the pending motions before us. These 15 discovery motions consist of four motions for a protective order, (Docs. 369, 371, 406, 408), nine motions to compel discovery, (Docs. 260, 261, 262, 263, 269, 270, 376, 390, 399), and two motions to strike, (Docs. 400, 402).[2] The parties involved in these various,

---

[2] There remains one motion for sanctions, (Doc. 421), which is not yet ripe for our review.

far-flung motions include the Elliott Greenleaf law firm and one of its attorneys, Jarad Handelman (collectively, "EG Defendants"); the Milton Hershey School's ("MHS") president, Peter Gurt; MHS's senior director for the alumni relations and programs, Ralph Carfagno; MHS's vice president for legal affairs, Andrew Cline; and numerous present and former members of the board of directors for MHS and the Hershey Trust Company (collectively, "MHS Defendants");[3] as well as the plaintiff, Mr. Fouad. These motions stem from our determination that limited, carefully tailored discovery was appropriate in this case regarding Fouad's motion for termination sanctions for what the plaintiff alleges was the unlawful receipt and inappropriate use by the defendants over the past 20 years of a document which he claims was attorney work product. (Doc. 241). While appearing to be a simple task with a narrow and focused scope, these parties quickly illustrated for us their vast disagreement regarding the scope of discovery and what documents each side was entitled to receive. Thus, on April 6, 2020, we directed these parties that: "any lingering or perceived disputes regarding the scope of discovery existing after April 13, 2020 should be promptly raised in an appropriate motion before this court, i.e., either a motion to compel or a motion for a protective order." (Doc. 365). After being

---

[3] The MHS and HTC have mirror boards. These individual current and former board members made part of this lawsuit include Robert Heist, David Saltzman, Velma Redmond, James Meade, James Brown, M. Diane Koken, Melissa Peeples-Fullmore, James Katzman, and Jan Loeffler Bergen.

inundated with these motions, we determined that extending the option for oral argument would be appropriate to give each side an opportunity to fully present their perspective on these contentious discovery motions. This argument was held on June 12, 2020, at which time all parties were given an opportunity to be heard.

The motions subject to this argument are fully briefed and are, therefore, ripe for disposition. After careful consideration, these motions will be granted, in part, and denied, in part.

## II.   **Discussion**

### A.   **Standards Governing Discovery Disputes**

Several basic guiding principles inform our resolution of the instant discovery disputes. At the outset, Rule 37 of the Federal Rules of Civil Procedure governs motions to compel discovery, and provides that:

> (a) Motion for an Order Compelling Disclosure or Discovery
>
> (1) In General. On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. . . .

Fed. R. Civ. P. 37(a).

The scope of what type of discovery may be compelled under Rule 37 is defined, in turn, by Rule 26 of the Federal Rules of Civil Procedure, which provides that:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional

to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

Rulings regarding the proper scope of discovery, and the extent to which discovery may be compelled, are matters consigned to the court's discretion and judgment. Thus, it has long been held that decisions regarding Rule 37 motions are "committed to the sound discretion of the district court." DiGregorio v. First Rediscount Corp., 506 F.2d 781, 788 (3d Cir. 1974). Similarly, issues relating to the scope of discovery permitted under Rule 26 also rest in the sound discretion of the Court. Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 90 (3d Cir. 1987). Therefore, a court's decisions regarding the conduct of discovery, and whether to compel disclosure of certain information, will be disturbed only upon a showing of an abuse of discretion. Marroquin-Manriquez v. I.N.S., 699 F.2d 129, 134 (3d Cir. 1983). This far-reaching discretion extends to rulings by United States Magistrate Judges on discovery matters. In this regard:

District courts provide magistrate judges with particularly broad discretion in resolving discovery disputes. See Farmers & Merchs. Nat'l Bank v. San Clemente Fin. Group Sec., Inc., 174 F.R.D. 572, 585 (D.N.J. 1997). When a magistrate judge's decision involves a discretionary [discovery] matter . . . , "courts in this district have determined that the clearly erroneous standard implicitly becomes an

7

abuse of discretion standard." <u>Saldi v. Paul Revere Life Ins. Co.</u>, 224 F.R.D. 169, 174 (E.D. Pa. 2004) (citing <u>Scott Paper Co. v. United States</u>, 943 F. Supp. 501, 502 (E.D. Pa. 1996)). Under that standard, a magistrate judge's discovery ruling "is entitled to great deference and is reversible only for abuse of discretion." <u>Kresefsky v. Panasonic Communs. & Sys. Co.</u>, 169 F.R.D. 54, 64 (D.N.J. 1996); <u>see also</u> <u>Hasbrouck v. BankAmerica Hous. Servs.</u>, 190 F.R.D. 42, 44-45 (N.D.N.Y. 1999) (holding that discovery rulings are reviewed under abuse of discretion standard rather than *de novo* standard); <u>EEOC v. Mr. Gold, Inc.</u>, 223 F.R.D. 100, 102 (E.D.N.Y. 2004) (holding that a magistrate judge's resolution of discovery disputes deserves substantial deference and should be reversed only if there is an abuse of discretion).

<u>Halsey v. Pfeiffer</u>, No. 09-1138, 2010 WL 3735702, *1 (D.N.J. Sept. 17, 2010).

This discretion is guided, however, by certain basic principles. Thus, at the outset, it is clear that Rule 26's broad definition of that which can be obtained through discovery reaches nonprivileged matter that is relevant to any party's claim or defense. Therefore, valid claims of relevance and privilege still cabin and restrict the court's discretion in ruling on discovery issues. Furthermore, the scope of discovery permitted by Rule 26 embraces all relevant information—a concept which is not confined to admissible evidence but is also defined in the following terms: "Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Rather, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." <u>Id.</u>

Moreover, it is also undisputed that "courts have broad discretion to manage the discovery process, and can expedite or otherwise alter the timing and sequence

of discovery." <u>Canal St. Films v. Does 1-22</u>, No. 1:13-CV-0999, 2013 WL 1775063, at *2 (M.D. Pa. Apr. 25, 2013). <u>See</u> <u>Malibu Media LLC v. Doe</u>, No. 1:15-CV-1129, 2015 WL 3795948, at *2 (M.D. Pa. June 18, 2015); <u>Kone Corp. v. ThyssenKrupp USA, Inc.</u>, No. CIV.A. 11-465-LPS, 2011 WL 4478477, at *3 (D. Del. Sept. 26, 2011). Indeed, at the oral argument relating to these discovery motions, the parties conceded this broad discretion that is conferred upon the court.

The Federal Rules of Civil Procedure also set numerical limits on the number of discovery demands which a party may propound. In this regard, Rule 33(a)(1) of the Federal Rules of Civil Procedure, which governs interrogatories to parties, expressly provides that: "Unless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." Fed. R. Civ. P. Rule 33(a)(1) (emphasis added). Over the past years, much ink has been spilled addressing the question of how interrogatory sections and subparts should be counted. In this regard, the positions of the parties are proponents or opponents of particular interrogatories often color their views regarding whether an interrogatory consists of a single, albeit extended, question, or multiple subparts each of which is independently counted in determining whether Rule 33's limits have been met or exceeded. On this score, as the courts have observed: "Identifying a 'discrete subpart' has proven difficult." <u>Banks v. Office of Senate Sergeant-at-Arms</u>, 222 F.R.D. 7, 10 (D.D.C. 2004). In addressing this

question: "[T]he courts have . . . attempted to formulate more conceptual approaches, asking whether one question is subsumed and related to another or whether each question can stand alone and be answered irrespective of the answer to the others. Kendall v. GES Exposition Services, 174 F.R.D. 684 (D. Nev. 1997). But, . . . , this is anything but a bright-line test. Safeco of America v. Rawstron, 181 F.R.D. 441, 445 (C.D. Cal. 1998)." Banks v. Office of Senate Sergeant-at-Arms, 222 F.R.D. 7, 10 (D.D.C. 2004).

In addressing this question, we begin as many other courts have in the past, by considering the Advisory Committee Notes to Rule 33 which explains that:

> Interrogatories often contain subparts. Some are explicit and separately numbered or lettered, while others are implicit and not separately numbered or lettered. Extensive use of subparts, whether explicit or implicit, could defeat the purposes of the numerical limit contained in Rule 33(a), or in a scheduling order, by rendering it meaningless unless each subpart counts as a separate interrogatory. On the other hand, if all subparts count as separate interrogatories, the use of interrogatories might be unduly restricted or requests for increases in the numerical limit might become automatic. The Advisory Committee addressed this issue and provided some guidance as to when subparts should and should not count as separate interrogatories:

> Each party is allowed to serve 25 interrogatories upon any other party, but must secure leave of court (or stipulation from the opposing party) to serve a larger number. Parties cannot evade this presumptive limitation through the device of joining as 'subparts' questions that seek information about discrete separate subjects. However, a question asking about communications of a particular type should be treated as a single interrogatory even though it requests that the time, place, persons present, and contents be stated separately for each such communication.

Advisory Committee Note, 146 F.R.D. 401, 675-676 (Fed. 1993).

Nyfield v. Virgin Islands Tel. Corp., 200 F.R.D. 246, 247 (D.V.I. 2001).

Adopting this approach, we note that we are urged to "use rules of reasonability and fairness in compressing subparts to count against [Rule 33's 25 interrogatory] limit." Id. In this regard, "the best test of whether questions with[in] a single interrogatory are subsumed or related, is to examine whether the first question is primary and subsequent questions are secondary to the primary question. Or, can the subsequent question stand alone?" Id. Put another way, "[a] subpart is discrete and regarded as a separate interrogatory when it is logically or factually independent of the question posed by the basic interrogatory. See Safeco of Am. v. Rawstron, 181 F.R.D. 441, 444-45 (C.D. Cal. 1998); Kendall v. GES Exposition Servs., Inc., 174 F.R.D. 684, 685-87 (D. Nev. 1997)." New Colt Holding Corp. v. RJG Holdings of Florida, Inc., No. CIV. 3:02CV173 (PCD), 2003 WL 22305141, at *1 (D. Conn. Feb. 6, 2003). Thus, an evaluation of whether various queries constitute separate interrogatories for purposes of assessing the limits set by Rule 33 often entails, "including subparts and sub-subparts that are often logically and/or factually independent of the question posed by the basic interrogatory." Knit With v. Knitting Fever, Inc., No. CV 08-4221, 2010 WL 11474937, at *1 (E.D. Pa. Jan. 22, 2010).

Rule 26 also provides a framework by which a party may seek a protective order to limit the scope of discovery. Specifically, Rule 26(c)(1) provides as follows:

A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending. . . . . The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(A) forbidding the disclosure or discovery;

(B) specifying terms, including time and place, for the disclosure or discovery;

(C) prescribing a discovery method other than the one selected by the party seeking discovery;

(D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;

(E) designating the persons who may be present while the discovery is conducted;

(F) requiring that a deposition be sealed and opened only on court order;

(G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way; and

(H) requiring that the parties simultaneously file specified documents or information in sealed envelopes, to be opened as the court directs.

Fed. R. Civ. P. 26(c)(1). In addition, valid claims of relevance and privilege still cabin and restrict the court's discretion in ruling on discovery issues. If a motion for a protective order is denied in whole or in part, "the court may, on just terms, order that any party or person provide or permit discovery." Fed. R. Civ. P. 26(c)(2).

Finally, we note that this broad discretion over discovery matters extends to decisions under Rule 26(c) relating to the issuance of protective orders limiting and regulating the timing of discovery. Indeed, it is undisputed that: " '[t]he grant and nature of [a protective order] is singularly within the discretion of the district court and may be reversed only on a clear showing of abuse of discretion.' Galella v. Onassis, 487 F.2d 986, 997 (2d Cir. 1973) (citation omitted)." Dove v. Atlantic Capital Corp., 963 F.2d 15, 19 (2d Cir. 1992).

**B.   Protective Orders**

    **a.   The Defendants' Motions for a Protective Order, (Docs. 369, 371), Will be Granted.[4]**

In their respective motions for a protective order, (Docs. 369 and 371), the EG and MHS Defendants allege that the plaintiff served excessive discovery requests in violation of our March 9, 2020 order, (Doc. 348), which set narrow and tailored discovery limitations for the parties. Specifically, the defendants assert that Fouad propounded excessive requests for production of documents on various individual defendants and that these requests included additional discrete subparts, placing them well over the limit set by our March 9, 2020 order. In addition, the defendants

---

[4] Our decision to grant this protective order is, to some extent, an apparent Pyrrhic victory for the MHS Defendants with respect to the interrogatories propounded by Fouad. We note that it appears that the MHS Defendants have indeed answered Fouad's interrogatories despite the fact that they had a motion for a protective order still pending with this court. (See Doc. 403, Exhibits 1A-L).

assert that Fouad served a total of 125 interrogatories on these various defendants—a figure also well beyond the prescribed limitations.

This March 9, 2020 order, which attempted to set clear guidelines for the parties' limited discovery, set the following restrictions on discovery:

(i)     Depositions to be taken by:

        Plaintiff    7          All Defendants    7

(ii)    Interrogatories:

        Plaintiff    25         All Defendants    25

(iii)   Request for Production of Documents:

        Plaintiff    25         All Defendants    25

(iv)    Request for Admissions:

        Plaintiff    25         All Defendants    25

(Doc. 348). This order also noted that "these are aggregate limits for both parties. **Discovery in excess of these limits must be approved by the Court upon a showing of good cause**." (Id.) (emphasis in original). It is undisputed that we have not received any such request for additional discovery from Fouad.

Fouad appears to argue that despite serving discovery requests on all defendants, the fact that he served each defendant with a number of requests within our prescribed limits with the same or common language rendered the number of requests compliant with the limits set by this order. In other words, he argues that

the number of questions with different requests was within our set limits, even though the total number of questions served may have been over the amount allowed.[5] We disagree with this logic for a number of reasons.

_____

[5] For example, Fouad served the following requests for production of documents on all 12 individual MHS Defendants and both EG Defendants:

1. Documents and communications relating to the 1999 Memo, including, but not limited to: (a) the interception, acquisition, or any other way obtaining of the 1999 Memo at the Hotel Hershey or anywhere else; (b) the chain of custody of the 1999 Memo before and after it was received by MHS, including the details of the files in which it was stored, the custodian of these files, and its disclosure to all persons, including all Defendants in this case; (c) the details of how, when and from whom the 1999 Memo was obtained by MHS; (d) MHS's decision to forbear from returning the 1999 Memo to Plaintiff, including any advice from any attorney to return the 1999 Memo to Plaintiff and forebear from examining or using the 1999 Memo; (e) MHS disclosures of the 1999 Memo to any attorney and the purpose of each such disclosure; (f) MHS's decisions to use the 1999 Memo and the details and purpose of those decisions and each such use; (g) any strategic plan or document of any kind, whether media, legal, or otherwise, that makes use of the content of the 1999 Memo directly or indirectly including, without limitation, any plan to use the 1999 Memo to allege Dragonetti Act violations against Plaintiff or any other party, any plan to rely on the 1999 Memo to obtain discovery concerning Plaintiff in any proceeding, and other plan that makes use of the content of the 1999 Memo in any way; and (h) the original 1999 Memo received by MHS and every iteration of the 1999 Memo.

2. Documents not already produced by you in response to request #1 and relating to the use, publication, or disclosure of the content of the 1999 Memo by you or any other Defendant in this case for any purpose, including, but not limited to: (a) use, publication, or disclosure of the content of the 1999 Memo in any docketed filing

Initially, even without reviewing the subparts of Fouad's discovery requests for document production and interrogatories, which seem replete with separate and distinct inquiries, he has requested more than he was authorized by the court to propound. In total, it appears that Fouad has propounded at least 32 requests for production of documents and 125 interrogatories in blatant disregard for the prescribed aggregate limits.[6] Thus, Fouad has demanded 7 more requests for

---

or other filing in any proceeding whether or not under seal and in any administrative proceeding whether or not confidential; (b) use, publication, or disclosure of the content of the 1999 Memo in evaluating, planning, or pursuing litigation hold letters, threats, or claims. including claims relating to the Dragonetti Act against Plaintiff or any other person or party; (c) use, publication, or disclosure of the content of the 1999 Memo relating to A&G or to any other person relating to any media or public relations strategy of MHS; and (d) use, publication, or disclosure of the content of the 1999 Memo to any other persons.

(Doc. 370, Exhibits 1, 6). Likewise, the requests served on the MHS designee contained substantially similar language to that quoted above. (See Doc. 370, Exhibit 3). The fact that virtually all defendants received the same requests does not render Fouad's discovery demands compliant with our March 9, 2020 order.

[6] We reach these figures as follows: in terms of his requests for production of documents, Fouad served each of the 12 MHS defendants with two requests, the MHS designee with four requests, and each of the EG Defendants with two requests. Thus, in the aggregate, Fouad has served 32 requests for production of documents on all defendants—at least 7 more than he is allowed. For interrogatories, Fouad served each of the 12 individual MHS defendants with 9 interrogatories, the MHS designee with 5, and each of the EG Defendants with 6. Thus, in the aggregate, Fouad has served 125 interrogatories on all defendants—five times the aggregate limit set by our March 9, 2020 order. We note that this is a very conservative estimate since it does not take into account the compound nature of many of these discovery demands.

production of documents and 100 more interrogatories than he is permitted under our March 9, 2020 order. Based on these figures alone, it is without question that a protective order is warranted in this case.

Moreover, Fouad's argument that he complied with the limits set by our order because he served each defendant with a conservative number of requests containing the same or common language blatantly defies the logic behind our order. When defining the limits of discovery in this case, we:

> carefully considered the competing and contrasting views of the parties. Specifically, we recognize that the defendants have recommended that no discovery be undertaken, while the plaintiff proposed serving up to 10 written discovery demands on each defendant, *a process which could result in the issuance of more than 150 written discovery demands*. In order to reconcile these competing views, we have authorized 7 depositions each, the number of depositions proposed by the plaintiff, while permitting 25 written discovery demands for each party, the default number of written discovery demands permitted by the rules of this court for full merits discovery in most cases. We note that these are aggregate limits for both parties.

(Doc. 348) (emphasis added). Despite this order's guidance, we are faced with a situation in which Fouad has persisted in doing that which we had explicitly proscribed when we issued our order—Fouad has issued close to 150 written discovery demands by serving written discovery on each defendant in this case. These aggregate limits were designed to prevent excessive and one-sided discovery obligations from being thrust upon the defendants in this case. Thus, quite clearly, a protective order is warranted.

In defining the scope of this protective order, we reiterate and reemphasize the terms of our March 9, 2020 order: each side is entitled, in the aggregate, to 25 interrogatories, 25 requests for production of documents, 25 requests for admissions, and 7 depositions, each of which include subparts. To be quite clear, this means that each side may propound one discovery request upon one individual party, which constitutes one discovery request. For example, Fouad could propound one request for production of documents upon the Milton Hershey School's designee requesting "documents and communications relating to the 1999 Memo, including, but not limited to the interception, acquisition, or any other way obtaining of the 1999 Memo at the Hotel Hershey or anywhere else," which would count for one of his available requests. He could not then propound this same request, phrased in the same or substantially similar manner, upon Jarad Handelman, for instance, and expect it to count as the same request; indeed, because he has served two individuals, despite the fact that he served each with the same request, he has served two requests.

In addition to this clarification, we reiterate that this memorandum opinion serves to further narrow and refine the scope of discovery for these parties. To this end, the parties are directed to limit their discovery to garnering facts concerning two simple questions: whether the 1999 Memo was purloined or misappropriated and whether it is subject to some valid claim of privilege by Fouad. We make this finding since the threshold issue in Fouad's motion for termination sanctions

revolves around whether this document was privileged and had been stolen. If this document was not misappropriated or not subject to some form of privilege, our inquiry is at an end. Only after these threshold determinations have been made and met in the affirmative should the parties take up the question of what subsequent use was made of this document. In our view, this limitation and narrow tailoring eliminates or stays many of Fouad's subparts within his requests for production of documents[7] and most of Fouad's interrogatories,[8] the subjects of these motions for a protective order.

We recognize that this bifurcation may alter Fouad's strategy and encourage more selective choices for what discovery requests Fouad wishes to serve upon

---

[7] Indeed, of his original requests for production of documents, we believe the only remaining requests available to Fouad would be requests for "Documents and communications relating to the 1999 Memo, including, but not limited to: (a) the interception, acquisition, or any other way obtaining of the 1999 Memo at the Hotel Hershey or anywhere else; . . . (c) the details of how, when and from whom the 1999 Memo was obtained by MHS; . . . and (h) the original 1999 Memo received by MHS[.]"

[8] Specifically, we believe the only remaining interrogatories are: "Interrogatory No. 1: Describe in reasonable detail how you came into possession of the 1999 Memo, including, but not limited to, the date or dates on which it was obtained, the identity of the person or persons who provided it, the employment status and affiliations with MHS or the Hotel Hershey of the person or persons who provided it, the form or forms in which it was provided, and all current contact information and employment details for all persons who provided it and all persons who received it wherever they may be contacted or employed now. . . . . [and] Interrogatory No. 9: Explain in reasonable detail your understanding of how MHS obtained the 1999 Memo, including when you first became aware that the 1999 Memo was not obtained by MHS through a document subpoena or a request for production of documents in a legal proceeding."

which defendant(s). To resolve this issue, we will grant the defendants' motion for a protective order in its entirety and not require the defendants to further respond to any of Fouad's initial requests for production of documents or interrogatories to the extent that they have not yet responded. For Fouad's part, we will allow him to propound 25 requests for production of documents, 25 interrogatories, 25 requests for admissions, and 7 depositions which comply with all of the directives laid out in this memorandum opinion.[9] We will grant Fouad 20 days from the date of this memorandum to re-serve the defendants with these discovery requests, and we will grant the defendants 20 days after receiving these requests to respond.

To ensure the equity of this new arrangement, we will also allow the defendants to propound 25 requests for production of documents, 25 interrogatories, 25 requests for admissions, and 7 depositions which comply with all of the directives laid out in this memorandum opinion. We will grant the defendants 20 days from the date of this memorandum to re-serve the plaintiff with these discovery requests, and we will grant the plaintiff 20 days after receiving these requests to respond.

---

[9] This discovery is not granted in addition to discovery already authorized by prior orders. This memorandum opinion supplants prior rulings on discovery limits and serves as the parties' template moving forward with this case. To the extent that either party believes they need more discovery in light of this new, extremely narrow scope of discovery, such requests should be filed with this court for our review accompanied by a showing of good cause.

Thus, any additional, selective, narrowly focused and targeted discovery must be propounded by June 30, 2020 and responded to by July 20, 2020. We prescribe this scheduling acknowledging that "courts have broad discretion to manage the discovery process, and can expedite or otherwise alter the timing and sequence of discovery." Canal St. Films v. Does 1-22, No. 1:13-CV-0999, 2013 WL 1775063, at *2 (M.D. Pa. Apr. 25, 2013). See Malibu Media LLC v. Doe, No. 1:15-CV-1129, 2015 WL 3795948, at *2 (M.D. Pa. June 18, 2015). Moreover, discovery on this narrow question has to date been accompanied by extraordinary, unreasonable delay. All parties have decried this delay, while blaming others for the delay. This fixed and firm schedule therefore addresses the parties' mutual concerns that discovery proceed forward promptly. Finally, recognizing that there may be a substantial overlap between any new discovery request and the prior requests propounded by the parties we are confident that much of the investigative work necessary to fully respond to discovery has already been accomplished.

### b.  **The Plaintiff's Motions for a Protective Order, (Docs. 406, 408), Will be Granted, in Part, and Denied, in Part.**

Fouad seeks a protective order to delay the timing of the noticed deposition of the plaintiff, (Doc. 406), and the deposition of one of the plaintiff's experts, Samuel Stretton, (Doc. 408), in light of the current health crisis caused by COVID-19. In addition, Doc. 408 seeks a motion to quash the Defendants' subpoena for Stretton's deposition and a protective order to prevent the EG Defendants from

taking Stretton's deposition before a final report has been issued since Fouad alleges that discovery is ongoing, the only report issued thus far is a preliminary one, and the Federal Rules of Civil Procedure prohibit parties from taking experts' deposition before final reports issue. (Doc. 408). Further, Fouad appears to hold some belief that the EG Defendants plan to depose Stretton multiple times after subsequent reports are issued, and accordingly seeks to foreclose the EG Defendants from pursuing this alleged scheme. (Id.)

To the extent that Fouad wishes to delay the depositions of the plaintiff, we find that this motion is now largely moot in light of our May 26, 2020 order temporarily staying the depositions of the plaintiff and one of his experts pending oral argument on June 12, 2020 to resolve the discovery motions which are the subject of this memorandum opinion. (Doc. 418). The parties should reschedule this deposition at a mutually convenient date and time to occur within the 90 days following the issuance of this opinion and order, on or before September 7, 2020. To this end, if necessary in light of the continuing public health crisis, the parties may request to conduct this deposition using nontraditional means, i.e., via video recording or telephonically,[10] if possible. In our view, Fouad's motion for a

---

[10] It appears that the parties briefly considered conducting Fouad's deposition while he remains abroad in Tokyo, but quickly rejected this as an option due to the vast differences in time zones. At the outset, we note that Fouad, who has brought this case, must be prepared to sit for depositions relating to the very serious allegations he has made, and should be prepared to return to the United States for this purpose.

protective order as to the plaintiff's deposition, (Doc. 406), is completely moot, so we need not discuss it further below.

Thus, we turn to Fouad's request that we quash the Defendants' subpoena for Stretton's deposition or stay Stretton's deposition until a final report has been issued. We find that these requests are without merit and will be denied. Fouad states that "the EG Defendants' subpoena is premature under Rule 26(b)(4)(A) standards because Plaintiff has not yet produced the final expert report, as expressly contemplated by Rule 26(a)(2)(B)." (Doc. 408). We find that this misconstrues the Federal Rules.

Rule 26(b)(4)(A) states that: "A party may depose any person who has been identified as an expert whose opinions may be presented at trial. If Rule 26(a)(2)(B) requires a report from the expert, the deposition may be conducted only after the report is provided." This rule does not distinguish between preliminary and final reports. It merely states that "the deposition may be conducted only after the report is provided." In this case, a report has been provided by an individual that Fouad has

---

However, we would also suggest that, in order to continue to advance this case and the important issues therein, the parties could consider scheduling this deposition via videoconference or other remote communication technology between the hours of 7:00 – 10:00 p.m. Eastern Time (8:00 – 11:00 a.m. Tokyo time) or 7:00 – 9:00 a.m. Eastern Time (8:00 – 10:00 p.m. Tokyo time) if Fouad is unable to return stateside within the timeframe prescribed for his deposition in this memorandum opinion. If his deposition must be conducted remotely, it can be conducted over the course of a few days in this fashion to allow for full development of his testimony.

identified as his expert, which thus triggers the ability for an opposing party to depose the expert providing the report.

Further, Rule 26(a)(2)(B) provides:

Unless otherwise stipulated or ordered by the court, this disclosure [of which experts a party plans to use] must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

Indeed, as courts have stated,

Parties are required to disclose the identity of potential expert witnesses, accompanied by a written expert report containing "a complete statement of all opinions to be expressed and the basis and reasons therefor" and "the data or other information considered by the witness in forming the opinions," within the time frames set out in Federal Rule of Civil Procedure 26. Fed. R. Civ. P. 26(a)(2)(B). Where additional relevant information becomes available such the initial

> expert report is rendered "incomplete or incorrect," a party is obligated to supplement or correct the initial disclosure by filing a supplemental report before the deadline for pretrial disclosures. Fed. R. Civ. P. 26(e).

In re Safeguard Scientifics, 2004 U.S. Dist. LEXIS 23494, *3-4 (E.D. Pa. 2004).

Here, Fouad has identified Stretton as one of his experts expected to opine on at least one issue in this case. Fouad has not indicated that he does not plan to use this expert at trial. Thus, the Federal Rules of Civil Procedure allow the defendants to depose this expert since he has issued a report. Whether this report has been designated as "final" is immaterial. Indeed, many experts state that their reports are based on the facts provided to them and are subject to updates as new facts are uncovered and relayed to them. Thus, the alleged "preliminary" nature of this report does not preclude the defendants from deposing Fouad's expert at this time.

Moreover, we note that Fouad's apparent objections to certain documents requested by the EG Defendants in advance of Stretton's deposition are documents which were required to be disclosed within the report itself. Specifically, Fouad appears to object to the EG Defendants' subpoena in Request #5 which seeks "(i) a complete statement of all opinions [Stretton] will express and the basis and reasons for them; and (ii) the facts or data considered by the witness in forming them." (Doc. 408). Indeed, these requests were required to be included in Stretton's report under Federal Rule of Civil Procedure 26(a)(2)(B) ("The report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons

for them; [and] (ii) the facts or data considered by the witness in forming them[.]"). Thus, Fouad's motion to quash the subpoena to depose Stretton is denied. To the extent that Fouad seeks to preclude the defendants from deposing this expert indefinitely, he may not do so unless he forfeits the use of this expert and the corresponding report.

We note, however, in light of our modified scope of discovery, that the defendants should, for this stage of discovery, consider whether it is necessary to depose Stretton since there may be little merit to deposing an expert opining on the alleged improper use of the 1999 Memo when the preliminary questions in this case are whether this document was stolen at all, a fact which appears presumed in Stretton's report, and whether the document is subject to any valid privilege.

Finally, to the extent that the defendants seek sanctions against Fouad, his counsel, his expert, and their related law firms, this request is denied for lack of a factual record on which to make required determinations. We make this denial without prejudice to the defendants filing a separate motion addressing their concerns at the close of all discovery so that we may take up this issue on a more fulsome record.

C. <u>**Motions to Compel**</u>

   a. <u>**Fouad's Motions to Compel Discovery, (Docs. 260, 261, 262, 263, 269, 270, 376) Will be Granted, in Part, and Denied, in Part.**</u>

As an initial matter, we note that several of Fouad's motions to compel are subject to dismissal under the local rules of this court. Specifically, Docs. 260, 261, 262, 263, 269, and 270 were never accompanied by a brief in support thereof as required by Local Rule 7.5.[11] These motions were filed on December 18 and 19 of 2019. Thus, almost six months have passed since these motions were filed without any action by Fouad. Therefore, by operation of Local Rule 7.5, these motions are deemed withdrawn and we need not address them further.

Turning next to Fouad's omnibus motion to compel discovery, (Doc. 376), he seeks the following: an order directing the Defendants (1) to comply with our prior order to produce initial disclosures relating to the provenance of the 1999 Memo,[12] (2) a vast expansion of our previously prescribed narrowly tailored scope of

---

[11] This Rule provides that: "Within fourteen (14) days after the filing of any motion, the party filing the motion shall file a brief in support of the motion. . . . . If a supporting brief is not filed within the time provided in this rule the motion shall be deemed to be withdrawn." Local Rule 7.5.

[12] Due to the passage of time in this case, the Defendants' objection that Fouad's motion to compel is premature is now moot. By this point, we expect that the Defendants will have produced such requested discovery or filed a motion for a protective order to prevent them from needing to respond. Seeing no protective order on the docket, to the extent that the Defendants have not responded, they will be required to respond. Based on our decision to severely limit discovery in this case, we find the Defendants' other defenses largely moot.

discovery, and (3) for this court to compel the defendants to respond, without objection, to all discovery requests that he has already propounded upon them. Fouad's requests strike us as in some respects contradictory and equivocal. As to these second and third requests, in essence, Fouad seeks to have this court determine that the need for narrowly tailored and focused discovery was an error in judgment and that the defendants are not entitled to object to any of the discovery requests that he has served upon them. Thus, Fouad seeks broad, unfettered discovery from the Defendants with unconditional compliance for all of his demands. Yet, with respect to the Defendants' initial disclosures, which largely mirror and replicate Fouad's own suspicions regarding the vast array of parties allegedly implicated in the purported plan to misappropriate and conceal the 1999 Memo, he complains that these responses are too broad and that he has accordingly not been able to appropriately plan or prepare his discovery to gain fruitful results.[13] Fouad makes this complaint despite himself having identified the same individuals as having potential information relevant to this lawsuit.

---

[13] For instance, the MHS Defendants identified the following individuals in their initial disclosures that may have discoverable information useful to their defense: (1) "Plaintiff F. Frederic Fouad concerning the allegations in his Sanctions Motion and related filings (e.g., Docs. 241, 242, 265, 280, 293)"; (2) "Any individual identified by Plaintiff or other parties in their initial disclosures relating to Plaintiff's Sanctions Motion;" (3) "Any individual identified in any discovery responses or depositions in relation to Plaintiff's Sanctions Motion." (Doc. 376, Exhibit 2).

This complaint is precisely that which we wished to avoid when setting our initial narrow scope of discovery for these parties. Rather than grant Fouad's curious request to broaden the scope of discovery available to these parties, which would only result in more ambiguous and broad discovery responses that would be equally unhelpful to Fouad, we will instead narrow and focus the available field of information that the parties should pursue, as described above. Specifically, moving forward, the parties should focus their discovery efforts solely on whether this 1999 Memo was ever stolen—an important, fundamental, and indeed largely overlooked fact that the plaintiff appears to presume—and whether it is subject to any valid claim of privilege. To this end, Fouad's requests to broaden the scope of discovery and preclude the Defendants from objecting to all discovery requests that he has served thus far are denied, and his request for more narrowly focused initial disclosures is granted. Fouad should re-serve these initial disclosures limited in scope in accordance with this memorandum opinion within the next 20 days, and the Defendants should respond 20 days after receipt thereof. To ensure reciprocal discovery, the Defendants are likewise entitled to re-serve new requests for initial disclosures limited in scope in accordance with this memorandum opinion within the next 20 days, and the Plaintiff shall respond 20 days after receipt thereof.

### b. **The Defendants' Motions to Compel Discovery, (Docs. 390, 399), Will be Granted, in Part, and Denied, in Part.**

The EG and MHS Defendants each seek an order compelling Fouad to produce, without objection, answers to their interrogatories and requests for production of documents that they served earlier this year after we directed the parties to engage in mutual, carefully tailored discovery. (Docs. 390, 399). According to the defendants, Fouad has not produced any information responsive to any discovery requests that have been served on him.

The EG Defendants seek documents and information relating to the provenance of the 1999 Memo, including its fax cover sheet. (Doc. 391, Exhibit F). In particular, the EG Defendants would like Fouad to produce the original copy of his 1999 Memo along with its fax cover page. For their part, the MHS Defendants seek documents and information relevant to Fouad's alleged legal representation of the Milton Hershey School Alumni Association ("MHSAA") and his communications with this group, Fouad's fax records, and his stay at the Hotel Hershey in 1999 in addition to the fax cover sheet for the 1999 Memo. (Doc. 404, Exhibit B). These motions are granted to the extent that the requested discovery is relevant to the question of whether the 1999 Memo was stolen and whether Fouad can assert any form of privilege.

In reaching this result we note that Fouad responds to these requests with an assertion of privilege and allegations of overbreadth. We find Fouad's assertions of

privilege to be ambiguous and without a discernable privilege log. In particular, Fouad does not specify what kind of privilege he invokes that would protect this 1999 Memo. To the extent that he asserts an attorney work-product privilege, he should be aware that the burden of demonstrating the existence of a privilege and that it has not been waived rests on the party asserting the privilege. In re Grand Jury (OO-2H), 211 F. Supp. 2d 555, 557 (M.D. Pa. 2001) (Judge Rambo). Likewise, the party claiming work product immunity bears the burden of showing that "the materials in question 'were prepared in the course of preparation for possible litigation.' " Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 138 (3d Cir. 2000). Here, in both instances, the burden rests on Fouad.

Communications are protected under the attorney-client privilege when "(1) the legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection may be waived." In re Impounded, 241 F.3d 308, 316 n.6 (3d Cir. 2001). Further, as Fouad concedes, the privilege belongs to the client and can be waived by the client. Therefore, if a representative of MHSAA voluntarily disclosed the memo to the defendants, that act may well constitute a waiver and this privilege may take flight.

The work product doctrine, in turn, is governed by Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides that:

(A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

(i) they are otherwise discoverable under Rule 26(b)(1); and

(ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

(B) Protection Against Disclosure. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3). Generally, "voluntary disclosure to one's adversary of documents protected by the work-product privilege waives the privilege." Montgomery County v. MicroVote Corp., 175 F.3d 296, 304 (3d Cir. 1999) (citing Westinghouse v. Republic of the Philippines, 951 F.2d 1414, 1424 (3d Cir. 1991)).

The test for determining whether a document was prepared in anticipation of litigation is "where in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1258 (3d Cir. 1993). Courts generally divide this test into two prongs:

the documents were prepared (1) at a time when litigation was reasonably foreseeable; and (2) primarily for the purpose of litigation. See United States v. Rockwell International, 897 F.2d 1255, 1266 (3d Cir. 1990); see also Muse-Freeman v. Bhatti, No. 07-3638, 2008 WL 2165147, at *1 (D.N.J. May 21, 2008). However, the Third Circuit makes clear that the materials must be prepared in anticipation of litigation, and not in the ordinary course of business. Id. Otherwise, the privilege does not apply. Id.

With these substantive requirements and policy considerations in mind, the party asserting the privilege bears the burden of proving that the privilege applies to a particular communication. See Joe v. Prison Health Servs., 782 A.2d 24, 31 (Pa. Commw. 2001); see also In re Grand Jury, 603 F.2d 469, 474 (3d Cir. 1979); SEPTA v. CaremarkPCS Health, L.P., 254 F.R.D. 253, 259 (E.D. Pa. 2008) ("The party asserting the attorney-client privilege 'bears the burden of proving that it applies to the communication at issue.' ") (quoting Sampson v. Sch. Dist. of Lancaster, 262 F.R.D. 469, 2008 WL 4822023, at *3 (E.D. Pa. Nov. 5, 2008)). In this regard, "[t]he burden of establishing the elements of the privilege can be met only by an evidentiary showing based on competent evidence and cannot be discharged by mere conclusory or *ipse dixit* assertions." Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, L.L.C., 202 F.R.D. 418, 423 (E.D. Pa. 2001). "Rarely, if ever, will the submission of documents to the court for *in camera* inspection be adequate to

prove the existence of the elements necessary to establish the applicability of the privilege." Delco Wire & Cable, Inc. v. Weinberger, 109 F.R.D. 680, 688 (E.D. Pa. 1986). Instead, "a party claiming the privilege must present record evidence, such as affidavits, and sufficient facts to bring the communication at issue within the narrow scope of the privilege." Wise Investments, No. 01-3458, 2002 U.S. Dist. LEXIS 22263, at *5 (citing Delco Wire & Cable, Inc., 109 F.R.D. at 688).

Notably, for purposes of the instant discovery dispute, the "attorney-client 'privilege does not shield documents merely because they were transferred to or routed through an attorney.' " Smithkline, 232 F.R.D. at 478 (quoting Resolution Trust Corp. v. Diamond, 773 F. Supp. 597, 600 (S.D.N.Y. 1991)). Accordingly, in order to invoke properly the attorney-client privilege, the party seeking to prevent disclosure "must clearly demonstrate that the communication in question was made for the express purpose of securing legal not business advice." AAMCO Transmissions, Inc. v. Marino, Nos. 88-5522, 88-6197, 1991 U.S. Dist. LEXIS 13326, *9 (E.D. Pa. Sept. 24, 1991).

While we find that these defense discovery demands are proper relevant lines of inquiry given the issues raised by Fouad in his motion, and acknowledge the hurdles that Fouad faces in asserting claims of privilege, we will permit Fouad a final opportunity to assert privilege claims, provided that he does so in the manner required by law. For purposes of this case, if Fouad wishes to claim some form of

privilege, he should, in the first instance, promptly prepare a privilege log identifying all relevant, but privileged, documents he possesses and we should be provided with some evidentiary showing in support of this assertion that would enable us to evaluate this claim on its merits, rather than in the abstract fashion that we have been presented thus far.

Finally, Fouad presents his claims of overbreadth in a vacuum without identifying how the defendants' requests are overbroad or what information he should not be required to produce. Given the narrow, focused scope of discovery which we are ordering, these vague overbreadth claims will be denied. Thus, the defendants' motions to compel are accordingly granted, in part, and denied, in part.

### D.   The Plaintiff's Motions to Strike, (Docs. 400, 402), Will be Denied.

Fouad has also filed motions that seek to strike a number of defense briefs, alleging that the defendants are engaging in "gimmicks" to evade word counts prescribed by the local rules. Rule 12(f) of the Federal Rules of Civil Procedure, which governs motions to strike pleadings, serves a specific and narrow purpose and provides, in part, that:

> (f) Motion to Strike. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

Fed. R. Civ. P. 12(f).

" 'The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.' Natale v. Winthrop Resources Corp., 2008 U.S. Dist. LEXIS 54358 (E.D. Pa. July 9, 2008). Relief under Federal Rule of Civil Procedure 12(f) is generally disfavored. Fiorentino v. Cabot Oil & Gas Corp., 750 F. Supp. 2d 506, 509 (M.D. Pa. 2010). Thus, while rulings on motions to strike rest in the sound discretion of the court, Von Bulow v. Von Bulow, 657 F. Supp. 1134, 1146 (S.D.N.Y. 1987), in practice, courts should exercise this discretion and strike pleadings only when those pleadings are "redundant, immaterial, impertinent, or scandalous" and unfairly prejudicial to the opposing party. Ruby v. Davis Foods, Inc., 269 F.3d 818, 820 (7th Cir. 2001). For purposes of Rule 12(f): " 'Immaterial matter is that which has no essential or important relationship to the claim for relief. Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question. Scandalous matter has been defined as that which improperly casts a derogatory light on someone, most typically on a party to the action. Scandalous pleading must "reflect cruelly" upon the defendant's moral character, use "repulsive language" or "detract from the dignity of the court." ' Donnelly v. Commonwealth Fin. Sys., No. 07-CV-1881, 2008 WL 762085, at *4 (M.D. Pa. Mar. 20) (internal citations omitted)." Zaloga v. Provident Life & Acc. Ins. Co. of Am., 671 F. Supp. 2d 623, 633 (M.D. Pa. 2009).

When considering motions to strike pleadings, courts are enjoined to bear in mind that "motions to strike under Rule 12(f) are highly disfavored." Hope Now, 2011 WL 883202, at *1 (citing Garlanger v. Verbeke, 223 F. Supp. 2d 596, 609 (D.N.J. 2002)) ("Because of the drastic nature of the remedy, . . . motions to strike are usually 'viewed with disfavor' and will generally 'be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.' " (citing Tonka, 836 F. Supp. at 218). Indeed, motions to strike are further disfavored because they are often brought by the movant "simply as a dilatory tactic." Hope Now, 2011 WL 883202, at *1 (citing Waste Mgmt. Holdings v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001)); see also Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1381 (3d ed. 2004) (observing that "[m]otions to strike a defense as insufficient are not favored by the federal courts because of their somewhat dilatory and often harassing character.").

Although the Rule permits the striking of redundant, immaterial, impertinent or scandalous matter contained within a pleading, " 'a motion to strike should not be granted unless the presence of the surplusage will prejudice the adverse party.' " Hope Now, 2011 WL 883202, at *1 (citing Symbol Techs., Inc. v. Aruba Networks, Inc., 609 F. Supp. 2d 353, 359 (D. Del. 2009); see also Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1381 (3d ed. 2004) "[E]ven when

technically appropriate and well-founded, Rule 12(f) motions often are not granted in the absence of a showing of prejudice to the moving party."). "Prejudice occurs when the challenged pleading confuses the issues or is so lengthy and complex that it places an undue burden on the responding party." Karpov. v. Karpov, 307 F.R.D. 345, 348 (D. Del. 2015). This is not the case here.

The plaintiff bases his motions to strike on allegedly overlong briefs filed by the defendants which contain what he characterizes as word count "gimmicks" that purportedly omit spaces between words and punctuation to artificially decrease the overall word count. Notably, while Fouad levels this complaint, he does not provide us with what he would consider to be the "true" word count, and apparently leaves us to ferret out this information ourselves.[14] While the plaintiff has alleged prejudice caused by "wear[ing] Plaintiff down, disadvantag[ing] him, and unfairly impos[ing] burden and cost on Plaintiff[,]" (Doc. 400), the plaintiff has not described how these prejudices have taken place through a filing that allegedly surpasses our word limit restrictions by an undefined amount. Indeed, while he has alleged that these briefs

---

[14] Our own review of the briefs in question do not disclose any gross anomalies in the text of the pleadings, but reveal some anomalies in collateral citations. For example, the EG Defendants are advised that "(Doc.357, p.15; Doc.363, pp.11-14; Docs.362,362-3)" is not the proper way to cite these docket numbers (they should appear as Doc. 357, p.15); that spaces are appropriate within, before, and after an ellipsis, i.e., ". . ."; that space is needed within WestLaw and Lexis citators in unreported opinions, i.e., 2018 WL 3995697, *1 and 2020 U.S. Dist. LEXIS 29364, *1; and that a space belongs between an ending and beginning parenthesis, i.e., ". . .) (. . .". (Doc. 427, at 5).

are overlong, he has not informed us of the actual word count of these briefs, only stating that these word count "tricks" cause the word count to "far surpass the number certified by counsel," leaving us to ascertain this information for ourselves. It is the movant's responsibility to provide information demonstrating prejudice and how the pleadings are overlength, and he has done neither in this case. This is an insufficient showing to grant such extreme and highly disfavored motions, and they will accordingly be denied.

While we reach this result, we close with two observations. First, the parties' submissions often descend into hyperbolic personal invective. If the parties follow our instructions and cease this practice, compliance with word counts should present little difficulty in the future. Second, this on-going debate over word counts reveals just how far afield these parties have gotten from the merits issues that divide them. We are committed to resolving this case on the merits. The parties should be too. A necessary corollary flows from this proposition. While the parties are free to engage in word-count recriminations, and we will address those concerns as they are presented to us, we are not inclined to have word-count litigation supersede the evaluation of the legal merits in this case.

Finally, we note that the mutually destructive discovery process engaged in by the parties, which has entailed more than a dozen motions relating to what should be simple straightforward factual discovery, is antithetical to the stated interests of

the parties and the cardinal virtue of our legal system, "the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Accordingly, in order to avoid the unnecessary delay attendant with motions practice in this field, instead of filing serial discovery motions, IT IS ORDERED that beginning on June 24, 2020, the parties will submit a weekly joint status report which shall be no greater than 10 pages in length (5 pages per side), briefly identifying any outstanding discovery issues, and the parties' positions with respect to these issues. We will then exercise our discretion in addressing these issues, determining which issues can be resolved by the court based upon the parties' submissions, and which issues may require further briefing, argument, or motions practice.

An appropriate order follows.

## III.  <u>Order</u>

Accordingly, for the foregoing reasons, these discovery motions are GRANTED, in part, and DENIED, in part, as follows:

Exercising our discretion, IT IS ORDERED that sanctions discovery is initially limited to two questions: whether the 1999 Memo, which forms the basis of Fouad's sanctions motion, was in any sense privileged and whether it was ever stolen—a key issue since Fouad seeks sanctions for *stolen* document use. To this end, we will order the bifurcation of the discovery process in this case as follows: the parties should first endeavor to determine whether the 1999 Memo was ever

stolen and whether this document is subject to any valid privilege held by Fouad. Only after these determinations have been made, and both answered in the affirmative, should the parties delve into what use has been made of this document. We will set a separate discovery schedule for the second half of discovery, relating to the use of the memo, should the parties need to progress to this stage.

In accordance with this directive, IT IS ORDERED that:

1. The Defendants' motions for a protective order, (Docs. 369, 371), are GRANTED since Fouad has previously exceeded the discovery limitations set by the court and the defendants are not required to further respond to any of Fouad's initial requests for production of documents or interrogatories to the extent that they have not yet responded. However, recognizing that this order may change the focus of discovery on Fouad's part, we will allow him to propound 25 requests for production of documents, 25 interrogatories, 25 requests for admissions, and 7 depositions which comply with all of the directives laid out in this memorandum opinion.[15] We will grant Fouad 20 days from the date of this memorandum to re-serve the defendants with these discovery requests, and we will grant the defendants

---

[15] This discovery is not granted in addition to discovery already authorized by prior orders. This memorandum opinion supplants prior rulings on discovery limits and serves as the parties' template moving forward with this case. To the extent that either party believes they need more discovery in light of this new, extremely narrow scope of discovery, such requests should be filed with this court for our review accompanied by a showing of good cause.

20 days after receiving these requests to respond. To ensure the equity of this new arrangement, we will also allow the defendants to propound an additional 25 requests for production of documents, 25 interrogatories, 25 requests for admissions, and 7 depositions which comply with all of the directives laid out in this memorandum opinion. We will grant the defendants 20 days from the date of this memorandum to re-serve the plaintiff with these discovery requests, and we will grant the plaintiff 20 days after receiving these requests to respond. Thus, any additional, selective, narrowly focused and targeted discovery must be propounded by **June 30, 2020** and responded to by **July 20, 2020**.

2. The Plaintiff's motions for a protective order, (Docs. 406, 408), are DENIED and the parties should reschedule Fouad's deposition at a mutually convenient date and time to occur within the 90 days following the issuance of this opinion and order, on or before **September 7, 2020**, while re-examining the necessity of the Stretton deposition in light of the more focused nature of the discovery, since Stretton appears to have no first-hand knowledge of the facts in this case.

3. The Plaintiff's motions to compel discovery, (Docs. 260, 261, 262, 263, 269, 270, 376) are GRANTED, in Part, and DENIED, in Part. Specifically, Docs. 260, 261, 262, 263, 269, and 270 which were never accompanied by a brief in support thereof as required by Local Rule 7.5 are DENIED. Further, moving

forward, the parties should focus their discovery efforts solely on whether this 1999 Memo was ever stolen—an important, fundamental, and indeed largely overlooked fact that the plaintiff appears to presume—and whether it is subject to any valid claim of privilege. To this end, Fouad's requests to broaden the scope of discovery and preclude the Defendants from objecting to all discovery requests that he has served thus far are denied, and his request for more narrowly focused initial disclosures is granted. Fouad should re-serve these initial disclosures limited in scope in accordance with this memorandum opinion within the next 20 days, and the Defendants should respond 20 days after receipt thereof. To ensure reciprocal discovery, the Defendants are likewise entitled to re-serve new requests for initial disclosures limited in scope in accordance with this memorandum opinion within the next 20 days, and the Plaintiff shall respond 20 days after receipt thereof.

4. The Defendants' motions to compel discovery, (Docs. 390, 399), are GRANTED, in Part, and DENIED, in Part. We find this discovery to be relevant, and with the narrow focus on discovery directed by the court we reject Fouad's overbreadth objections. While we find that these defense discovery demands are proper relevant lines of inquiry given the issues raised by Fouad in his sanctions motion, and acknowledge the hurdles that Fouad faces in asserting claims of privilege, we will permit Fouad a final opportunity to assert privilege claims, provided that he does so in the manner required by law. For purposes of this case, if

Fouad wishes to claim some form of privilege, he should, in the first instance, promptly prepare a privilege log identifying all relevant, but privileged, documents he possesses and we should be provided with some evidentiary showing in support of this assertion that would enable us to evaluate this claim on its merits, rather than in the abstract fashion that we have been presented thus far.

5. The Plaintiff's motions to strike, (Docs. 400, 402), are DENIED.

6. Further, in order to avoid the unnecessary delay attendant with motions practice in this field, instead of filing serial discovery motions, IT IS ORDERED that beginning on **June 24, 2020**, the parties will submit a weekly joint status report which shall be no greater than 10 pages in length (5 pages per side), briefly identifying any outstanding discovery issues, and the parties' positions with respect to these issues. We will then exercise our discretion in addressing these issues, determining which issues can be resolved by the court based upon the parties' submission, and which issues may require further briefing, argument, or motions practice.

7. All discovery described in this order shall be competed on or **September 10, 2020.** A hearing on the termination sanctions motion will then be held on **September 22, 2020 at 9:00 a.m.,** at which time the parties may present evidence

and argument relating to whether the 1999 Memo was ever stolen and whether this document is subject to any valid privilege held by Fouad.

So ordered this 17th day of June, 2020.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge